UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

JOANNE NOEL HIGGINS,                                    Index No.: 1:21-cv-04203-LJL

                            Plaintiff,

            -against-

                                                        **AMENDED**
                                                        <u>**COMPLAINT**</u>

120 RIVERSIDE BOULEVARD AT TRUMP PLACE
CONDOMINIUM, THE BOARD OF MANAGERS OF 120
RIVERSIDE   BOULEVARD    AT   TRUMP   PLACE             **JURY**
CONDOMINIUM,        MICHAEL       RITCHKEN,             **TRIAL**
INDIVIDUALLY AND AS PRESIDENT OF THE BOARD             **REQUESTED**
OF MANAGERS OF 120 RIVERSIDE BOULEVARD AT
TRUMP PLACE CONDOMINIUM, AKAM ASSOCIATES,
INC., RONALD STARCIC, CARLOS A. GALLIANI and
NANCY GALLIANI,

                            Defendants.

-------------------------------------------------------------------- X

      1.     Plaintiff Joanne Noel Higgins (hereafter also referred to as "Higgins"), by her

counsel, Rodriguez-McCloskey, PLLC, as and for her Amended Complaint in this action against

defendants: (i) 120 Riverside Boulevard At Trump Place Condominium; (ii) The Board of

Managers of 120 Riverside Boulevard at Trump Place Condominium (the "Board of Managers");

(iii) Michael Ritchken, individually and as president of the Board of Managers; (iv) AKAM

Associates, Inc. ("AKAM"); (v) Ronald Starcic; (vi) Carlos A. Galliano; and (vii) Nancy Galliano

(collectively referred to below as "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

2.     In or about 2016, Higgins, a disabled person as defined by state and federal law, began searching for a new home. Higgins had hoped to start a family in the home and to make it her forever home.

3.     Higgins was looking for an apartment that was move-in ready, even though she anticipated doing some work to make the apartment a "home" and to accommodate her disabilities. Ultimately, she decided on condominium unit 3N, located at 120 Riverside Boulevard at Trump Place ("Trump Place Condominium"). Higgins, who is permanently disabled, desired a lower floor residence to accommodate her vertigo and other ailments associated with a traumatic brain injury she had suffered earlier in her life.

4.     During the final walkthrough prior to her purchase of the Home,[1] Higgins observed water staining at the window in the bedroom.

5.     At no point did Higgins observe the existence of an active or present leak in the unit alerting her to the presence of this defect in the Home prior to closing.

6.     In order to induce Higgins to close, the attorney for the sellers, defendants Carlos A. Galliani and Nancy Galliani (the "Sellers"), signed a sworn statement in which he attested he had spoken to Nancy Galliani, and she confirmed that there was no leak from the window as said leak had been repaired several years earlier. Moreover, Higgins relied on the direct representation in the rider to the contract of sale made by Sellers stating that the unit would be delivered free from leaks and had not had any leaks in the twelve months prior to closing.

7.     Higgins was not at any point aware of the leak defect in the Home prior to closing, she was only aware of water staining which she did not attribute to an active leak due to the

---

[1] Unit 3N at 120 Riverside Boulevard at Trump Place Condominium shall be referred to as the "Home" herein.

statements of Sellers through their attorney and the representations within the contract rider.

8.     Relying on the fraudulent representations made by the Sellers concerning the water damage and status of leaks in the unit, Higgins proceeded to closing where she purchased the Home in an all-cash transaction.

9.     After the closing, Higgins began to move her belongings into the Home, believing, based on the Sellers' representations, that the window was without material defect.     In fact, soon after her purchase the window began to leak and, upon information and belief, the leak stemmed from water penetration from the facade of the Building.

10.     Higgins immediately contacted defendants Trump Place Condominium, the Board of Managers and AKAM about the leak in an effort to resolve the issue. Despite years of requests for repair, to date, the leaks continue, have developed mold, have caused extensive damage to both the Home and Higgins and have rendered Higgins homeless. To make matters even more egregious, the Board of Managers and AKAM have embarked upon a campaign to discredit and discriminate against Higgins which has resulted in severe personal injury to Higgins and her inability to use her Home for any purpose.

11.     Higgins seeks declaratory, injunctive, and equitable relief, as well as monetary damages and attorneys' fees, costs, and expenses to redress Defendants' unlawful disability discrimination and retaliation against Higgins, in violation of Federal Fair Housing Amendments Act of 1988 ("FHA"), Title VIII of the Civil Rights Act, 42 U.S.C. §§ 3604(c); 3604(f)(2), 3604(f)(3)(B), 3617, and 3631; the New York State Executive Law (the  "Executive Law") § 296, New York State Civil Rights Law, § 40, and the Administrative Code of the City New York (the "Administrative Code"), § 8-107, among other things.

12.     As explained more fully below, Trump Place Condominium, the Board of

Managers, and AKAM own, lease, operate, manage and/or control an apartment building, which is a dwelling and housing accommodation, and which violates the above-mentioned laws.

13.     At all times relevant hereto, defendants Trump Place Condominium, Board of Managers, AKAM, Ritchken, and Starcic had actual notice of Higgins's disabilities and have discriminated against Higgins with respect to the apartment building located at 120 Riverside Boulevard, New York, New York (referred to herein as "120 Riverside Blvd." or the "Building"), and the Home by refusing to make requested reasonable accommodations and modifications for Higgins' disability.

14.     Trump Place Condominium, Board of Managers, AKAM, Ritchken, and Starcic made a decision to ignore the explicit legal requirements that required them to make the Building, including Higgins' Home therein, accessible.

15.     Trump Place Condominium, Board of Managers, AKAM, Ritchken, and Starcic decided to violate the law and harm Higgins, despite Higgins' repeated pleas that they make the building accessible for the disabled; with the presumption that they would never be caught or required to respect Higgins' civil rights. In doing so, Trump Place Condominium, Board of Managers, AKAM, Ritchken, and Starcic made a calculated, but unlawful decision that Higgins does not deserve rights equivalent to those afforded to other non-disabled persons.

16.     This action seeks to right that wrong via recompensing Higgins and making Trump Place Condominium fully accessible so that Higgins can finally receive both the full and equal opportunity to enjoy her home, and the goods, services, privileges, advantages, and accommodations that Trump Place Condominium provides to those who are not disabled.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 3604 and 28

U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Higgins' rights under the FHA among other statutes. The Court has supplemental jurisdiction over Higgins' related claims arising under the New York State and City laws pursuant to 28 U.S.C. § 1367(a).

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the Defendants' acts of discrimination, retaliation, and negligence herein occurred in this District and Defendants' apartment Building and Higgins' Home therein that are the subject of this action are located in this District.

## PARTIES

19.     Higgins is a resident of the State and City of New York. Until her ouster from the Building due to mold infestation, Higgins resided in Unit 3N at 120 Riverside Boulevard at Trump Place Condominium, New York, New York 10069.

20.     At all times relevant to this action, Higgins has been and remains disabled following a severe past injury in which Higgins suffered a traumatic brain injury which has, in turn, caused a number of ongoing disabilities including vertigo, hearing and vision impairment, severe headaches, and post-traumatic stress disorder.

21.     Upon information and belief, defendant Trump Place Condominium, was at all relevant times a condominium association built in 2004 by the Trump organization existing under Article 9-B of the Real Property Law which is charged with operating and maintaining 120 Riverside Boulevard. Upon information and belief, Trump Place Condominium is authorized to do business in the State of New York.

22.     The Board of Managers of 120 Riverside Boulevard at Trump Place Condominium, was authorized to act on behalf of the unit owners of Trump Place Condominium in accordance

with the Offering Plan, By laws and House Rules of the Condominium. Upon information and belief, the members of the Board of Managers are residents of the State of New York.

23.     Michael Ritchken, is the president of the Board of Managers, charged with making decisions which impact Trump Place Condominium and its unit owners. Upon information and belief, Ritchken is a resident of the State of New York.

24.     AKAM Associates, Inc., is the managing agent of Trump Place Condominium, and, upon information and belief, is charged with operating and maintaining Trump Place Condominium. Upon information and belief, AKAM is authorized to do business in the State of New York.

25.     Ronald Starcic is an agent of AKAM, and upon information and belief is responsible for the day-to-day maintenance issues at Trump Place Condominium. Upon information and belief, Starcic is a resident of the State of New Jersey.

26.     Defendants Trump Place Condominium, the Board of Managers, Michael Ritchken, AKAM Associates, Inc., and Ronald Starcic shall collectively be referred to as the "Condo Management Group."

27.     The Sellers, Carlos A. Galliani and Nancy Galliani, are former unit owners of 120 Riverside Boulevard, Unit 3N, New York, New York 10069. Upon information and belief, the Sellers are residents of the State of Alabama.

## STATEMENT OF FACTS

28.     Shortly after taking occupancy of the Home, Higgins vacated and temporarily lived in San Francisco while her Home Unit was being renovated to accommodate her disabilities among other things including retrofitting the bathroom for handicap use.

29.     Higgins told the building manager, Patrick Crotty, that she could not live in her Home during construction due to her disability, as the noise could trigger both headaches and

vertigo, as well as symptoms of her post traumatic stress disorder.

30.     With this knowledge as well as the fact that Higgins had previously disclosed her disability, no one on the board or in management advised Higgins, her real estate agent, or her lawyer that there was significant construction that was soon to begin in the lobby.

31.     During the annual board meeting on November 29, 2016, the first one since Higgins had purchased her Home, Higgins learned of upcoming lobby renovations at the Building.

32.     The Home is located on the floor directly above the lobby.

33.     When Higgins expressed concern about the impact of the lobby renovations on her ability to live in her Home, given her proximity and her disability, Higgins was assured that the Condo Management Group would be using sound reducing methods and would meet with Higgins in advance of any building work and that she would have nothing to worry about insofar as upcoming construction.

34.     When the construction of the lobby began in June 2017, it was done without notice to Higgins, and without any precautions to minimize disruption to Higgins.

35.     Higgins became aware of the start of lobby renovations by a harsh chemical smell, followed days later by a sudden onslaught of incessant noise and vibrations, causing her walls, windows, light fixtures, and furniture to shake.

36.     On June 9, after one week had passed, Higgins sent an email with a video recording of the construction noises and vibrations in her Home to the property manager for 120 Riverside Blvd., Patrick Crotty, asking how long the noise would continue.

37.     Higgins' inquiries continued as work continued, but her concerns about the impact of the noise, dust, and vibrations to her own health went unanswered.

38.     On June 15, 2017, Higgins sent another email, with another video, to Mr. Crotty showing the chandelier inside her Unit swinging and shaking like an earthquake had struck and capturing the sounds of banging and demolition reverberating through the walls. In this email,

Higgins stated she would find a lawyer if she did not get a response.

39.    The property manager met with Higgins the very next day but insisted that no one had ever promised to use noise reduction techniques, and that they were very familiar with her disability.

40.    On Saturday, June 24, 2017, Higgins sent yet another email complaining that, after being specifically told she would receive a schedule alerting her in advance what days the lobby renovation would be noisy, and promised there would be NO construction on weekends, as the House Rules forbade that, Higgins was awoken on that Saturday morning by loud lobby renovation noises.

41.    On June 28, 2017, another property manager for 120 Riverside Blvd., Basile, sent an email, advising that the demolition set for the next day was being rescheduled to July 5, to accommodate the contractor's schedule.

42.    On July 19, Basile offered in an email to have people move Higgins's work on computers to a spare room or offered her the sum of $250.00 per day for the two days, July 24 and 25, and that he expected the new demolition to continue.

43.    Higgins replied on July 21 that she knew of no hotel in Manhattan with a pool and a health club that would be available in late July on less than one week's booking notice for a price under $250.00.

44.    Higgins was forced to search for hotels at the lowest end of pricing and sent the information she obtained to Mr. Crotty. In this email, just as in earlier emails to the property manager, Higgins requested a meeting with the Board of Managers for a discussion of the situation.

45.    At no time was Higgins' request for a meeting accommodated.

46.    The lobby construction problems continued to plague Higgins; on August 29, 2017, having been explicitly told that no power tools would be in use that day, the wall behind her glass topped desk in her Home where she was working started shaking, her window popped open, loud

noises began, and she suffered a full-blown panic attack.

47.     Higgins sent an email alerting the building manager, Mr. Crotty, to the use of extremely loud, reverberating power tools despite his promise, and that her work towards preparing for an important business meeting the next day was thwarted.

48.     The email that Higgins sent that day also asked the property manager to tell her who on the Board of Managers was requesting her medical records, when they had never even arranged to meet her.

49.     Later that evening the property manager, Mr. Crotty, responded and told her he had cancelled the sidewalk drilling that had been scheduled for the next day to accommodate her need to work, and that there would be no such disturbance the next day.

50.     However, the very next day, August 30, Higgins awoke with vertigo, caused by drilling noises. She recorded the sounds and emailed the clip to Mr. Crotty.

51.     Mr. Crotty's email bounced back with an automated message: "I am currently out of office and will be returning on Wednesday September 6."

52.     On that date, September 6, 2017, a chemical smell began seeping into Higgins' Home, and the Fire Department responded to the building at 6 pm. FDNY advised the building to air out the lobby and to bring in ventilation machines/equipment and told Higgins to open her windows.

53.     Higgins reported this in a lengthy email in which she aired three months of concerns, grievances, and the injury to her health, and suggested that she may have to sell her Unit.

54.     Although the Board of Managers had never met or spoken with Higgins, they immediately had their law firm send a letter to her entitled: "Complaints Related to Work at 120 Riverside Boulevard at Trump Place," which did not address the substance of her complaints, but only provided what would be their future defenses, should she choose to sue.

55.     Concerned about the impact on her health from her exposure to the toxic fumes and

odors, as she was suffering from headaches, nosebleeds, a rash, and a sore throat, Higgins requested, and received the name of the products that had been used in the lobby: a varnish remover and a paint thinner.

56.     Higgins researched the products and forwarded the warnings and hazards to the property manager, requesting that the information be shared with the Condo Management Group as a matter of safety.

57.     Higgins sustained respiratory difficulties as a result of exposure to the fumes used by the Condo Management Group's contractors.

58.     Higgins was subsequently seen by an ENT specialist, who wrote a letter dated September 11, 2017, documenting her patient's "anxiety and severe allergies to fumes in the setting of construction in the building," and Higgins provided the doctor's letter to the Condo Management Group.

59.     During the next month, Higgins spent much of her time out of her Home due to the fact that the smells from the lobby construction lingered and had permeated the clothes in her closet and furniture. The property manager, Mr. Crotty was aware of the problem and took Higgins' front door key from the front desk lockbox on numerous occasions to inspect her Home after he had installed an ozone machine and an air purifier machine in an attempt to remedy the noxious air quality.

60.     During the ensuing months of lobby renovations, machines were used indoors to cut marble or stone, releasing dust; additionally, paints, varnishes, and the like were used without appropriate ventilation, allowing fumes and odors to spread to and remain in Higgins's Home.

61.     In 2017 Higgins's personal and professional life were disrupted repeatedly as she had to switch from one hotel to another, take taxis, return home for clothes, food, mail, and work. In a "spirit of cooperation" the attorneys for the Condo Management Group offered Higgins a hotel allowance. Higgins managed to get a friend and family rate through a friend of hers and was able

to stay at a hotel in the city for $250 to $350 a night.

62.     But Higgins was out of her home for approximately 100 days between 2017 and 2018, checking in and out of various hotels in Manhattan and upstate New York, where rates were less expensive, staying with friends, and even sleeping in her car on one occasion.

63.     Higgins spent well over $5,000.00 in out-of-pocket expenses, and lost income of more than $10,000.00 as a result of the inability of the Condo Management Group to provide reasonable accommodations to her. Although the Condo Management Group paid for her hotel stays a few times, most of the time, Higgins had to bear the burden of living away from her Home.

64.     Higgins' problems with the Condo Management Group continued. On October 12, 2017, the FDNY again responded to the Building on a complaint of odor smoke, because of which Higgins had already gone to the hospital.

65.     On that morning, Higgins was in her Home on the phone with the property manager, and while being yelled at by the property manager, Higgins had a panic attack, lost consciousness, and fell to the floor. At 10:50 am, Mr. Crotty retrieved her key from the Building lockbox and went to assist her.

66.     When the ambulance arrived in response to his call, one of the Building employees told the EMTs that Higgins is "crazy;" when she heard the EMTs calling the job in "as responding to an 'EDP' [emotionally distressed person]" Higgins refused to go with the EMTs.

67.     Higgins went to a hospital's emergency department on her own for medical attention because she had experienced severe vertigo, was vomiting, and had a bruise on her cheek from falling to the floor.

68.     That afternoon, a friend of Higgins came to the Building to check on conditions while Higgins was in the emergency room. Higgins' friend called 911, as she encountered strong fumes in the Home and her throat began to burn, her chest began to tighten, and she began to cough.

69.     The NYC Fire Department responded at 2:11 pm and discovered elevated CO levels in the lobby and the third floor above the lobby floor where Higgins resides, both in her Home and in the unit next door. The fire department vented both floors, and the CO levels dropped. Their report states: "**Construction on first floor and Lacquer finish seemed to be causing the problems. This has been an ongoing issue. Woman who was evacuated had left prior to FDNY arrival. New venting procedures were put in place to alleviate any future issues. Readings were zero when we left.**"

70.     The FDNY left 2 hours later, at 4:16 pm.

71.     The stress of the construction, which caused Higgins repeated displacement from her Home, inability to work, exacerbation of her vertigo, allergic reaction to chemicals, headaches, anxiety, and other symptoms of PTSD, all contributed to Higgins' ever-increasing levels of frustration and fear.

72.     At or about that time, for no apparent reason, the Building Manager, Patrick Crotty, upon information and belief, an employee of the Condo Management Group, asked Higgins in person to provide a personal financial statement to the Building. Higgins had her financial advisor draft a letter, dated October 9, 2017, and emailed it to Patrick Crotty on October 10, 2017. Her statement revealed that she was living on a fixed income.

73.     On November 16, 2017, Higgins went to the front desk of the Building to report that the chemical odor was coming into her Home and complained that Mr. Crotty had not returned her calls for a week. She learned then Mr. Crotty was no longer employed as the property manager. She asked if someone would check the Media Room.

74.     Handyman, Nick Kuka, upon information and belief, an employee of the Condo Management Group, said there was no smell, called Higgins a "liar" called her "motherf***er" in Albanian which Higgins understood and he falsely stated in front of others that the FDNY found no fumes when they were last there, and that she was making s**t up, and that she should "stop

with the bull s\*\*t."

75.     Upset, Higgins responded, loudly, that "management has not got back to me" and then adding "I don't f\*\*king care who hears me; you need to air out the Media Room."

76.     On the next afternoon, November 17, as Higgins was again at the lobby front desk trying to learn the source of the fumes, a resident, Jill Rosenblum, approached the desk with her dog.

77.     Thinking that Rosenblum was on the Board of Managers, Higgins asked her to go smell the media room, saying, "you wouldn't even want to put your dog in a room with this smell."

78.     Rosenblum retorted that, "you have mental issues" and "need to get back on your medication."

79.     On November 28, 2017, during the annual meeting of the unit owners  (the "Nov. 28 Owners Meeting"), Higgins asked to speak and expressed her frustration about the detrimental impact on her health caused by her exposure to the extreme noise, vibrations, reverberations, shaking, and exposure to dust and noxious fumes emanating from the lobby renovation that had begun six months earlier and which was still incomplete at the time of the unit owners' annual meeting. Since the lobby renovation had commenced in June 2017, Higgins had repeatedly submitted, by email, telephone, and in-person, complaints to the property manager for the Building that the construction conditions had caused loud noises and vibrations in her Home, caused her Home windows, walls, chandelier, and furnishings to shake, filled her Home with noxious odors, had triggered bouts of vertigo, headaches, and tinnitus, and impaired her health by causing her respiratory distress and allergic reactions from fumes, resulting in her visiting Urgent Care, and ultimately forcing her out of her Home and home office.

80.     Higgins was forced to stay out of her Home, intermittently, over ninety days between June and November 2017.

81.     As a result of the lobby renovations being conducted without appropriate

safeguards, Higgins suffered multiple episodes of severe vertigo and tinnitus, headaches, respiratory distress, anxiety, and passed out on one occasion.

82.     Within one week of the Nov. 28 Owners Meeting, the Board of Managers brought a Strategic Lawsuit Against Public Participation ("SLAPP") against Higgins, seeking to permanently silence her from any discussion of the building or her Home Unit except to the "on-duty concierge" or the "building manager," a remedy which clearly would be in violation of the Higgins' right of free speech, and/or seeking One Million Dollars in damages. That lawsuit was settled with no adjudication to either party.

83.     Upon information and belief, at the time, Higgins' then counsel did not realize the extent of the damage to Higgins, nor that the claims were brought in an effort to intimidate and harass her into silence.

84.     During the Unit Owner's annual meeting in 2018, an unidentified male who was, upon information and belief, an ex-member of the Board of Managers cut Higgins off while she was speaking, confronting her with the fact that she had once "sued the building where she lived before."

85.     The inference was that Higgins' personal injury lawsuit in which she sued her then-landlord had been a phony lawsuit, and another member of the Board of Managers then added that Higgins moved to the Building so as to be able to sue it as well.

86.     Higgins purchased the Unit because the Building met the criteria, she had set for herself as a disabled woman: an established, full-service building, not under construction, with an indoor pool and a health club, the latter two items were important to allow Higgins to manage the impact of her various disabilities and medical conditions.

87.     Included in Higgins' application to the Board of Managers prior to her purchase was her disclosure that she is permanently partially disabled from a back injury and a traumatic brain injury that cause her pain, vertigo, headaches, some cognitive problems, anxiety, and other

symptoms from post-traumatic stress disorder ("PTSD").

88.     Higgins also advised the Condo Management Group that she would be using her Home as her office, in order to conduct her business as a graphic, fashion, and makeup designer.

89.     On or about January 2019, a trainer at the health club at the Building began to harass Higgins by screaming very loudly inside the fitness room, knowing loud noises caused her great stress. Higgins complained about the harassment to the general manager of the health club, but instead of trying to help Higgins in any way, retorted by saying, "aren't you f*****g deaf? So why are you complaining about noise?"

90.     On or about April 10, 2019, due to the harassment Higgins was receiving at the health club at the Building, she was forced to join Equinox Sports Club in an attempt to avoid any further conflicts with trainers or other members of the health club at the Building and hoping that she could return to the health club that autumn.

91.     On or about November 10, 2019, a resident and an ex-member of the Board of Managers grabbed Higgins' left arm while she was operating a fitness machine, which caused Higgins to have anxiety, panic attack, and she began to cry. Higgins reported the incident to the health club manager Rosalina Delarosa.

92.     On or about March 9, 2020, Higgins experienced huge amounts of noise and the ceiling of her Home shook so badly that her chandelier began rattling and shaking dangerously due to renovation work being performed in an apartment one floor above Higgins' Home and also on the 14th floor. Despite Higgins' request to the Condo Management Group that she be provided with notice of renovation work that would create loud noises in light of her disability, the Condo Management Group ignored Higgins' requests and furthermore ignored all requests by Higgins that the renovation work be performed according to the By-Laws so as not to disturb other unit owners. The loud noises and vibrations caused by the construction persisted for several months and the loud noises were continuous throughout that time.

93.     On or about May 25, 2020, a noxious chemical odor from an unknown source invaded the third-floor hallway and lobby of the Building The odor could be smelled inside Higgins' Home, in the third-floor hallway, inside the elevators, and in the Building lobby. Numerous people who were in any of those areas of the Building could all smell the noxious odor and even employees of the Condo Management Group, including the doorman on-duty at the time, and they all acknowledged the presence of the odor.

94.     For several after Higgins moved in, she experienced a leak in her window. Moreover, marijuana smoke fumes emanating from another unit continued throughout that time. When Higgins complained, she was once again threatened with a new SLAPP lawsuit by the Condo Management Group. Neither of these issues were ever resolved or even addressed by the Condo Management Group.

95.     On or about late 2020, Higgins began feeling ill, having shortness of breath and other respiratory issues. Believing she had contracted the COVID-19 virus, Higgins received numerous COVID-19 tests. While her COVID-19 test results all said Higgins had not contracted that virus, her respiratory issues worsened, eventually leading her to resort to having her sister take her to the hospital. Ultimately, Higgins's doctor determined that her symptoms were caused by exposure to mold.

96.     On or about June 8, 2016, Higgins purchased her Home. She hired contractors to perform renovations and retrofit it to assist her when her medical conditions manifest, including installation of a handicap bathroom and other items which assist her when she is unable to walk due to vertigo. During the renovation, the contractors discovered water penetration in the walls near the bedroom window and notified Higgins of said water penetration.

97.     On or about July 9, 2016, upon learning of the water penetration to Higgins' Home, Higgins notified the then property manager Patrick Crotty, managing agent of the Building, AKAM.

16

98.     The Condo Management Group continued to fail to conduct any repairs to Higgins'
Home despite her requests that they repair the window leak and water damage to her walls at unit
owner meetings for the Building.

99.     For years, Higgins' numerous requests that the Condo Management Group repair
the water damage to Higgins' Home and identify and seal the source of the ongoing water
penetration went ignored. Although multiple property managers did visit Higgins' Home to inspect
the conditions, the Condo Management Group insisted that Higgins hire her own contractor to
remedy the problem.

100.    To date, Higgins' bedroom window continues to leak, and the problem remains
unabated. Indeed, on several occasions Building staff refused to come to Higgins' Home to observe
the water leaking from her window. The Condo Management Group has and continues to turn a
blind eye to the leaks and their underlying cause.

101.    On or about January 6, 2021, Starcic emailed Higgins a proposed agreement which
required Higgins to forfeit her rights to her Home in exchange for the Condo Management Group's
payment for the costs of repairing the leak to the window in her Home. The agreement also
provided that Higgins would pay for the cost of repairing items behind the wall to her Home, the
costs for which the Condo Management Group is responsible.

102.    Furthermore, upon information and belief, Higgins' neighbor in the unit one floor
above her, 4N, who had a similar window leak issue, was not required to sign a similar agreement
with the Condo Management Group in which she would have to forfeit all rights to use of her unit
and pay for work on additional items behind her unit apartment walls for which the Condo
Management Group is responsible under the By-Laws and Declaration of 120 Riverside Blvd.

103.    Higgins sought the assistance of her insurance carrier in repairing the window and
underlying leak.

104.    On or about February 26, 2021, a contractor provided by Higgins' insurance carrier

17

discovered mold behind the sheetrock behind her bedroom walls near the window when they began demolition for repair and renovation of the portions of her Home that had sustained water damage. Because the mold discovered was greater than 10 square feet, the contractor put the repair project on hold and hired a hygienist to provide a protocol for the mold removal.

105.    Higgins' insurance carrier's contractor contacted a hygienist to conduct an inspection of Higgins' Home for mold and collect samples to test for mold. On or about March 2, 2021, the hygienist conducted an inspection of Higgins' Home and the resulting report found that the area of Higgins bedroom near the window exhibited an abnormal and above-background total airborne fungal spore presence. The report further details that the swab sample taken at the drywall ceiling adjacent to the bedroom window indicated the presence of fungal spores and potential growth and amplification at the location tested.

106.    On or about April 9, 2021, Higgins allowed the Condo Management Group's agents, specifically two engineers, one hygienist, and defendant Ronald Starcic to access her Home to perform an inspection of the water damage and mold growth.

107.    The inspection performed by the Condo Management Group was fraught with many issues. They unilaterally decided which areas from which their hygienist would collect swab samples and refused to collect any samples from the blinds that had previously been hanging in front of the bedroom window which was attached to the portion of drywall where Higgins' hygienist report had identified mold growth.

108.    As part of the inspection, the Condo Management Group was supposed to conduct a water infiltration test of the window by spraying water on it and monitoring whether and where water was leaking. This particular test was performed wholly improperly. The water pressure the Condo Management Group used in conducting the test was far weaker than what is standard practice for similar tests for water infiltration.

109.    The Condo Management Group sent a letter dated April 26, 2021, in which they

baselessly claimed that there was no evidence of mold or an active water leak in the Home. In this letter, the Condo Management Group proposed installation of sealant along the concrete column joints at the head section of the window of the Home and sealing and fire stopping of all piping penetration.

110.    Higgins additionally learned from her insurance carrier that the Condo Management Group's attorneys contacted the insurance carrier and urged her to close Higgins' claim and allow them to do the minimal work they recommended. Upon information and belief, the carrier refused as the mold remediation would not be remedied in that manner.

111.    As a result of additional inspection by Higgins' contractors she learned, on May 3, 2021, that more mold was found in the window joint (inside the wall which the Condo Management Group is responsible for).

## FIRST CAUSE OF ACTION AGAINST CONDO MANAGEMENT GROUP
### (Violation of the Fair Housing Act)

112.    Higgins realleges and incorporates by this reference all allegations set forth in this Amended Complaint as if fully set forth herein.

113.    The Fair Housing Act 42 U.S.C. § 3601, et seq., enacted as Title VIII of the Civil Rights Act of 1968, amended in 1988, recognizes individuals with disabilities as a protected class.

114.    The Fair Housing Act imposes strict liability upon each of the property owners, the managing agent and their respective principals and employees.

115.    Higgins suffers a variety of conditions including vertigo, hearing and vision impairment from traumatic brain injury and thus has a disability within the meaning of the FHA. As a direct and proximate result of Higgins's disability, Higgins is particularly sensitive to loud noises, noxious fumes, and vibrations resulting from construction work as well as other harmful conditions such as mold.

116.    The Condo Management Group violated the FHA by not responding to Higgins'

19

requests for reasonable accommodations and by failing to make reasonable accommodations available for Higgins' disability.

117.    The Condo Management Group continuously practices a pattern of unlawful discrimination and retaliation against Higgins.

118.    When Higgins spoke out at a unit owner meeting regarding the debilitating effects of the Condo Management Group's lobby renovation construction work, the Condo Management Group retaliated against Higgins.

119.    The Condo Management Group has interfered with Higgins in the exercise and enjoyment of her rights to be free of discrimination and retaliation and the use of her Home and the common areas of the Building.

120.    The Condo Management Group has discriminated against Higgins by publishing notices and/or statements that indicate a preference, limitation or discrimination as to disability, or an intention to make any such preference, limitation or discrimination.

121.    As a direct and proximate result of Higgins' disability, the Condo Management Group has directly and indirectly, refused, withheld from, and denied Higgins the accommodations, advantages, facilities, and privileges that Higgins is entitled to – the rights to all of which the FHA seeks to protect from encroachment and violation.

122.    The Condo Management Group has discriminated and retaliated against Higgins in violation of the FHA by creating, fostering, condoning, accepting, ratifying, and otherwise failing to prevent or to remedy the discrimination and retaliation against Higgins.

123.    As a direct and proximate result of the Condo Management Group's unlawful discrimination and retaliation, in violation of the FHA, Higgins has, and continues to, suffer loss of use and enjoyment of her Home and the Building.

124.    As a direct and proximate result of the Condo Management Group's unlawful discrimination and retaliation, in violation of the FHA, Higgins has and continues to endure mental

anguish and emotional distress, including but not limited to depression, humiliation, stress, embarrassment, anxiety, loss of self-esteem, and self-confidence, as well as emotional pain and suffering.

125.    Higgins sustained damages from the Condo Management Group under the FHA, in an amount to be determined at trial but no less than $ 10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages, and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

### SECOND CAUSE OF ACTION AGAINST CONDO MANAGEMENT GROUP
### (Violation of the Administrative Code of the City of New York)

126.    Higgins realleges and incorporates by this reference all allegations set forth in this Amended Complaint as if fully set forth herein.

127.    Higgins suffers a variety of conditions including vertigo, hearing and vision impairment from traumatic brain injury and thus suffers from a disability within the meaning of the New York City Administrative Code § 8-102(16).

128.    The Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), also known as Local Law 85, clarified the scope of the Administrative Code in relation to the New York City Human Rights Law. The Restoration Act confirmed the legislative intent to abolish "parallelism" between the Administrative Code and the Federal and New York State anti- discrimination laws by stating as follows:

> The provisions of this title shall be *construed liberally* for the accomplishment of the uniquely *broad and remedial* purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed.

Restoration Act § 7, amending Administrative Code §8-130 (emphasis added).

129.    Administrative Code §8-130 is to be construed broadly in favor of Higgins to the

fullest extent possible. See, Albunio v. City of New York, 16 N.Y.3d 472 (N.Y.  Court of Appeals, March 31, 2011).

130.    The Administrative Code requires property owners, owners, and managing agents, to make reasonable accommodations for tenants with disabilities. Administrative Code § 8-102(17).

131.    Refusing to make reasonable accommodations for tenants with disabilities constitutes discrimination. Administrative Code §8-107 (15)(a).

132.    By, among other things, refusing to make reasonable accommodations and modifications, both in conducting renovation construction in the Building lobby and in effectuating repair work to eliminate water penetration into Higgins' Home and remedial work to remove all mold growth, for Higgins' disability, the Condo Management Group has established a discriminatory practice in violation of the Administrative Code §8-107(15)(a).

133.    The Condo Management Group discriminated against Higgins in violation of Administrative Code of the City of New York, § 8-107, and Local Law 58 by maintaining and /or creating an inaccessible housing accommodation, refusing to safely conduct lobby renovation work, refusing to accommodate Higgins' requests regarding noise, vibrations, and noxious fumes, as well as failing to repair Higgins' Home to prevent water penetration and mold growth therein.

134.    The Condo Management Group has discriminated against Higgins by circulating or posting statements that express a limitation, specification, or discrimination as to disability, or an intent to make any such limitation, specification, or discrimination. Administrative Code § 8-107(5)(a)(3).

135.    The Condo Management Group has and continues to subject Higgins to disparate treatment by directly and indirectly refusing, withholding, and denying reasonable accommodations, advantages, services, facilities, and privileges of their housing accommodation all because of disability in violation of Administrative Code § 8-107(5)(a)(2).

136.    The Condo Management Group discriminated against Higgins in violation of Administrative Code of the City of New York, § 8-107, and Local Law 58 by maintaining and/or creating an inaccessible housing accommodation.

137.    The Condo Management Group has discriminated against Higgins by circulating, posting or displaying written or printed communications, or notices to the effect that the accommodations, advantages, facilities and privileges of their place of accommodation shall be refused, withheld from or denied on account of disability. Administrative Code § 8-107(4)(a).

138.    The Condo Management Group has and continues to subject Higgins to disparate treatment by directly and indirectly refusing, withholding, and denying the accommodations, advantages, facilities, and privileges of their place of public accommodation all because of disability in violation of Administrative Code § 8-107(4).

139.    The Condo Management Group's failure to construct and maintain an accessible entrance from the public sidewalk to the Building constitutes disability discrimination in violation of the Administrative Code.

140.    The Condo Management Group discriminated against Higgins in violation of Administrative Code § 8-107(4), and Local Law 58 by maintaining and/or creating an inaccessible Building and an uninhabitable Home.

141.    As a direct and proximate result of the Condo Management Group's unlawful discrimination in violation of Administrative Code of the City of New York, Higgins has suffered, and continues to suffer emotional distress, including but not limited to humiliation, stress, embarrassment, and anxiety.

142.    The Condo Management Group's refusal to make 120 Riverside Blvd., including Higgins' Home within, fully accessible to Higgins is deliberate, calculated, egregious, and undertaken with reckless disregard to Higgins' rights under the Administrative Code.

143.    It would not impose an undue hardship on the Condo Management Group to make

the reasonable accommodations requested or to make their housing accommodation, and place of accommodation fully accessible. Administrative Code §8-102(18).

144.    By failing to comply with the law, the Condo Management Group has articulated to disabled persons such as Higgins that they are not welcome, objectionable, and not desired as tenants of the Building.

145.    The Condo Management Group has aided and abetted as well as attempted to aid and abet unlawful discrimination and retaliation against Higgins in violation of Administrative Code §8-107(6). The Condo Management Group has actually and actively participated in the unlawful discrimination and retaliation against Higgins.

146.    The Condo Management Group's unlawful discriminatory and retaliatory conduct constitute malicious, willful and wanton violations of the Administrative Code for which Higgins is entitled to an award of punitive damages. Administrative Code § 8-502.

147.    By refusing to make the Building, including the Home, accessible the Condo Management Group has unlawfully profited from their discriminatory conduct.

148.    Higgins sustained damages from the Condo Management Group because of its willful and/or reckless disregard for Higgins's rights under the Administrative Code, in an amount to be determined at trial but no less than $ 10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

### THIRD CAUSE OF ACTION AGAINST CONDO MANAGEMENT GROUP
#### (Violation of New York State Executive Law)

149.    Higgins realleges and incorporates by this reference all allegations set forth in this Amended Complaint as if fully set forth herein.

150.    Higgins suffers a variety of conditions including vertigo, hearing and vision impairment from traumatic brain injury and thus suffers from a disability within the meaning of

the Executive Law § 296(21).

151.     The Condo Management Group has engaged in a persistent and ongoing discrimination practice which has impacted Higgins in numerous adverse ways.

152.     By refusing to make reasonable accommodations for Higgins' disability, the Condo Management Group has committed a discriminatory practice in violation of the Executive Law §296(5).

153.     The Condo Management Group has discriminated against Higgins by refusing to make reasonable accommodations in its rules, policies, practices, or services that are necessary to afford Higgins equal opportunity to use and enjoy her housing accommodation. Executive Law §296(18)(2).

154.     The Condo Management Group has discriminated against Higgins by refusing to take reasonable steps and precautions in conducting renovation work on the Building lobby and refusing to perform repair work to prevent water penetration into Higgins' home to afford Higgins equal opportunity to use and enjoy her housing accommodation. Executive Law §296(18)(2).

155.     The Condo Management Group has discriminated against Higgins by circulating or posting statements that express a limitation, specification, or discrimination as to disability, or an intent to make any such limitation, specification, or discrimination. Executive Law §296(5)(3).

156.     The Condo Management Group has and continues to subject Higgins to disparate treatment by denying Higgins equal opportunity to use and enjoy her home, including the Building it is contained within, all because she is disabled.

157.     The Condo Management Group has actively aided and abetted each other in discriminating and retaliating conduct against Higgins in violation of Executive Law §296(6).

158.     The Condo Management Group discriminated against Higgins in violation of Executive Law by maintaining and/or creating an inaccessible apartment building and refusing to

take reasonable steps and precautions in conducting renovation work on the lobby and refusing to perform repair work to prevent water penetration into Higgins' home and rendering Higgins homeless as a result of their ongoing callous lack of concern for the wellbeing of Higgins.

159.    It would not impose an undue hardship or undue burden on the Condo Management Group to make the reasonable accommodations, modifications, and repairs requested and to make their Building fully accessible.

160.    The Condo Management Group discriminated against Higgins in violation of New York State Executive Law § 296(2), by maintaining and/or creating an inaccessible and discriminatory place of accommodation.

161.    The Condo Management Group has failed to make all readily achievable accommodations and modifications to remove barriers to access in violation of Executive Law § 296(2)(c)(iii).

162.    The Condo Management Group has also failed to take steps to ensure that Higgins is not excluded or denied services because of the absence of auxiliary aids and services in violation of Executive Law § 296(2)(c)(ii).

163.    In the alternative, the Condo Management Group has failed to provide Higgins with reasonable alternatives to barrier removal in violation of Executive Law § 296(2)(c)(iv). It would be readily achievable to make the Condo Management Group's place of accommodation fully accessible.

164.    The Condo Management Group has discriminated against Higgins by circulating, posting or displaying written or printed communications, or notices to the effect that the accommodations, advantages, facilities, and privileges of their place of accommodation shall be refused, withheld from or denied on account of disability. Executive Law §296(2)(a).

165.    As a direct and proximate result of the Condo Management Group's unlawful discrimination and retaliation in violation of New York State Executive Law, Higgins has suffered,

and continues to suffer emotional distress, including but not limited to humiliation, embarrassment, stress, and anxiety.

166.    The offering plan and the Condominium By-Laws for the Building both state: "The members and officers of the Board of Managers shall not be liable to the Unit Owners except for their own individual willful misconduct or bad faith actions or bad faith failures to act." (The Offering Plan p. 99)

167.    The acts of Ritchken were undertaken in bad faith and willfully. Indeed, Higgins attempted on multiple occasions to resolve these issues amicably with the Condo Management Group.

168.    Higgins has suffered damages in an amount to be determined at trial before a jury.

169.    Higgins sustained damages against the Condo Management Group because of its willful and/or reckless disregard for Higgins's rights under the Executive Law, in an amount to be determined at trial but no less than $ 10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

## FOURTH CAUSE OF ACTION AGAINST CONDO MANAGEMENT GROUP
### (Violations of New York State Civil Rights Laws)

170.    Higgins realleges and incorporates by this reference all allegations set in this Amended Complaint as if fully set forth herein.

171.    The Condo Management Group discriminated against Higgins pursuant to New York State Civil Rights Law.

172.    Consequently, Higgins is entitled to recover the penalty prescribed by Civil Rights Law §§ 40-c and 40-d, in the amount of $500 for each and every violation.

173.    Notice of the Condo Management Group's violations and this action has been served upon the Attorney General as required by Civil Rights Law § 40-d.

**FIFTH CAUSE OF ACTION AGAINST CONDO MANAGEMENT GROUP**
**(Retaliation Coercion Intimidation)**

174.    Higgins realleges and incorporates by this reference all allegations set in this Amended Complaint as if fully set forth herein.

175.    The peaceful enjoyment of one's home is a root concept of our society. This cause of action is simply about holding the Condo Management Group accountable for intentionally intruding upon the quietude of Higgins' home with strong-arm retaliation tactics to bully Higgins.

176.    The Condo Management Group, in whole or in part, engaged in unlawful conduct to coerce, intimidate, and threaten Higgins, as well as engaged in unlawful conduct to interfere with Higgins' exercise and enjoyment of her rights to complain of discrimination and seek enforcement of her rights protected by the FHA, Executive Law and Administrative Code.

177.    The Condo Management Group refused to take any steps to accommodate any of Higgins' reasonable requests that the Condo Management Group implement measures to reduce noise, vibrations, and noxious fumes in carrying out their renovation of the lobby of the Building, and effectively deprived Higgins from occupying her home.

178.    When Higgins spoke up at the unit owners meeting to make reasonable requests that were based on the effects of her disability and her sensitivity to fumes, noise, and vibrations, the Condo Management Group retaliated by pointing to the irrelevant fact that she had sued a building in which she previously lived.

179.    When Higgins lost consciousness, the Condo Management Group further retaliated by telling EMTs that Higgins was "crazy" so that the EMTs would treat Higgins as an emotionally distressed patient.

180.    The Condo Management Group has also retaliated by refusing to repair the leak on the facade of the Building which is causing water damage in Higgins' Unit.

181.    The Condo Management Group's reprehensible and outrageous conduct violates,

42 U.S.C. § 3631, 24 C.F.R. § 100.400(c)(2), Executive Law § 296(7), and the New York City Administrative Code.

182.    As a direct and proximate result of The Condo Management Group's unlawful discrimination and retaliation, Higgins has, and continues to, endure mental anguish and emotional distress, including but not limited to frustration, anger, stress, anxiety, and emotional pain and suffering.

183.    The Offering Plan and the Condominium By-Laws for the Building both state: "The members and officers of the Board of Managers shall not be liable to the Unit Owners except for their own individual willful misconduct or bad faith actions or bad faith failures to act." (The Offering Plan, p. 99)

184.    Higgins sustained actual and punitive damages from the Condo Management Group because of its willful and/or reckless disregard for Higgins' rights, in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

## SIXTH CAUSE OF ACTION AGAINST CONDO MANAGEMENT GROUP
### (Breach of By-Laws and Declaration)

185.    Higgins realleges and incorporates by this reference all allegations set in this Amended Complaint as if fully set forth herein.

186.    The Condo Management Group breached its obligations under the Trump Place Condominium By-Laws and Declaration by failing to properly maintain the exterior walls of the Building and to repair the water penetration issues culminating into mold infestation into the Unit.

187.    The offering plan for the Building states: "Damage to or destruction of any portion of the Building as a result of fire or other casualty shall be promptly repaired and reconstructed by the Board of Managers as nearly as practicable to the condition it was in before the casualty using

the proceeds of casualty insurance and/or other funds for that purpose, subject to various conditions as described in the By-laws." (The Offering Plan, p. 100)

188.    Under the By-laws for the Building, the "General Common Elements" include the "exterior walls of the Building excluding windows but including all facade and structural elements of exterior walls." (The Offering Plan, p. 346) The By-laws also state that the duties of the Board of Managers include "making ordinary repairs, restorations, additions and improvements to or alterations of the General Common Elements and making repairs to and restoration of the Property and/or to the 65th Street Public Access Area after damage or destruction by fire or other casualty, as a result of condemnation or eminent domain proceedings." (The Offering Plan, p. 387)

189.    Under the Condominium By-laws for the Building, the "Residential Common Elements" include "exterior windows, including without limitation, panes, casements, and frames in Residential Unit." (The Offering Plan, p. 347) The Condominium By-laws further state that the Board of Managers is responsible for "maintenance, repairs and replacements whether structural or non-structural ordinary or extraordinary to the 65th Street Public Access Area ("PAA") or the Public Access Easement ("PAE") thereon or the General Common Elements, Residential Common Elements or Non Residential Common Elements whether located inside or outside of the Units shall be made by the Board of Managers if concerning a General Common Element, the PAA or the PAE by the Residential Committee if concerning a Residential Common Element…" (The Offering Plan, p. 413) The offering plan and the Condominium By-Laws for the Building both state: "The members and officers of the Board of Managers shall not be liable to the Unit Owners except for their own individual willful misconduct or bad faith actions or bad faith failures to act." (The Offering Plan, p. 99)

190.    Higgins has been severely damaged as a result of the breaches of the offering plan,

By-laws, and Declaration for the Building.

191.    Higgins sustained damages from the Condo Management Group in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

## SEVENTH CAUSE OF ACTION AGAINST CONDO MANAGEMENT GROUP
### (Negligence)

192.    Higgins realleges and incorporates by this reference all allegations set in this Amended Complaint as if fully set forth herein.

193.    The Condo Management Group was aware of the existence of a water leak in the Home.

194.    The Condo Management Group did not take any affirmative steps to control the ongoing moisture issue in the Home, causing mold to develop.

195.    On or about February 2021, it was uncovered that significant mold was present behind the walls.

196.    Higgins has suffered from extensive medical issues as a result of the mold which have exacerbated her disabilities.

197.    The Condo Management Group was negligent in allowing the mold to occur in the Home.

198.    The mold rendered the Home dangerous, hazardous, and uninhabitable. Higgins is the owner of her Home where the mold exists. The mold may be originating from behind the wall.

199.    Because of the presence of mold in the air, Higgins inhaled the dangerous mold which caused personal injury and damage to Higgins' property.

200.    The Condo Management Group knew or should have known that mold was growing in the Home. The Condo Management Group was notified of the mold. The Condo Management Group failed to act promptly upon receiving notice of the mold.

201.    It is the Condo Management Group's duty to remove mold, correct the underlying water leaks that may be leading to mold problems and fix any ventilation problems that contribute to mold.

202.    Higgins's respiratory ailments are mold related. The Condo Management Group was at all relevant times aware of Higgins' ailment and failed to have the Unit remediated to the condition it was before the mold was discovered.

203.    As a result of the existence of mold and the dire medical ramifications Higgins has endured, she was forced to move out of her Home.

204.    To date, Higgins remains out of her Home while her Home remains impacted by the mold.

205.    Despite repeated assurances that this issue would be resolved, to date it has not been.

206.    The offering plan for 120 Riverside Blvd. states: "Damage to or destruction of any portion of the Building as a result of fire or other casualty shall be promptly repaired and reconstructed by the Board of Managers as nearly as practicable to the condition it was in before the casualty using the proceeds of casualty insurance and/or other funds for that purpose, subject to various conditions as described in the By-laws." (The Offering Plan, p. 100)

207.    Under the Condominium By-laws for 120 Riverside Blvd., the "General Common Elements" include the "exterior walls of the Building excluding windows but including all facade and structural elements of exterior walls." (The Offering Plan, p. 346) The Condominium By-laws

also state that the duties of the Board of Managers include "making ordinary repairs, restorations, additions and improvements to or alterations of the General Common Elements and making repairs to and restoration of the Property and/or to the 65th Street Public Access Area after damage or destruction by fire or other casualty, as a result of condemnation or eminent domain proceedings." (The Offering Plan, p. 387)

208.    Under the Condominium By-laws for 120 Riverside Blvd., the "Residential Common Elements" include "exterior windows, including without limitation, panes, casements, and frames in Residential Unit." (The Offering Plan, p. 347) The Condominium By-Laws further state that the Board of Managers is responsible for "maintenance, repairs and replacements whether structural or non-structural ordinary or extraordinary to the 65th Street Public Access Area ("PAA") or the Public Access Easement ("PAE") thereon or the General Common Elements, Residential Common Elements or Non Residential Common Elements whether located inside or outside of the Units shall be made by the Board of Managers if concerning a General Common Element, the PAA or the PAE by the Residential Committee if concerning a Residential Common Element…" (The Offering Plan, p. 413)

209.    The Condo Management Group has to date refused to provide its insurance claim information to Higgins or her insurance agent. Instead, it has attempted to force Higgins to patch up the walls in another strong-arm attempt to intimidate Higgins, although the mold has yet to be remediated and the water penetration has not been identified.

210.    Higgins sustained damages from the Condo Management Group's, in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

**EIGHTH CAUSE OF ACTION AGAINST CONDO MANAGEMENT GROUP**
**(Injunctive Relief))**

211.    Higgins realleges and incorporates by this reference all allegations set in this Amended Complaint as if fully set forth herein.

212.    Higgins will continue to experience unlawful discrimination and retaliation because of The Condo Management Group's failure to comply with the above-mentioned laws. Therefore, injunctive relief is necessary to order the Condo Management Group to alter and modify the Building, including the Home therein, as well the Condo Management Group's operations, policies, practices and procedures relating to the Building.

213.    Injunctive relief is also necessary to direct the Condo Management Group to make the Building readily accessible to and usable by Higgins in accordance with the above-mentioned laws.

214.    Injunctive relief is further necessary to order the Condo Management Group to provide auxiliary aids or services, modification of their policies, and/or provision of alternative methods, in accordance with the FHA, Executive Law and the Administrative Code.

215.    Injunctive relief is further necessary to order the Condo Management Group to implement policies against disability discrimination and retaliation and train all its employees and agents on these policies.

216.    Injunctive relief is further necessary to order the Condo Management Group to retain the services of an independent entity to monitor its compliance with the laws.

217.    Injunctive relief is further necessary to order the Condo Management Group to retain the services of an independent third-party managing agent.

**NINTH CAUSE OF ACTION AGAINST CONDO MANAGEMENT GROUP**
**(Declaratory Relief)**

218.    Higgins realleges and incorporates by this reference all allegations set in this

Amended Complaint as if fully set forth herein.

219.    Higgins is entitled to a declaratory judgment concerning each of the violations committed by the Condo Management Group against Higgins as to the policies, practices, procedures, facilities, goods, and services of the Condo Management Group.

## TENTH CAUSE OF ACTION AGAINST CONDO MANAGEMENT GROUP
### (Negligent Infliction of Emotional Distress)

220.    Higgins realleges and incorporates by this reference all allegations set in this Amended Complaint as if fully set forth herein.

221.    As the result of the negligent, reckless and careless conduct of the Condo Management Group, aforesaid, Higgins has suffered emotional distress.

222.    Higgins has lost consciousness, sustained debilitating panic attacks and anxiety, inability to concentrate, loss of equanimity, repeated bouts of extreme vertigo, loss of balance or dizziness, and uncontrollable bouts of crying caused by the negligent conduct of the Condo Management Group.

223.     Said negligence consists of the Condo Management Group's negligent acts and failure to act which exposed her to repeated, sudden and protracted periods of noise, vibrations and reverberations that shook the walls, ceiling, furniture and fixtures in her Home, as well as mold, dust and chemical odors.

224.    Higgins sustained damages from the Condo Management Group in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

## ELEVENTH CAUSE OF ACTION AGAINST SELLERS
### (Fraudulent Inducement)

225.    Higgins realleges and incorporates by this reference all allegations set in this

Amended Complaint as if fully set forth herein.

226.     Sellers made deliberate misstatements as to the condition of the Home being without leaks on more than one occasion for the purpose of inducing Higgins to purchase the Home.

227.     In Paragraph R6 of the rider to the contract for sale dated May 2, 2021, sellers represented "to the best of Seller's actual knowledge, there have not been any leaks into the Unit and Seller has not received written notice of any leaks from the Unit, during the past twelve months. The Unit shall be delivered free from any active leaks." A copy of the fully executed contract and rider is annexed hereto as Exhibit A.

228.     On June 8, 2021, attorney Marc J. Isaacs signed a sworn statement indicating "On June 8, 2016, I had a telephone conversation with Nancy Galliani who confirmed to me that the last leak into Unit 3N at 120 Riverside Boulevard was more than 3 years ago." A copy of the sworn statement is annexed hereto as Exhibit B.

229.     Sellers as prior owners of the unit had exclusive knowledge of the defects in the Home.

230.     Higgins relied on the misstatements in purchasing the Home.

231.     At no point prior to closing was Higgins on notice of the falsity of the representations made by the Sellers.

232.     At no point prior to closing was Higgins aware of the defect in the Home.

233.     Unbeknownst to Higgins, the Home was not worth the purchase price based on the material defects which were actively concealed by Sellers.

234.     Higgins was under no pre-existing legal obligation to purchase the Home.

235.     Had Sellers disclosed the material defects in the Home, as required by Real

Property Law § 462, Higgins would not have purchased the Home.

236.    But for Sellers fraudulent misrepresentation Higgins would not have suffered the damages resulting from her ownership of the Home.

237.    As a result of the deliberate misstatements made by Sellers, Higgins was fraudulently induced into purchasing the Home.

238.    The fraudulent statements of the Sellers were intended to and did obstruct Higgins from discovering the truth regarding the Home.

239.    Sellers misrepresentations regarding the leak in the Home has caused Higgins to make more than one claim with her insurance as the water entry continues to actively damage the work completed by contractors.

240.    As a result of the persistent water entry from the undisclosed defect in the Home, Higgins, who lives on a fixed income, has been unable to inhabit the Home and has and continues to incur significant financial losses, emotional and physical harm.

241.    Higgins has and continues to sustain damages against the defendants because of the Sellers' willful and/or reckless disregard for Higgins' rights, in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

## TWELFTH CAUSE OF ACTION AGAINST RONALD STARCIC
### (Slander Per-Se)

242.    Higgins realleges and incorporates by this reference all allegations set in this Amended Complaint as if fully set forth herein.

243.    On or about April 9, 2021, Defendant Starcic made oral defamatory false statements

regarding Higgins' state of mind and her disability and published them to third-party without authorization or privilege.

244.    On the day Defendant Starcic visited Higgins' Unit to conduct water inspection and mold growth he was accompanied by Thomas Eng from Lawrence Environmental; Ayman Zafar and Raul Mayta from Mayta & Sebastian Architecture. Also present at the inspection was one of Higgins' lawyers Solomon Lim.

245.    Throughout the inspection Starcic denigrated Higgins by calling her "crazy" to persons present at the inspection.

246.    During this time Higgins stepped out of her Home to go to her car. When she left, she used a walker to assist her; upon return, she did not have the walker with her. Seeing this as an opportune moment, Starcic turned to Higgins' lawyer and said, "one minute she needs a walker and another minute she does not," insinuating that Higgins' disability and the many symptoms caused by it were not genuine.

247.    Defendant Starcic knew his statements were false as he was aware of Higgins' disability and the statements were not authorized by Higgins. Starcic was negligent and his false statements were made without due regard that would normally be exercised by a reasonably prudent person in similar circumstances.

248.    Defendant Starcic's patently false statements regarding Higgins' mental state and disability made to persons who were there to conduct inspection were not made in jest. They were vilifying and disparaging as well as damaging to Higgins' reputation.

249.     Higgins sustained damages from the Condo Management Group in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will

continue to accrue during the pendency of this action.

## ATTORNEY'S FEES, EXPENSES AND COSTS

250.     In order to enforce Higgins' rights against the Defendants, Higgins has retained counsel and is entitled to recover attorney's fees, expenses, and costs pursuant to the FHA, 42 U.S.C. §§ 3613, 3617; 42 U.S.C. §12205; 28 C.F.R. §36.505; Administrative Code § 8-502(f); and Executive Law §297(10).

## PRAYER FOR RELIEF

WHEREFORE, Joanne Noel Higgins respectfully requests that the Court enter a judgment against the defendants (i) 120 Riverside Boulevard At Trump Place Condominium; (ii) The Board of Managers of 120 Riverside Boulevard at Trump Place Condominium; (iii) Michael Ritchken, president of the Board of Managers; (iv) AKAM Associates, Inc.; (v) Ronald Starcic; (vi) Carlos A. Galliano; and (vii) Nancy Galliano as follows:

A.     On the First Count (Violation of the Fair Housing Act) in favor of Higgins and against Condo Management Group under the FHA, awarding damages in an amount to be determined at trial but no less than $ 10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

B.     On the Second Count (Violation of the Administrative Code of the City of New York) in favor of Higgins and against the Condo Management Group as follows:

i.     Declare Higgins sustained damages from the Condo Management Group under the Administrative Code, in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the

pendency of this action,

    ii.  Redress the wrongdoing of the Condo Management Group and prevent a continuation of unlawful discriminatory and retaliatory conduct, and

    iii.  Award punitive damages for Condo Management Group's malicious, willful and wanton violations of the Administrative Code § 8-502.

  C.  On the Third Count (Violation of New York State Executive Law) in favor of Higgins and against the Condo Management Group for discriminatory practices under the Executive Law, awarding damages in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

  D.  On the Fourth Count (Violation of New York State Civil Rights Law) in favor of Higgins and against the Condo Management Group, awarding Higgins $500 for each and every violation as prescribed by Civil Rights Law § 40-c and 40-d.

  E.  On the Fifth Count (Retaliation Coercion Intimidation) in favor of Higgins and against the Condo Management Group for unlawfully discriminating, retaliating, coercing, intimidating and threatening Higgins, awarding damages sustained from the acts of the Condo Management Group in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

  F.  On the Sixth Count (Breach of By-Laws and Declaration) in favor of Higgins and against the Condo Management Group, awarding damages sustained from the acts of the Condo Management Group in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills

incurred by Higgins, all of which will continue to accrue during the pendency of this action.

G.      On the Seventh Count (Negligence) in favor of Higgins and against the Condo Management Group declaring Higgins sustained damages because of the Condo Management Group's willful and/or reckless disregard for Higgins's rights, in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

H.      On the Eighth Count (Injunctive Relief) in favor of Higgins and against the Condo Management Group as follows:

      i.    Enjoin the Condo Management Group from further discriminating against Higgins,

      ii.    Order requiring the Condo Management Group to alter and modify the Building, including the Home therein, as well the Condo Management Group's operations, policies, practices and procedures,

      iii.    Order directing the Condo Management Group to make the Building readily accessible to and usable by Higgins in accordance with the above-mentioned laws,

      iv.    Order directing the Condo Management Group to provide auxiliary aids or services, modification of their policies, and/or provision of alternative methods, in accordance with the FHA, Executive Law and the Administrative Code,

      v.    Order directing the Condo Management Group to implement policies against disability discrimination and retaliation and train all its employees and agents of these policies,

      vi.    Order directing the Condo Management Group to retain the services of an

independent entity to monitor its compliance with the laws, and

vii.   Order directing the Condo Management Group to retain the services of an independent third-party managing agent.

I.      On the Ninth Count (Declaratory Relief) in favor of Higgins and against the Condo Management Group declaring, Higgins is entitled to a declaratory judgment concerning each of the violations committed by the Condo Management Group as to the policies, practices, procedures, facilities, goods and services.

J.      On the Tenth Count (Negligent Infliction of Emotional Distress) in favor of Higgins and against the Condo Management Group, awarding damages sustained from the Condo Management Group in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

K.      On the Eleventh Count (Fraudulent Inducement) in favor of Higgins and against Sellers for their deliberate misstatement to fraudulently induce Higgins to purchase the Home, awarding Higgins damages in an amount to be determined at trial but no less than $10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

L.      On the Twelfth Count (Slander Per Se) in favor of Higgins and against Starcic under New York law for defamation per se, awarding Higgins damages in an amount to be determined at trial but no less than $ 10,000,000.00 (TEN MILLION DOLLARS), plus costs, attorneys' fees, interest, punitive damages and medical bills incurred by Higgins, all of which will continue to accrue during the pendency of this action.

M.      Award punitive damages, reasonable attorneys' fees, costs, and expenses pursuant to the Administrative Code, the FHA, and Executive Law.

N.       For such other and further relief, at law or in equity, to which Higgins may be justly

entitled.

## JURY DEMAND

Higgins demands a trial by jury on all claims so triable.

Dated:       Brooklyn, New York
             September 21, 2021


                                        Respectfully submitted,

                                        RODRIGUEZ-MCCLOSKEY PLLC

                            By: /s/ Yenisey Rodriguez-Mccloskey
                                        Yenisey Rodriguez McCloskey, Esq.
                                        300 Cadman Plaza West, 12 Floor
                                        Brooklyn, New York 11201
                                        Telephone: (347) 689-7625
                                        yenisey@rodriguezmccloskey.com
                                        *Attorneys for Joanne Noel Higgins*