UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

JOANNE NOEL HIGGINS,

       Plaintiff,

   -v-

120 RIVERSIDE BOULEVARD AT TRUMP PLACE
CONDOMINIUM, BOARD OF MANAGERS OF 120
RIVERSIDE BOULEVARD AT TRUMP PLACE
CONDOMINIUM, MICHAEL RITCHKEN, individually
and as President of the Board of Managers of 120
Riverside Boulevard at Trump Place Condominium,
AKAM ASSOCIATES, INC., RONALD STARCIC,
CARLOS A GALLIANI, and NANCY GALLIANI,

       Defendants.

----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_11/19/2021__

21-cv-4203 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants 120 Riverside Boulevard at Trump Place Condominium, the Board of

Managers of 120 Riverside Boulevard at Trump Place Condominium, Michael Ritchken,

individually and as President of the Board of Managers of 120 Riverside Boulevard at Trump

Place Condominium, AKAM Associates, Inc., and Ronald Starcic (collectively, "Condominium

Defendants") move, pursuant to Federal Rule of Civil Procedure 12(b)(6) and 12(c) to dismiss

the amended complaint against them and, in the alternative, to decline to exercise jurisdiction

over Plaintiff Joanne Noel Higgins' ("Plaintiff" or "Higgins") state-law claims if dismissal of the

federal-law claim alone is granted.  Dkt. No. 61.

**BACKGROUND**

For purposes of this motion, the Court accepts as true the well-pleaded allegations of the amended complaint, as supplemented by the documents incorporated by reference.  Dkt. No. 48 ("Amended Complaint" or "Am. Compl.").[1]

Plaintiff is the owner of an apartment unit (the "Unit") which she uses as her home at Trump Place Condominium, in Manhattan, that is located on the floor directly above the lobby. Am. Compl. ¶¶ 3, 8, 32.  She is also a disabled person within the meaning of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, having suffered a traumatic brain injury which has caused a number of ongoing disabilities, including vertigo, hearing and vision impairment, severe headaches, and post-traumatic stress disorder.  Am. Compl. ¶¶ 2–3, 20, 115.  Plaintiff purchased the Unit in June 2016 from defendants Carlos A. Galliani and Nancy Galliani (together with the Condominium Defendants, the "Defendants").  *Id.* ¶¶ 27, 96.  Prior to purchasing the Unit, Plaintiff became aware of water staining around the bedroom window in the Unit.  *Id.* ¶ 4. Nonetheless, she decided to purchase the Unit, relying on a sworn statement from the sellers' attorney that he had spoken to Nancy Galliani and that she had confirmed that there was no leak from the window as the leak had been repaired several years earlier, as well as on a rider in the contract of sale stating that the Unit would be delivered free from leaks and had not had any leaks in the twelve months prior to closing.  *Id.* ¶¶ 6–8.

To hear Plaintiff tell it, as the Court must at this stage, the Unit has been nothing but trouble.  Her complaints about the Unit and the Defendants' conduct generally center around

---

[1] Higgins attaches a declaration and exhibits to her opposition to the motion to dismiss.  Those documents are not cognizable on this motion. *In re Petrobras Secs. Litig.*, 2016 WL 11671141, at *3 (S.D.N.Y. Mar. 25, 2016) (explaining that "it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss" and declining to consider information in exhibits to a declaration submitted in opposition to a motion to dismiss); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).

three issues: intermittent problems with noxious odors and construction occurring in the building, problems associated with water penetration and mold in her apartment, and harassing behavior and occasional statements made by various people associated with the building. The Court will briefly review the relevant allegations for each.

## I.      Construction and Noxious Odors

At an annual board meeting in November 2016, Plaintiff learned about upcoming renovations to the lobby of the building. *Id.* ¶ 31. Plaintiff expressed concern about the effect that the lobby renovations would have on her ability to occupy her home given her disabilities—she had temporarily vacated her Unit when it was undergoing renovation so that she could avoid the associated construction noise, which could trigger headaches, vertigo, and symptoms of post-traumatic stress disorder. *Id.* ¶¶ 28–30. But she was assured that the Condominium Defendants would use sound-reducing methods and would meet with Higgins in advance of the construction. *Id.* ¶ 33. In June 2017, without notice to Higgins, construction began in the lobby, causing harsh chemical smells, loud noises, and vibrations. *Id.* ¶¶ 34–35, 38. The construction caused the windows, walls, chandelier, and furnishings in the Unit to shake, and filled the Unit with noise and noxious odors. *Id.* ¶ 79. Plaintiff sent repeated emails to the property manager, attaching video recordings of the noises and vibrations affecting the Unit, requesting information regarding how long the noise would continue, and complaining that she was awakened by construction noises on a Saturday morning despite being promised that there would be no construction on weekends, in accordance with the "House Rules" of the Condominium. *Id.* ¶¶ 36–38, 40, 47. Plaintiff also requested to meet with the Board of Managers to discuss the construction, but the request was not accommodated. *Id.* ¶¶ 44–45.

The construction triggered bouts of vertigo and caused Plaintiff to have episodes of headaches, tinnitus, and anxiety, and exposure to the fumes from products and tools used by the

Condominium Defendants' contractors caused Plaintiff to have respiratory difficulties. *Id.* ¶¶ 57–60, 71, 79, 81. As a result, Plaintiff had to visit urgent care and was forced to stay out of the Unit, which contained her home office, for over ninety days between June and November 2017, disrupting her personal and professional life. *Id.* ¶¶ 61, 79–81. The Condominium Defendants and a property manager offered Plaintiff a hotel allowance so that she did not have to occupy the Unit while construction was taking place, but Plaintiff bore the burden of living away from the Unit and spent over $5,000 in related out-of-pocket expenses. *Id.* ¶¶ 42, 61–63.

Plaintiff experienced problems from construction in a different apartment in 2020. On or about March 9, 2020, due to renovation work being performed in an apartment on the floor above her Unit and on the 14th floor of the Condominium, Higgins experienced a large amount of noise, and the ceiling of the Unit shook so much that her chandelier began rattling and shaking dangerously. *Id.* ¶ 92. The noises and vibrations from the construction persisted for several months, but the Condominium Defendants ignored her requests that she be given notice of renovation work that would create loud noises and that renovation work be performed according to the Condominium's bylaws (the "Bylaws") so as not to disturb other unit owners. *Id.* Also, on or about May 25, 2020, a noxious chemical odor from an unknown source invaded the third-floor hallway and lobby of the building and could be smelled inside the Unit. *Id.* ¶ 93. Furthermore, for a period of time after Higgins moved into the Unit, marijuana smoke from another unit invaded her Unit, and when Higgins complained, she was threatened with a Strategic Lawsuit Against Public Participation ("SLAPP") lawsuit by the Condominium Defendants. *Id.* ¶ 94.

## II.   Water Penetration and Mold

Shortly after moving into the Unit, Plaintiff renovated it to accommodate her disabilities. *Id.* ¶ 28. During renovation of the Unit, the contractors discovered water penetration in the walls

near the bedroom window. *Id.* ¶ 96. Moreover, soon after Higgins purchased the Unit, the window began to leak, upon information and belief, from water penetration from the façade of the building. *Id.* ¶ 9. Higgins notified the property manager and the managing agent of the building, AKAM Associates, Inc., of the water penetration discovered by the contractors, *id.* ¶ 97, but, despite numerous requests by Plaintiff, the Condominium Defendants failed to conduct any repairs to the Unit or to repair the window leak or water damage to Plaintiff's walls, insisting that Higgins hire her own contractor to remedy the problem, *id.* ¶¶ 98–99.

On or about late 2020, Plaintiff visited the hospital because she was feeling ill and had shortness of breath and other respiratory issues, which her doctor ultimately determined were caused by exposure to mold. *Id.* ¶ 95. Higgins eventually sought the assistance of her insurance carrier in repairing the window and the leak. *Id.* ¶ 103. On or about February 26, 2021, a contractor provided by the insurance carrier discovered mold in the sheetrock behind Higgins' bedroom walls near the window when the contractor began demolition to repair and renovate of portions of the Unit that had sustained water damage. *Id.* ¶ 104. Because the mold was greater than ten square feet, the contractor hired a hygienist to conduct an inspection and provide a protocol for mold removal. *Id.* The insurance carrier's hygienist conducted an inspection on or about March 2, 2021 and reported that the area of Higgins' bedroom near the window exhibited an abnormal and above-background total airborne fungal spore presence. *Id.* ¶ 105. The hygienist further reported that the sample taken from the ceiling adjacent to the bedroom window indicated that fungal spores were present and that there was potential for growth and amplification. *Id.* The Condominium Defendants hired their own engineers and a hygienist, and they found no evidence of mold or an active leak in the Unit. *Id.* ¶¶ 106–109. They proposed installation of sealant along the concrete column joints at the head section of the window of the

Unit and sealing and fire stopping of all piping penetration, but, upon information and belief,

Higgins' insurance carrier refused to allow the work because it would not remediate the mold.

*Id.* ¶¶ 108–10.  During an additional inspection by Higgins' contractors on May 3, 2021, more

mold was found in the window joint.  *Id.* ¶ 111.  As of the date of the Amended Complaint,

Higgins' bedroom window continues to leak, and the problem remains unabated.  *Id.* ¶100.

### III.     Harassment and Comments

Higgins also complains about harassment and comments made by other tenants and

persons who work at the building.  In October 2017, Higgins had a panic attack, fainted, and fell

while being yelled at by the property manager, *id.* ¶ 65; after an ambulance arrived at the

building, one of the building employees told the responding Emergency Medical Technicians

that Higgins was "crazy."  *Id.* ¶ 66.  In November 2017, when Higgins reported a chemical odor

coming into the Unit and complained that the building manager had not returned her calls for a

week, the handyman called her a liar, said that there was no smell, and used an invective to say

that she was fabricating her complaint.  *Id.* ¶¶ 73–74.  The next day, when Higgins complained to

another resident about the fumes coming from the media room, believing that the resident on the

Board of Managers, she was met with the retorts "you have mental issues" and "get back on your

medication."  *Id.* ¶¶ 76–78.  After Higgins made complaints at a November 28, 2017 meeting of

the unit owners, the Board of Managers brought a SLAPP lawsuit against her, which ultimately

was settled.  *Id.* ¶¶ 79, 82.  During the 2018 annual meeting of the unit owners, an unidentified

male who was, upon information and belief, a former member of the Board of Managers

interrupted Higgins while she was speaking and said that she had "sued the building where she

lived before."  *Id.* ¶ 84.  On or about January 2019, a trainer at the building's health club began

to harass Higgins by screaming very loudly inside the fitness room, knowing that loud noises

caused Higgins great stress.  *Id.* ¶ 89.  When Higgins complained to the general manager of the

health club, the general manager responding by asking "aren't you [invective] deaf?  So why are you complaining about the noise?"  *Id.* ¶ 89.  In the fall of 2019, a resident and ex-member of the Board of Managers grabbed Higgins' left arm while Higgins was operating a fitness machine, which caused her to have anxiety and a panic attack and to begin to cry.  *Id.* ¶ 91.[2]  And, during an inspection of the Unit in April 2021, defendant Ronald Starcic called Higgins "crazy" in the presence of others there for the inspection and commented on Higgins' inconsistent use of a walker.  *Id.* ¶¶ 245–246.

Plaintiff asserts claims under (1) the FHA, 42 U.S.C. § 3601 *et seq.*, (against the Condominium Defendants) for the alleged failure to respond to her requests for reasonable accommodations and failure to make reasonable accommodations and for discriminating and retaliating against Higgins; (2) various provisions of the New York City Administrative Code, including sections 8-107(15)(a), 8-107(4), and 8-107(5)(a)(3), for the failure to make reasonable accommodation for her as a tenant with a disability, with respect to both the renovation work and the repair and remediation work needed to address the water penetration into the Unit and to remove all mold; (3) New York State Executive Law sections 296(5) and (18) for failure to make a reasonable accommodation for her disability and for discriminating against her; and (4) New York State Human Rights Law for the same conduct.  She also asserts claims against the Condominium Defendants for retaliation, coercion, and intimidation; breach of the Bylaws; negligence; and negligent infliction of emotional distress.  She asserts a claim against the Gallianis for fraudulent inducement and against defendant Starcic for slander per se.

---

[2] Higgins joined a sports club outside the building in April 2019 in an attempt to avoid further conflicts with trainers or other members of the health club at the building, in the hope that she could return to the building's health club that autumn.  *Id.* ¶ 90.

**DISCUSSION**

**I.      Plaintiff's FHAA Claim**

The FHA originally prohibited discrimination on the basis of race, color, religion, or national origin.  The Fair Housing Amendments Act of 1988 (the "FHAA") extended the FHA's principle of equal opportunity in housing to individuals with handicaps, making it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person."  42 U.S.C. § 3604(f)(2)(A).  "To establish discrimination under [the FHAA], plaintiffs have three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003), *superseded by regulation on other grounds*.  Plaintiff proceeds on a failure-to-accommodate theory.

The FHA, as amended by the FHAA, prohibits a housing provider's "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).  "In order to prove a failure-to-accommodate claim, a plaintiff must show (1) that the plaintiff . . . had a handicap within the meaning of § 3602(h); (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that the accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation."  *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014); *see also Fair Housing Justice Center, Inc. v. Cuomo*, 2018 WL 4565152, at *12 (S.D.N.Y. Sept. 24, 2018) (same); *Spavone v. Transitional Servs. of N.Y. Supportive Hous. Program (TSI)*, 2016 WL 2758269, at *5 (E.D.N.Y. May 12,

8

2016).  "A reasonable accommodation is 'one that gives the otherwise qualified plaintiff with disabilities meaningful access to the programs or services sought.'"  *Timmons v. Kingsley-Johnston, Inc.*, 2020 WL 6700138, at *5 (N.D.N.Y. Nov. 13, 2020) (quoting *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 341 (E.D.N.Y. 2012)).

"[T]he duty to make reasonable accommodations is framed by the nature of the particular handicap."  *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 301 (2d Cir. 1998).  Thus, the FHA is "addressed to 'rules . . . that hurt [people with disabilities] *by reason of their handicap*, rather than that hurt them solely by virtue of what they have in common with other people.'"  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003) (alterations in original) (quoting *Good Shephard Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir. 2003)); *see also Taylor v. The Housing Authority of New Haven*, 267 F.R.D. 36, 70 (D. Conn. 2010) (quoting *Henrietta D.*, 331 F.3d at 276, in the fair-housing context).  A plaintiff is not entitled to *preferential* enjoyment of her housing solely by virtue of her disability.  Rather, she "'must show that, but for the accommodation, [she has been denied or] likely will be denied an *equal* opportunity to enjoy the housing of [her] choice.'"  *Olsen*, 759 F.3d at 156 (emphasis added) (quoting *Tsombanidis*, 352 F.3d at 578).[3]

The FHA requires that a suit be filed within two years "after the occurrence or the termination of an alleged discriminatory housing practice."  42 U.S.C. § 3613(a)(1)(A).  "Section 3613(a)(1)(A) requires a suit to be brought within two years of a protected person's experiencing

---

[3] A different provision of the FHA, section 3604(f)(3)(A), makes it unlawful for a housing provider to refuse "to permit, at the expense of the [disabled] person, reasonable modifications of existing premises occupied by such person if such modifications may be necessary to afford such person *full enjoyment* of the premises."  42 U.S.C. § 3604(f)(3)(A) (emphasis added).  "Under the FHA, a reasonable modification is a structural change made to the premises, while a reasonable accommodation is a change, exception, or adjustment to a rule, policy, practice, or service."  *Timmons*, 2020 WL 6700138, at *4.

discrimination." *Fair Housing Justice Center, Inc. v. JDS Development LLC*, 443 F. Supp. 3d

494, 500 (S.D.N.Y. 2020).  Plaintiff filed this action on May 11, 2021.[4]  Therefore, the

discriminatory practice complained of in the pleading must have occurred *after* May 11, 2019 for

Plaintiff's FHA claim to be timely.[5]

  The Condominium Defendants do not dispute for purposes of this motion that Higgins is

a person with a handicap within the meaning of section 3602(h) and that they "knew or

reasonably should have been expected to know of the handicap."  They argue primarily that

Higgins did not request an accommodation as a result of her handicap, that the "accommodation"

she requested was not "necessary" to afford her "an equal opportunity to use and enjoy the

dwelling" or more particularly that it was not made necessary by her disability, and that they did

not refuse to make a requested accommodation.

  Higgins alleges a number of acts that took place after May 11, 2019: (1) in November

2019, a resident and ex-member of the Board of Managers grabbed Higgins' left arm while she

was operating a fitness machine, causing her to have anxiety and a panic attack, Am. Compl.

¶ 91; (2) in March 2020, the Condominium Defendants ignored Higgins' requests that she be

provided, in light of her disability, with notice of renovation work that would create loud noises

and that renovation work be performed according to the Bylaws so as not to disturb other unit

owners, where renovation work that was performed in a unit in the floors above her caused loud

noises and vibrations for several months, *id.* ¶ 92; (3) in May 2020, a noxious chemical odor

from an unknown source invaded the third-floor hallway and lobby of the building and could be

smelled inside the Unit, *id.* ¶ 93; and (4) the building failed to address the water leak in her Unit

---

[4] Plaintiff's complaint was entered on the docket on May 12, 2021.  *See* Dkt. No. 13.
[5] For reasons explained below, the Court does not find persuasive Plaintiff's argument that the limitations period should be extended under the continuing-violation doctrine.

and hired experts who, in April 2021, performed an inspection of the water damage and mold growth in the Unit that "was fraught with many issues" and "performed wholly improperly," causing the Condominium Defendants to conclude that there was no evidence of mold or of an active water leak in the Unit and to urge her insurance carrier to close Higgins' claim and do the minimal work the building had recommended. *Id.* ¶¶ 107–11.

The Amended Complaint fails to allege facts that would support a claim that any of these acts violated the FHA. The first and the third allegations identified above do not allege any conduct on the part of any Defendant. The first is leveled only against an unidentified resident and does not allege any disability-related discrimination or failure to accommodate, and the third relates to an odor from an unknown source that caused inconvenience. There is no allegation that Plaintiff needed an accommodation with respect to either, that she requested an accommodation from the Condominium Defendants, or that any such defendant denied her a reasonable accommodation. Those allegations cannot support an FHA reasonable-accommodation claim.

Plaintiff's second claim is that in March 2020, the Condominium Defendants ignored her requests that she be provided with notice of renovation work that would create loud noises and that renovation work be performed according to the Bylaws so as not to disturb other unit owners. *See id.* ¶ 92. Higgins' allegations are that, due to her disabilities, she is denied an equal opportunity to enjoy her home when she is exposed to loud noises, vibrations, and noxious odors. *See id.* ¶¶ 29, 79, 81, 89, 115, 177–178. The failure to make an accommodation for the impact that noise associated with construction could have on a disability could, in theory, support a failure-to-accommodate claim under the FHA. *See, e.g.*, *Holland v. Related Companies, Inc.*, 2015 WL 4498776 (N.D. Cal. July 23, 2015). Although Higgins alleges that construction was

11

done without notice to her, *see* Am. Compl. ¶¶ 34, 40, 92, and that she requested notice of

construction, *see id.* ¶ 92, she does not allege that she told the Condominium Defendants she

needed an accommodation because of her disability, as opposed to, for example the general

annoyance that construction noise would cause her, as well as any others.[6]

There is a paucity of Second Circuit cases considering the level of detail needed for a

request to become a request *for a reasonable accommodation* under the Fair Housing Act,

triggering a duty to respond. A plaintiff must, of course, give the defendant "an opportunity to

accommodate her," meaning that "[t]he defendants must have had an idea of what

accommodation [was] sought prior to their incurring liability for failing affirmatively to grant a

reasonable accommodation." *Taylor v. Harbour Pointe Homeowners Ass'n*, 690 F.3d 44, 49 (2d

Cir. 2012) (citing *Tsombanidis*, 352 F.3d at 578–79). But the question remains open whether a

plaintiff with a known disability who makes a request that may or may not relate to her disability

and does not mention that the requested action relates to her ability to use or enjoy her home can

then hold a defendant responsible under the FHA for failing to honor that request. Courts

outside of this Circuit that have considered this issue have explained that, in circumstances such

as this one, the defendant must be provided some explanation of how a request is related to a

plaintiff's disability before being liable for failing to honor the request. *See Colon-Jimenez v.*

*GR Mgmt. Corp.*, 218 F. App'x 2, 3 (1st Cir. 2007) ("A routine or mundane request, such as a

request to transfer to a different apartment, does not rise to the level of a request for a reasonable

accommodation unless the plaintiff specifically explains how the accommodation requested is

---

[6] Plaintiff does allege that she requested "that she be provided with notice of renovation work that would create loud noises in light of her disability," Am. Compl. ¶ 92, but that her disability motivated her to make the request does not establish that she told Condominium Defendants she needed an accommodation because of her disability.

linked to some disability."); *Elliott v. QF Circa 37, LLC*, 2018 WL 2933467, at *7 (S.D. Cal.

June 12, 2018) ("[T]o trigger a defendant's duty to provide an accommodation . . . the plaintiff's

request [must] contain[] sufficient information to place a defendant on notice that the request is

one for a reasonable accommodation."); *cf. Schwartz v. City of Treasure Island*, 544 F.3d 1201,

1219 (11th Cir. 2008) (noting that an entity "cannot be liable for refusing to grant a reasonable

and necessary accommodation if the [entity] never knew the accommodation was in fact

necessary" (internal quotation marks omitted)).  This approach helps to ensure that defendants

are actually given the chance to remedy a problem before resorting to litigation; as the United

States District Court for the District of Hawaii has explained:

> The duty to make a reasonable accommodation does not simply spring from the
> fact that the handicapped person wants such an accommodation made.  Defendants
> must instead have been given an opportunity to make a final decision with respect
> to Plaintiffs' request, which necessarily includes the ability to conduct a meaningful
> review of the requested accommodation to determine if such an accommodation is
> required by law.

*Prindable v. Ass'n of Apt. Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1258 (D. Haw.

2003) (internal quotation marks and alterations omitted).  The Court is persuaded that such an

approach makes good sense in circumstances such as this one, where the request is typical of

occupants of a shared space and is plausibly motivated by a reason other than a disability.

To be sure, plaintiffs do not have an evidentiary burden at the motion to dismiss stage,

but they do need to allege facts that, if taken as true, would state a claim for relief.  According to

Plaintiff's allegations, the Condominium Defendants knew that she had disabilities and knew

that nearby loud noises would exacerbate her disabilities.  Plaintiff has not alleged that she ever

told the Condominium Defendants that notice of construction happening by anyone, anywhere in

the building was an accommodation necessary for her to derive the same use and enjoyment

from her home as other residents.  While she did not need to "use the 'magic words' of

13

'reasonable accommodation' or the 'Fair Housing Act,'" *Elliott*, 2018 WL 2933467, at *7, some

explanation that indicated to the Condominium Defendants that she was requesting notice to

address the difficulties posed by her disability, rather than notice as an interested tenant

inconvenienced by noise occurring elsewhere in the building, was necessary.  Because Plaintiff

has failed to plead facts showing that she gave such an explanation or otherwise indicated that

she was requesting an accommodation, she has not adequately pleaded an essential element of

her failure-to-accommodate claim.

As to Higgins' allegation that the Condominium Defendants "ignored all requests by

Higgins that the renovation work be performed according to the By-Laws so as not to disturb

*other* unit owners," Am. Compl. ¶ 92 (emphasis added), this is a generalized grievance.  It

appears from her Amended Complaint that Higgins was making the request to address the

general harm it would cause her as well as "other unit owners" and not because of any articulated

concern regarding the harm that the noise would cause her as a person with disabilities.  She thus

has failed to plead that she requested and was denied a reasonable accommodation to put her "on

the same footing as everyone else."  *Salute*, 136 F.3d at 302 (internal quotation marks omitted).

The fourth claim—with respect to mold Plaintiff alleges is in the Unit—does not state a

claim under the FHA.  Plaintiffs' allegations are that the Condominium Defendants had failed to

address the water leak and that, after the buildings' experts concluded that there was no mold and

disagreed with Higgins' experts, the Condominium Defendants urged Higgins' insurer

(unsuccessfully) to perform only limited work.  Am. Compl. ¶¶ 106–11.  Higgins does not allege

that she requested the Condominium Defendants to remediate the mold in her apartment or that

such a request would constitute an accommodation that was related to her disability and would

14

put her on equal footing with other residents exposed to mold.[7]  Mold can affect everyone who is

exposed to it.  *Mold and Health*, EPA, https://www.epa.gov/mold/mold-and-health ("[M]old

exposure can irritate the eyes, skin, nose, throat, and lungs of both mold-allergic and non-allergic

people.").  There is no allegation that it caused harm to Higgins as a result of her disability that

would be different than that experienced by anyone else without the disability who also was

exposed to it.  Higgins alleges that as a result of her exposure to mold, she began feeling ill and

having shortness of breath and other respiratory issues.  *Id.* ¶ 95.  But she does not allege that

those symptoms are any different than the symptoms that she or anyone else would have

experienced even without her disability.  Although she alleges in conclusory form that as a result

of her brain injury she is "particularly sensitive to . . . harmful conditions such as mold," *id.*

¶ 115, she does not allege facts to support that the symptoms she experienced had any

relationship to her disability.  From the allegations of the Amended Complaint, they could have

come just as easily from the effect that mold generally has on all persons regardless of disability.

Thus, she does not allege either that she requested a disability-based accommodation or that even

if she mentioned her disability, the request was actually prompted by "a need caused by her

disability."  *Freeland v. Sisao LLC*, 2008 WL 906746, at *5 (E.D.N.Y. Apr. 1, 2008).  "The

'opportunity to use and enjoy' language of the FHAA reinforces the ability of people with

handicaps to have the same opportunity as similarly situated persons who have no evident

---

[7] Plaintiff alleges that the Condominium Defendants did not control the moisture or leaking
issues in her Unit—an obligation that the Condominium Defendants assert falls on Plaintiff, *see*
Dkt. No. 84 at 8—but, as for mold, she alleges only in conclusory form that the Condominium
Defendants "failed to act promptly" or "to have the Unit remediated to the condition it was in
before the mold was discovered."  Am. Compl. ¶ 202.  She does not affirmatively allege that she
asked the Condominium Defendants to remove the mold.  To the contrary, she states she enlisted
her insurance carrier for water- and mold-related issues and complains only that the building did
not support her request for removal of the mold.  *Id.* ¶¶ 103–10.

handicaps." *Salute*, 136 F.3d at 302.  Where Higgins has not alleged that the condition would

affect her differently than it would affect any other person who does not have her disability, she

cannot use the FHA to give her rights against the Condominium Defendants that would not be

possessed by any other resident subject to the identical condition.  *See Perricone-Bernovich v.*

*Tohill*, 843 F. App'x 419, 421 (2d Cir. 2021) (summary order) (affirming dismissal of FHA

failure-to-accommodate claim where plaintiff did not argue that her requests for a zoning

variance "were related to her disability"); *Lowe v. Planning & Zoning Comm'n of Town of*

*Mansfield*, 2018 WL 379010, at *7 (D. Conn. Jan. 10, 2018).

Higgins does allege a number of actions that preceded May 12, 2019, but none of those

acts is independently actionable under the FHA.  Each alleged action is at most a "discrete

incident[]" of discrimination as opposed to a "specific ongoing discriminatory polic[y] or

practice[], or [a] specific and related instance[] of discrimination [that was] permitted . . . to

continue unremedied for so long as to amount to a discriminatory policy or practice."  *Cornwell*

*v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994); *see Eastern Paralyzed Veterans Ass'n, Inc. v.*

*Lazarus-Burman Associates*, 133 F. Supp. 2d 203, 212 (E.D.N.Y. 2001) ("[W]here a plaintiff's

claim is based on [] an ongoing policy as opposed to a discrete incident, a continuing wrong is

present."); *see also National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 115 (2002)

(holding that continuing-violation doctrine applies to claims that "cannot be said to occur on any

particular day" but occur "over a series of days and perhaps years" and not to "discrete

discriminatory acts" even if they "are related to acts alleged in timely filed charges"); *Bernstein*

*v. N.Y.C. Dep't of Educ.*, 2020 WL 6564809, at *5 (S.D.N.Y. Nov. 9, 2020).

Each of the alleged acts that preceded May 12, 2019 was complete and concluded more

than two years before Higgins filed this action.  Higgins complains, for example, that the

Condominium Defendants did not respond to her complaints about the construction in the lobby and how that was affecting her Unit.  But the lobby construction began in June 2017 and concluded in November 2017.  *See* Am. Compl. ¶ 80.  It was not until 2020 that there was construction that again bothered Higgins, and when there was such construction, it took place and the noise and vibrations emanated from a different location, occupied by another unit holder.  She does not allege that the construction or the failure to respond with respect to the lobby construction lasted beyond November 2017.  She also does not allege any other construction-related incidents between November 2017 and March 2020.

Higgins also alleges that the property manager failed to respond in November 2017 to a chemical odor coming into the Unit and that the same month, another resident was unresponsive to her complaints about fumes coming from the media room, *id.* ¶¶ 73, 75, but each of those claims alleges a discrete incident and not a continuing violation.  She does not allege, for example, facts to support that there was a continuous odor emitted from an undisclosed location in the building or facts that the Condominium Defendants permitted the condition to remain unaddressed for so long that it was equivalent to a policy or practice.  So too the comments made to her by building employees, residents, and the Board of Managers prior to May 12, 2019.  The only thread that ties together each of these events is that Higgins was aggrieved.  Otherwise, each involves different persons, engaged in different conduct at different times, seemingly without any knowledge of or any connection to the conduct of other persons.

Thus, the two principal cases Higgins relies upon, *Eastern Paralyzed Veterans* and *Fair Housing Justice Center*, are inapposite.  *Eastern Paralyzed Veterans* involved a claim that, "throughout" a three-year period, the defendant failed to have the "ramps, sufficiently wide doorways and hallways, and accessible light switches and environmental controls" necessary to

17

afford residents with disabilities an equal opportunity to enjoy their dwelling.  133 F. Supp. 2d at

212–13.  The fact that the plaintiffs first became aware of the condition more than two years

before they brought suit did not bar their claim when the violation related to "an ongoing policy

as opposed to a discrete incident" and that ongoing policy continued into the limitations period.

*Id.* at 212.  *Fair Housing Justice Center* is even further afield.  In that case, the court held that

"the FHA limitations period on design-or-construction claims . . . begins to run when a person

protected by the FHA encounters the allegedly unlawful building elements, and thus is subjected

to discrimination," 443 F. Supp. 3d at 503, and not when—as defendant argued—the last

certificate of occupancy for the building was issued or the last unit in the building was sold, *id.* at

498.  The case did not involve the continuing-violation doctrine at all.  In this case, it is

undisputed that Higgins experienced each of the alleged acts of discrimination at the time it

occurred.  Thus, *Fair Housing Justice Center* is of no help to Higgins.[8]

## II.    Plaintiff's State-Law Claims

A district court "may decline to exercise supplemental jurisdiction over a claim" once it

"has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  The

Court declines to exercise supplemental jurisdiction here.  Although Higgins has filed two

complaints, the case is at its very incipiency.  Discovery has just commenced, and the Court has

expended few judicial resources on the matter.  Moreover, the remaining claims include those for

negligence and other state-law torts that do not turn upon the issues addressed in this Opinion

and that are of the sort routinely handled by the state courts.  Respect for the role of state courts

in interpreting state law and in applying it to this housing matter further supports a declination of

---

[8] Higgins also relies on *United States v. Yonkers Branch NAACP*, 30 F. Supp. 2d 650, 651 (S.D.N.Y. 1998), but in that case the statute of limitations defense was waived.

supplemental jurisdiction.   Finally, an order declining jurisdiction works no undue hardship on the parties.  Document discovery has proceeded in this case.  To the extent that the allegations of the Amended Complaint state claims under state law, that discovery will be available to be used in state court.  There will be no waste.

## CONCLUSION

The Condominium Defendants' motion to dismiss the first claim for failure to state a claim for relief is GRANTED.  The Court declines to exercise jurisdiction over the remaining claims, and those claims are dismissed for lack of subject matter jurisdiction.  The first claim for relief is dismissed without prejudice to Plaintiff filing an amended complaint within thirty (30) days containing allegations that address the deficiencies with respect to the FHA claim identified in this Opinion.  The state-law claims are dismissed without prejudice.  The pending motion to dismiss by Carlos and Nancy Galliani is DENIED AS MOOT, as the Court declines to exercise jurisdiction over the relevant claim.

The Clerk of Court is respectfully directed to close the Dkt. Nos. 61 and 73 and to lift the stay imposed on November 16, 2021.


SO ORDERED.

Dated: November 19, 2021
      New York, New York                           LEWIS J. LIMAN
                                        United States District Judge