UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  8/31/2022
```

------------------------------------------------------------------X
                  :

JOANNE NOEL HIGGINS,        :

         Plaintiff,    :

                  :       21-cv-4203 (LJL)

     -v-         :

                  :    OPINION AND ORDER

120 RIVERSIDE BOULEVARD AT TRUMP PLACE :
CONDOMINIUM, *et al.*,                  :

         Defendants.    :

                  :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

   Defendants 120 Riverside Boulevard at Trump Place Condominium ("120 Riverside");

the Board of Managers of 120 Riverside (the "Board of Managers"); Michael Ritchken

("Ritchken"), individually and as President of the Board of Managers; AKAM Associates, Inc.

("AKAM"); and Ronald Starcic ("Starcic") (collectively, the "Condominium Defendants")

move, pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the second amended

complaint against them.[1]  Dkt. No. 95.  Defendants Carlos A. Galgiani and Nancy Galliani

(together, "the Gallianis" and with the Condominium Defendants, "Defendants") also move,

pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the second amended complaint

against them.  Dkt. Nos. 76, 93.

   For the reasons that follow, the Condominium Defendants' motion is granted in part and

denied in part, and the Gallianis' motion is granted.

---

[1] Plaintiff Joanne Higgins has labeled the operative complaint a "First Amended Complaint."  It
is the third complaint in this action and the second amended complaint, and the Court will refer
to it as such notwithstanding Plaintiff's characterization of it.

**BACKGROUND**

For the purposes of this motion, the Court accepts as true the well-pleaded allegations of the second amended complaint ("Second Amended Complaint"), as supplemented by the documents incorporated by reference.  Dkt. No. 89.

Plaintiff Joanne Noel Higgins ("Plaintiff" or "Higgins") owns a condominium unit (the "Unit") at 120 Riverside.[2]  *Id.* ¶ 3.  Higgins is "a disabled person as defined by state and federal law," *id.* ¶ 2, having suffered a back injury and traumatic brain injury that cause her pain, vertigo, headaches, cognitive problems, anxiety, and symptoms from post-traumatic stress disorder, *id.* ¶¶ 3, 30.  Higgins purchased the Unit on or about June 8, 2016 from the Gallianis.  *Id.* ¶¶ 29–30.  In her application to the to the Board of Managers prior to her purchase, Higgins disclosed that she was disabled from a back injury and traumatic brain injury and noted the symptoms she experiences.  *Id.* ¶ 30.  Higgins alleges that "[a]t all times relevant hereto, defendants [120 Riverside], Board of Managers, AKAM, Ritchken, and Starcic had actual notice of Higgins's disabilities and her ongoing requests for a reasonable accommodation under the [Fair Housing Act ("FHA")] as a necessity to allow her to enjoy the [Unit] in the same manner as the other residents of the Building," *id.* ¶ 12, but that they refused to "make requested reasonable accommodations and modifications necessary for Higgins' disability," *id.*, and that they "had notice that as a disabled person, Higgins' health was declining as a result of their failure to accommodate her reasonable requests due to her disability," *id.* ¶ 13.

Since purchasing the Unit, Higgins has faced a number of problems with the Unit and the conduct of the Condominium Defendants that have forced her to move out of the Unit on various occasions and have caused her distress and deteriorating health.  As a result of the conditions in

---

[2] The apartment building that houses the Unit will be referred to herein as the "Building."

her Unit, she has moved out.  Her complaints about the Unit and the Defendants' conduct (or lack thereof) generally center around three issues: problems associated with leaks, water penetration, and mold in the Unit; problems with noxious odors and disruptive construction in the Building; and other allegedly discriminatory acts, including harassing behavior and statements made by various people associated with the Building.  The Court will review the relevant allegations for each.

## I.      Leaks, Water Penetration, and Mold

During her final walkthrough of the Unit prior to purchasing it, Higgins observed water staining at the window in the bedroom, but she did not observe the existence of an active or present leak.  *Id.* ¶¶ 4–5.  An attorney for the Gallianis signed a sworn statement that stated he had spoken to Nancy Galliani and she confirmed that there was no leak from the window and there had not been for several years.  *Id.* ¶ 6.  A rider to the contract of sale also stated that the Unit would be delivered free from leaks and had not had any leaks in the twelve months prior to closing.  *Id.*  Because of these representations, Higgins did not attribute the water staining she observed to an active leak.  *Id.* ¶ 7.  Higgins alleges that the representations made by the Gallianis concerning the water damage and status of leaks in the units were "fraudulent."  *Id.* ¶ 8.

Soon after Higgins purchased the Unit, her window began to leak.  *Id.* ¶ 9.  Upon information and belief, the leak was from water penetration from the façade of the Building.  *Id.*  During renovations of the Unit to accommodate her disabilities—renovations which occurred shortly after Higgins took occupancy of the Unit—contractors discovered water penetration in the walls near her bedroom window.  *Id.* ¶¶ 31–32.  In July of 2016, Higgins notified Patrick Crotty ("Crotty"), the property manager and AKAM, the managing agent of the Building, about the water penetration.  *Id.* ¶ 33.

Water began leaking into the bedroom window of the Unit on May 18, 2019.  *Id.* ¶ 108. On June 6, 2019, water came through the ceiling, down the walls, and outside of the window, and water was coming down the side of the Building.  *Id.* ¶ 114.  There was water "leaking in the [Unit] like a faucet," but the manager refused to observe the leak and "no accommodation was offered."  *Id.*  On August 14, 2019, a doctor wrote a letter "[t]o whom it may concern," explaining that, since the recent increase in construction noise and the water leak, Higgins has had "recent severe exacerbation of her brain injury symptoms" and that Higgins should "remain in a quiet, clean, mold free living environment."  Dkt. No. 108 at 4.

The Condominium Defendants failed to conduct repairs to the leak Higgins experienced for years, Dkt. No. 89 ¶ 129, even though she requested that they repair the window leak and water damage to her walls, *id.* ¶ 131, and identify and seal the source of the ongoing water penetration, *id.* ¶ 132.  Multiple property managers visited the Unit to inspect the conditions, but the Condominium Defendants "insisted that Higgins hire her own contractor to remedy the problem," *id.*, and on other occasions, building staff have refused to come to the Unit to observe the leak, *id.* ¶ 133.  In 2019, "the Building" indicated it would take steps to remedy the water leak.  *Id.* ¶ 154.  Correspondence appended to the Second Amended Complaint, and incorporated by reference thereto, shows that on September 9, 2019, Higgins asked Starcic when the window was going to be repaired; she requested "a proper timeline, details and dates" and expressed a "need for all water damage fixed [sic] and checked for mold."  Dkt. No. 89-7 at 8.  In that email, Higgins complained that it has taken a very long time to get the window fixed and that she "can't have [Starcic] take more then [sic] a few days on this project."  *Id.* at 8–9.  The following day, Starcic responded, appearing to attach an email from August 23, 2019 requesting access to the apartment and stating that he had a call out to a contractor to see if the contractor could inspect

the Unit the following day (September 11, 2019) for a proposal for the work.  *Id.* at 7.  Higgins

suggested instead that someone come on "Monday from 10:30 to 12:30" and stated that she

required Starcic to have two different contractors to inspect the space, that the repair should be

no longer than three days, and that the repair should include repainting the affected portion of the

bedroom with her paint, which is "a custom blend with sparkles" and "was very costly."  *Id.* at 7.

She also requested information about the Building's insurance.  *Id.*  Starcic replied that the

vendor would be there on the requested day and time—Monday from 10:30 to 12:30—to inspect

the space.  *Id.* at 6.  Starcic later explained that "vendors have looked at [Higgins'] window in

the past but were unable to pinpoint the problem," which is why they "shifted the focus on the

exterior façade to caulk [Higgins'] window and the two [apartments] above [her] unit."  *Id.*  In

response, Higgins attached letters from her doctors and stated that she "should be able to live i[n]

a peaceful environment with no construction noise, gas fumes, water leaks & banging and

marijuana smoke!"  *Id.* at 5.  She also wrote that Starcic "refused to have any understanding of

[her] disability."  *Id.* at 4.  It is not clear from the correspondence or the Second Amended

Complaint whether the inspection was ever conducted.

On January 6, 2021, Starcic emailed Higgins a proposed agreement that would have had

the Condominium Defendants pay the costs of repairing the leak to the window in the Unit but

would have required Higgins to forfeit her rights to her Unit and provided that Higgins would

pay to repair items behind the wall to the Unit, for which the Condominium Defendants were

responsible.  *Id.* ¶ 134.

Higgins began experiencing respiratory issues in late 2020, and her doctor determined

that her symptoms were caused by exposure to mold.  *Id.* ¶ 130.  On February 26, 2021, a

contractor provided by Higgins' insurance carrier who was repairing portions of the Unit that

sustained water damage discovered mold behind the sheetrock near the bedroom window.  *Id.*

¶ 137.  The contractor contacted a hygienist to provide a protocol for the mold removal because

the mold discovered was greater than ten square feet.  *Id.* ¶¶ 137–138.  The hygienist inspected

the Unit, and the resulting report found that the area near the window of Higgins' bedroom

"exhibited an abnormal and above-background total airborne spore presence" and "that the swab

sample taken at the drywall ceiling adjacent to the bedroom window indicated the presence of

fungal spores and potential growth and amplification."  *Id.* ¶ 138.

On April 9, 2021, agents of the Condominium Defendants—two engineers, one hygienist,

and Starcic—performed an inspection of the water damage and mold growth in the Unit.  *Id.*

¶ 139.  Higgins alleges that there were many issues with the inspection: the agents unilaterally

decided the areas from which the hygienist would collect swab samples and refused to collect

samples from certain places, *id.* ¶ 140, and a water infiltration test was sprayed improperly, *id.*

¶ 141.  The Condominium Defendants sent a letter dated April 26, 2021 claiming that there was

no evidence of mold or an active water leak in the Unit and proposing the installation of sealant

along the concrete column joints at the head section of the window and fire-stopping piping

penetration.  *Id.* ¶ 142.  Higgins then learned from her insurance carrier that attorneys for the

Condominium Defendants contacted the insurance carrier and urged it to do the work they

recommended, but, upon information and belief, the insurance carrier refused as the actions

would not remediate the mold.  *Id.* ¶ 143.  Additional inspection by Higgins' contractors revealed

that more mold was found in the window joint, which is inside the wall for which the

Condominium Defendants are responsible.  *Id.* ¶ 144.

Around this time, Higgins' doctors wrote letters concerning the effect that black mold

had on Higgins' health.  A letter dated March 15, 2021 from Dr. Gregory Tsai states that Higgins

suffers from nasal congestion and chronic sinus infections, which "can be exacerbated by allergies or exposure to environmental triggers," and Higgins therefore "should not be living in an area that is infested with black mold," as exposure to such triggers "can worsen Ms. Higgins's health and increase the frequency of her infections." Dkt. No. 108 at 12. That same day, Dr. Martin Pico wrote that Higgins "would greatly benefit from being able to perform physical therapy and exercise in an environment that is free from mold." *Id.* at 11.

There was additional flooding in the Unit later in 2021. On September 2, 2021, counsel for Higgins wrote to counsel for Defendants in a letter appended to the Second Amended Complaint, informing them that water penetrated the Unit, flooding the floor and ruining "newly completed drywall." Dkt. No. 89 ¶ 162; Dkt No. 89-9 at 2. In the letter, counsel writes that "[t]he contractor recently finished replacing the drywall in the area and the ceiling, [and] due to the water penetration their work has and continues to be undone." Dkt. No. 89-9 at 3.

## II.     Construction and Noxious Odors

### A.     Construction Noises

Upon occupying the Unit, Higgins informed Crotty that, because of her disability, she would need a reasonable accommodation of advanced notice of construction work that was to be performed. *Id.* ¶ 34. She told Crotty that the advanced notice was required so that Higgins could make appropriate arrangements, including assessing whether she would need to vacate her Unit during the construction, because "sustained construction noise could trigger both headaches and vertigo, as well as symptoms of her post traumatic stress disorder." *Id.* However, with knowledge of this request, Higgins' need for notice of construction, and Higgins' previous disclosure of her disability, no one from the Board of Managers or AKAM advised Higgins or her agents that construction would soon begin on the lobby, which is one floor below the Unit. *Id.* ¶¶ 35, 37. Higgins did not learn about upcoming lobby renovations until an annual board

meeting on November 29, 2016. *Id.* ¶ 36. During that meeting, and in the presence of the then-Board of Managers and upon information and belief in the presence of Ritchken, Higgins "expressed the need for a reasonable accommodation of advanced notice, due to her disability." *Id.* ¶ 38. Higgins was assured that the Condominium Defendants would use sound-reducing methods in the lobby renovations and that they would meet with Higgins in advance of the building work. *Id.* ¶ 39.

The lobby renovations began in June of 2017 without notice to Higgins and without precautions to minimize disruption to her. *Id.* ¶ 40. With the renovations came "a harsh chemical smell" and a "sudden onslaught of incessant noise and vibrations," causing fixtures, furniture, and her Unit's walls and windows to shake. *Id.* ¶ 42. Higgins reached out to Crotty asking how long the noise would continue, highlighting that the noises and odors associated with the construction affected her "as a disabled person" more than "the average person." *Id.* As the work continued, her inquiries continued, and "[s]he informed the Board of Managers of her need for a reasonable accommodation because of her disability, and requested that steps be taken to reduce the noise and inquired when these conditions would cease." *Id.* ¶ 43. About a week after reaching out to Crotty to find out how long the noise would continue, Higgins sent an email to Crotty and another property manager, Michael Basile ("Basile"), attaching a video capturing the effects the lobby renovation was having on the Unit. *Id.* ¶ 44. The day after she sent this email, a property manager met with Higgins, insisting that no one had promised to use noise-reduction techniques, informing her that they were familiar with her disability, and telling her that no accommodation would be offered to her. *Id.* Throughout the construction, Higgins made repeated requests for the Condominium Defendants to reduce the construction noise and informed them that this was a necessary accommodation to avoid triggering her disability. *Id.*

8

¶ 52.  These requests were ignored, and one day, after being told no power tools would be in use that day, a wall in the Unit started shaking, loud noises began, and she suffered a panic attack. *Id.* ¶ 53.  Higgins sent an email to Crotty alerting him to this disruption, and Crotty responded to tell her that he had canceled sidewalk drilling that had been scheduled for the following day.  *Id.* ¶¶ 54, 56.  However, the following day, Higgins awoke with vertigo caused by drilling noises. *Id.* ¶ 57.

Higgins did not only request that the Condominium Defendants reduce the noise resulting from construction; she also alleges that she requested advance notice of construction but did not receive it.  On June 24, 2017, Higgins sent an email complaining that she was awoken on a Saturday morning by loud renovation noises after being told that she would receive advance notice regarding the days the lobby renovation would be noisy and being promised that there would be no construction on weekends.  *Id.* ¶ 45.  Higgins alleges that, despite her repeatedly informing the Condominium Defendants "that she required a reasonable accommodation notice of any construction [sic]," the Condominium Defendants ignored her requests.  *Id.* ¶ 49.

Higgins alleges that the construction noise and lack of reasonable accommodations occurred in 2019 as well: on January 18, 2019, there was "non-stop drilling and banging" for approximately eight hours, *id.* ¶ 102, and on February 6, 2019, the construction noise "continued with no warning or any notice of when it was to conclude," *id.* ¶ 103.  On March 22, 2019, Higgins wrote to Basile alerting him to "construction noise for the last two days" that "has been going on for months" and asked for "a date of when it [sic] going to end."  Dkt. No. 89-2 at 4. Starcic responded that day that the construction was occurring in another unit, a majority of the demolition work had been completed, and the noise should be considerably less going forward. *Id.* at 3–4.  Higgins responded the following Monday that there was "[n]on stop banging for over

[three] hours;" that under New York City law there was a certain level that noise should not be over and the noise was over that level; that she was very sick and could not leave her home and that this was affecting her health and quality of life; and that she needed to know an end date for the construction. *Id.* at 3. In response, Starcic informed Higgins that the work was scheduled to be completed by that Wednesday, *id.* at 3, but the following Monday, Higgins informed Starcic that "[t]he banging is still going!" *Id.* at 2. When Starcic responded that he would investigate the noise, Higgins wrote back: "Now, it [sic] louder!" *Id.* Higgins alleges that she "requested a reasonable accommodation in the form of notice of when the construction would cease," Dkt. No. 89 ¶ 104, and that no reasonable accommodation was provided, despite the Condominium Defendants being on notice that one was necessary for Higgins' disability, *id.* ¶ 103.

On March 29, 2019, drilling started "out of nowhere"; Higgins had not been given warning "despite ongoing requests from Higgins for reasonable notice of construction prior to its occurring due to her disability." *Id.* ¶ 105. On May 18, 2019, there was "non-stop noise from the upstairs neighbor's AC" and Higgins did not get a response to her inquiries about it. *Id.* ¶ 108; *see also id.* ¶¶ 109–110.

On August 19, 2019, Higgins awoke to banging on her window as a result of construction work. *Id.* ¶ 121. She sent an email to Ritchken, Starcic, and AKAM informing them of her need for notice on this kind of work to accommodate her disability, and she complained of their failure to do so. *Id.* On March 9, 2020, Higgins experienced huge amounts of noise and the ceiling of her Unit started shaking due to work being performed in an apartment on the fourth floor and on the fourteenth floor. *Id.* ¶ 126. The Condominium Defendants ignored Higgins' request that she be provided with notice of renovation work that would create loud noises to accommodate her disability and that renovation work be performed according to the

Condominium Bylaws (the "Bylaws") to not disturb other unit owners.  *Id.*  The noises and vibrations cause by the constriction persisted for months.  *Id.*

### B.     Noxious Odors

In September of 2017, a chemical smell began seeping into the Unit.  *Id.* ¶ 59.  The Fire Department of the City of New York ("NYFD") advised the building to air out the lobby and to bring in ventilation machines and told Higgins to open her windows.  *Id.* ¶ 60.  Higgins reported this in an email, including in the email "three months of concerns, grievances, and the injury to her health," and she "made the Building[3] aware that their lack of accommodations, despite knowledge of her need for them because she is a disabled person, affected her ability to use and enjoy [the Unit]."  *Id.* ¶ 60.  The Board of Managers' law firm sent a letter to Higgins providing their future defenses should she choose to sue but not addressing the substance of her complaints. *Id.* ¶ 61.

As a result of exposure to the fumes, Higgins sustained respiratory difficulties.  *Id.* ¶ 64. Higgins, suffering from headaches, nosebleeds, a rash, and a sore throat, requested the name of the products that had been used in the lobby, which were a varnish remover and a paint thinner. *Id.* ¶ 62.  She thereafter researched the products and forwarded the warnings and hazards to the property manager, with a request that the information be shared with the Condominium Defendants "as a matter of safety."  *Id.* ¶ 63.

During the next month, Higgins spent much of her time outside of the Unit because of the lingering smells from the lobby construction and the fact that these odors permeated Higgins' clothes and her furniture.  *Id.* ¶ 68.  Crotty, who had installed an ozone machine and an air

---

[3] In the Second Amended Complaint, Higgins defines the "Building" as "the apartment building located at 120 Riverside Boulevard, New York, New York."  *Id.* ¶ 13.  The "Building" thus does not appear to refer to any defendant, all of which are defined differently.  *See id.* ¶¶ 1, 3.

purifier machine in an attempt to remedy the problem, inspected Higgins' home on numerous occasions.  *Id.*  During the ensuing months, machines that were used indoors to cut marble or stone released dust, and paints and varnishes were used without proper ventilation, allowing fumes and odors to spread to the Unit and to remain there.  *Id.* ¶ 69.

On October 12, 2017, the FDNY again responded to the Building for a complaint of "odor smoke."  *Id.* ¶ 73.  The visit was apparently in response to a call from Higgins' friend, who came to check on conditions in the Building while Higgins was in the emergency room from a fall and who had encountered strong fumes in the Unit, causing her throat to begin to burn, her chest to begin to tighten, and her to start coughing.  *Id.* ¶ 77.  When the FDNY responded, it discovered elevated carbon monoxide levels in the lobby and in the Unit and the unit next door. *Id.* ¶ 78.  The FDNY vented both floors, causing the carbon monoxide levels to drop, and wrote in its report that "Construction on first floor and Lacquer finish seemed to be causing the problems.  This has been an ongoing issue.  Woman who was evacuated had left prior to FDNY arrival.  New venting procedures were put in place to alleviate any future issues."  *Id.*

Issues regarding noxious fumes recurred in the future, however: On November 16, 2017, Higgins went to the front desk of the Building to report that a chemical odor was entering the Unit.  *Id.* ¶ 82.  She also complained that Crotty had not returned her calls for a week and learned that Crotty was no longer employed as the property manager.  *Id.*  She returned the following day to try to learn the source of the fumes.  *Id.* ¶ 85.  On September 19, 2018, fumes were again coming into the Unit, this time from the mechanical room where paint and cleaning products were improperly stored.  *Id.* ¶ 99.  On December 18, 2018 and December 30, 2018, fumes were coming in to the Unit, and Higgins "provided notice of the need for a reasonable accommodation in the form of addressing the fumes by the Building because of her disability" and "made clear

that the requested accommodation was necessary for her to derive the same use and enjoyment from the [Unit] as other residents." *Id.* ¶ 100.[4]  Fumes from the mechanical room entered the Unit again on June 1, 2019.  *Id.* ¶ 113.

In April of 2019, marijuana odor entered the Unit, which aggravated Higgins' disability. *Id.* ¶ 106.  In oral and written communications, Higgins had expressed the need to rectify these odors and requested reasonable accommodations "from the Building in doing so"; while "the Building" acknowledged the issue in communications made that month, the problem was never corrected.  *Id.*  On multiple occasions in mid-to-late May, the Unit smelled of marijuana, *id.* ¶¶ 110–112; on May 22, 2019, Higgins called management, who put up air blowers, but that did not help, *id.* ¶ 111.  When marijuana "fumes" came into the Unit again on May 31, 2019, the manager refused to come up to Higgins' apartment.  *Id.* ¶ 112.  Just over a week later, on June 7, 2019, "marijuana and some funky smelling fumes" entered the Unit, and the manager again refused to do anything about it.  *Id.* ¶ 115.  On June 9, 2019, the Unit smelled like marijuana, and Higgins could not breathe and felt shaky.  *Id.* ¶ 116.  Security came to Higgins' floor but refused to enter the Unit and stated that management did not want security to report the marijuana further.  *Id.*  Higgins had a fume reader in the Unit; for the entire week from June 10, 2019 to June 15, 2019, the fume reader altered to the presence of marijuana fumes, but management refused to take any action.  *Id.* ¶ 117.

On November 26, 2019, Higgins woke up at 2:00 a.m. to "fumes and an OC detector going off."  *Id.* ¶ 123.  Higgins requested the resident manager to come to her Unit but was told he refused.  *Id.*  She then called the fire department.  *Id.*  When the fire department came, a

---

[4] It is not clear from the Second Amended Complaint that Higgins was actually present for the fumes that were coming into the Unit on these days—she alleges that she "left for the Christmas holiday and came back on January 7, 2019."  *Id.* ¶ 100.

"worker" started pulling down plastic that was trapping the fumes and forcing them up to the Unit; this was done to allow for complete ventilation. *Id.*

On May 18, 2020, gas fumes came into the Unit, but the manager refused to investigate, and no reasonable accommodations were offered. *Id.* ¶ 125. A week later, "a noxious chemical odor from an unknown source" entered the third-floor hallway and lobby and could be smelled inside the Unit. *Id.* ¶ 127. Higgins alleges that the Condominium Defendants were "on notice that this occurrence warranted a reasonable accommodation for Higgins' disability," but "no reasonable accommodation was provided." *Id.* ¶ 128.

### C.   Correspondence Regarding Health Conditions and Need for Accommodations

In addition to the communications referenced above, Higgins alleges that she made explicit statements to the Condominium Defendants regarding her need for "reasonable accommodations." Higgins provided the Condominium Defendants with various letters from doctors documenting the effects that the construction was having on Higgins' health. Higgins saw an Ear, Nose, and Throat ("ENT") specialist, who wrote a letter dated September 11, 2017 documenting Higgins' "anxiety and severe allergies to fumes in the setting of construction in the building." *Id.* ¶ 65; Dkt. No. 108 at 2. Higgins provided this letter to the Condominium Defendants and requested that "an accommodation be made because of her disability, that the noxious fumes be addressed by the Building and reasonable notice of any construction project going forward." Dkt. No. 89 ¶ 65. On October 4, 2017, Dr. Heidi Fusco wrote a letter detailing the "exacerbation of [Higgins'] brain injury symptoms, including worsening anxiety, PTSD symptoms, vertigo and headache" "[d]ue to the construction currently occurring in her building." Dkt. No. 108 at 3; *see also* Dkt. No. 89 ¶ 66. Dr. Fusco wrote additional letters regarding Higgins' health conditions in connection with construction noise on August 14, 2019, Dkt. No.

108 at 4, on February 22, 2021, *id.* at 7, and on March 12, 2021, *id.* at 9.  At the conclusion of the

August 14, 2019 letter, Dr. Fusco recommended that Higgins "remain in a quiet, clean, mold free

living environment with a structured routine of sleep, exercise . . . and avoidance of all

construction due to the exacerbation of her symptoms." *Id.* at 4.  On November 25, 2019, Dr.

Fusco wrote about the effect that the "constant daily marijuana use by [Higgins'] neighbor with

contamination of [Higgins'] living environment" had on Higgins' brain injury symptoms and

recommended that Higgins "remain in a quiet, clean, smoke-free living environment with a

structured routine of sleep, exercise, and low stress." *Id.* at 5.  Dr. Fusco repeated this

recommendation in letters dated February 10, 2020, *id.* at 6, February 22, 2021, *id.* at 7, and

March 12, 2021, *id.* at 9.  Dr. Fusco's letters were provided to the Condominium Defendants, and

all of the doctors' letters were "accompanied by notice of Higgins' need to be accommodated

due to her disability in accordance with the physician recommendations." Dkt. No. 89 ¶ 67.

Higgins alleges that the letters from her doctors "provide further notice to the [Condominium

Defendants] that their failure to provide the requested accommodations caused Higgins'

condition to worsen and affected her differently from what a person without her disability would

have experienced." *Id.* ¶ 152.

On November 18, 2017—two days after she allegedly learned Crotty was no longer

employed as the property manager—Higgins emailed Crotty:

> expressing continued concern with respect to the Building lobby renovations and
> the lack of notice which Higgins requested as a reasonable accommodation for her
> disability, expressly notifying Crotty of the impact of the renovations on her and
> reminding him of the prior doctors letters she sent him regarding the need for a
> reasonable accommodation for her disability.  Higgins asked Crotty to inform the
> Board of Managers of her request and concern and her intention to bring legal
> action should her requests for accommodations related to her disability continue to
> be ignored.

*Id.* ¶ 88.  At the annual meeting of unit owners held on November 28, 2017, Higgins spoke and "expressed her frustration about the detrimental impact on her health caused by her exposure to the extreme noise, vibrations, reverberations, shaking, and exposure to dust and noxious fumes emanating from the lobby renovation" that had been ongoing for six months and was still not yet complete.  *Id.* ¶ 89.  The Board of Managers did not consider the reasonable accommodations requested by Higgins; instead, within one week of the meeting, the Board of Managers brought a Strategic Lawsuit Against Public Participation ("SLAPP") lawsuit against her.  *Id.* ¶ 92.[5]

Higgins alleges that the Building's property managers "were aware and put on notice from the consistent communications of Higgins that a reasonable accommodation was necessary for her to use and enjoy her home."  *Id.* ¶ 89.  Higgins specifically alleges that:

> Since the lobby renovation had commenced in June 2017, Higgins had repeatedly submitted, by email, telephone, and in-person, complaints and requests for reasonable accommodations due to her disability, to the property manager for the Building that the construction conditions had caused loud noises and vibrations in [the Unit], caused [the Unit's] windows, walls, chandelier, and furnishings to shake, filled [the Unit] with noxious odors, had triggered bouts of vertigo, headaches, and tinnitus, and impaired her health by causing her respiratory distress and allergic reactions from fumes, resulting in her visiting Urgent Car, and ultimately forcing her out of [the Unit] and [her] home office.

*Id.*  She also alleges that, in a response AKAM sent to Higgins concerning a complaint she made about an incident in the gym, AKAM "address[es] Higgins concern for a reasonable accommodation with respect to alterations within nearby units and her need for notice due to her disability . . . effectively conced[ing] to Higgins['] request to be accommodated."  *Id.* ¶ 124. Higgins attached this letter to her complaint; in relevant part it states:

> [W]ith respect to your recent complaints about owners performing basic alterations within their units, these renovations have been approved by the Board of Managers. If a unit owner is performing an alteration adjoining your unit, you will be notified by the unit owner and/or by the Resident Manager.  However, alterations are

---

[5] That lawsuit was later settled.  *Id.*

permitted to continue as long as they are being done within the appropriate time of
day.

Dkt. No. 89-6.

Higgins alleges that both she and Gale Brewer, the Manhattan Borough President,
informed the Condominium Defendants that Higgins needed a reasonable accommodation due to
her disabilities. *Id.* ¶¶ 119, 145. The letter from Brewer referenced in connection with this
allegation, which is appended to the Second Amended Complaint, does not specify what
reasonable accommodation is requested. *See* Dkt. No. 89-3. It is dated June 25, 2019, addressed
to Ritchken, and states, in relevant part:

> Ms. Higgins reports that she is disabled, and as such has rights under ADA which
> are being violated by management and the Board, according to Ms. Higgins. Ms.
> Higgins states that she cannot sleep from construction noise that she is not notified
> about, and her breathing is impacted by the marijuana smoke that enters into her
> apartment from the next door neighbor. Ms. Higgins also says that she feels
> inconvenienced because management continues to perform window power wash
> tests in front of her apartment without taping down cords and wires.
>
> I request that you respond to Ms. Higgins and the issues outlined in her email.

*Id.*

### D.    Higgins' Displacement

Higgins alleges that the Condominium Defendants did attempt to work with her during
the construction; they offered Higgins a hotel allowance so that she could stay elsewhere. *Id.*
¶ 70. For example, in July of 2017, Basile offered to have Plaintiff's work computers moved to a
spare room or to give her $250.00 per day for two days that he expected the new demolition to
continue. *Id.* ¶ 47. Higgins replied that she did not know of a hotel in Manhattan with a pool
and a health club—which she alleges are required to aid Higgins with symptoms of her
disability—for that price in late July with little notice, *id.* ¶ 48; she thus alleges that "[t]hese
purported accommodations were not reasonable in light of Higgins' disability and her particular

17

needs," *id.* ¶ 47.  Higgins sent information regarding hotel pricing to Crotty and requested a meeting with the Board of Managers, *id.* ¶ 50, but her request for a meeting was not accommodated, *id.* ¶ 51.

Higgins recognizes that the Condominium Defendants "paid for her hotel stays a few times" but states that "most of the time, [she] had to bear the burden of living away from [the Unit]."  *Id.* ¶ 72.  Moving around between the Unit and hotels also led to disruption "as she had to switch from one hotel to another, take taxis, return home for clothes, food, mail, and work."  *Id.* ¶ 70.  She was out of her home for approximately one hundred days between 2017 and 2018, *id.* ¶ 71, and over ninety days between June and November 2017, *id.* ¶ 90; spent over $5,000.00 in out-of-pocket expenses, and lost income of more than $10,000.00, *id.* ¶ 72.  She alleges this financial damage was "a result of the inability of the [Condominium Defendants] to provide reasonable accommodations to her," *id.* ¶ 72.

## III.   Other Allegedly Discriminatory Acts

### A.   Harassing Statements and Conduct

Higgins alleges that she was the subject of defamatory and harassing statements.  On the morning of October 12, 2017, when the FDNY responded to the Building for a complaint of "odor smoke," Higgins was on the phone with the property manager.  *Id.* ¶¶ 73–74.  While being yelled at by the property manager, Higgins had a panic attack, lost consciousness, and fell to the floor.  *Id.* ¶ 74.  Crotty went to assist her and called an ambulance, and when the ambulance arrived in response to his call, a Building employee told the responding Emergency Medical Technicians ("EMTs") that Higgins was "crazy."  *Id.* ¶¶ 74–75.  Higgins heard the EMTs calling the job in as "responding to an [emotionally distressed person]" and refused to go with them.  *Id.* ¶ 75.  She thereafter went to the emergency room on her own, as she had experienced severe vertigo, was vomiting, and had a bruise from falling to the floor.  *Id.* ¶ 76.

A little over a month later, when Higgins went to the front desk to report a chemical odor coming into the Unit and to request that someone check the Media Room, a handyman said there was no smell, called Higgins a "liar" and used an expletive in Albanian, stated in front of others that the FDNY found no fumes when they were there last, that Higgins was "making s**t up," and that she should "stop with the bull s**t." *Id.* ¶ 83.  Higgins responded loudly that "management has not got [sic] back to me" and, with expletives, directed the handyman "to air out the Media Room." *Id.* ¶ 84.  The next day, Higgins returned to the front desk trying to learn the source of the fumes. *Id.* ¶ 85.  A resident approached the desk with her dog, *id.* ¶ 85, and Higgins, thinking that the resident was on the Board of Managers, asked her to smell the Media Room and stated that "you wouldn't even want to put your dog in a room with this smell," *id.* ¶ 86.  The resident responded to Higgins "you have mental issues" and "need to get back on your medication." *Id.* ¶ 87.

During the unit owners' annual meeting in 2018, a male who was, upon information and belief, an ex-member of the Board of Managers interrupted Higgins and confronted her with the fact that she had "sued the building where she lived before." *Id.* ¶ 95.  On or about January 2019, a trainer at the building's health club screamed very loudly inside the fitness room, knowing that loud noises caused Higgins great stress. *Id.* ¶ 101.  When Higgins complained to the general manager of the health club, the general manager responded "aren't you [expletive] deaf? So why are you complaining about noise?" *Id.* ¶ 102.  Due to this harassment, Higgins "was forced to join Equinox Sports Club" in April of 2019, in order to avoid "further conflicts with trainers or other members of the health club at the Building." *Id.* ¶ 106.

In 2019, after Higgins complained to the Condominium Defendants about construction occurring in another unit, a unit owner was given Higgins' apartment number and told of her

disability. *Id.* ¶ 104. The unit owner knocked aggressively at Higgins' door and left her an angry letter, but no one from the Board of Managers contacted Higgins to see if she was alright or to investigate this occurrence. *Id.*

On November 10, 2019, a resident of the Building and a former member of the Board of Managers grabbed Higgins' arm while Higgins was operating a fitness machine. *Id.* ¶ 122. This caused Higgins to have anxiety and a panic attack, and she began to cry; she reported the incident to the manager of the health club. *Id.*

On April 9, 2021, the day that Starcic visited the Unit "to conduct water inspection and mold growth," Starcic called Higgins "crazy" to individuals present at the inspection. *Id.* ¶¶ 295–297. During this time, Higgins left the Unit, using a walker to assist her, but upon return, she did not have the walker with her. *Id.* ¶ 298. Starcic said to Higgins' lawyer "one minute she needs a walker and another minute she does not." *Id.*

### B.   Other Acts

Higgins alleges that she was met with "FHA related discrimination" when she attempted to move her belongings to other locations. *Id.* ¶ 155. At times, she is unable to open or carry heavy items due to her disabilities. *Id.* ¶ 156. Although her building has a 24-hour doorman, the doorman was not present on several occasions despite Higgins' attempts to make advance plans for doorman assistance in opening the door and retrieving her items. *Id.* ¶ 157. There is also no handicap-accessible doorway at the entrance of the building. *Id.* ¶ 158. As a result, in moving her belongings out of the Unit in October and November 2021, Higgins was left to try to open the heavy front door on her own. *Id.* Higgins sent emails to Ritchken, Starcic, and AKAM in October 2021 concerning her inability to access the Building entrance. *Id.*; *see also* Dkt. No. 89-8. One such email, appended to the Second Amended Complaint and incorporated by reference thereto, complained to Ritchken and others that that one of the doormen "refused to get up [two]

times to open the door until [Higgins] asked him to do so" and reminded them that Higgins had a "spine injury a neck injury shoulder rotating [sic] cuff right side ripped and balance issues."  Dkt. No. 89-8 at 2.  In an earlier email on this thread, also appended to the Second Amended Complaint, Higgins complained that she had to wait in the rain for five minutes because she could not open the front door to the Building, but she also stated that she had "not lived in [her] apartment over [nine] months now" and that one of the doormen "refused to get up front [sic] behind the desk" twice after seeing her with luggage such that she had to ask him to open the door.  *Id.* at 9.

## PROCEDURAL HISTORY

Higgins initially filed this lawsuit on May 11, 2021.[6]  Dkt. No. 1.  On September 21, 2021, Higgins filed an amended complaint, asserting claims under the FHA, 42 U.S.C. § 3601 *et seq.* for the Condominium Defendants' failure to accommodate her disability and for discrimination and retaliation, under various provisions of the New York City Administrative Code for failure to make reasonable accommodations, under the New York State Executive Law for failure to accommodate and discrimination, and under the New York State Human Rights Law for the same conduct.  Dkt. No. 48.  She also brought claims against the Condominium Defendants for retaliation, coercion, and intimidation; breach of the Bylaws; negligence; and negligent infliction of emotional distress; against the Gallianis for fraudulent inducement; and against Starcic for slander per se.  *Id.*

On October 7, the Condominium Defendants filed a motion to dismiss that complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and 12(c).  Dkt. No. 61.  On October 22, 2021, the Gallianis moved to dismiss that complaint against them.  Dkt. No. 76.  After receiving

---

[6] Due to a filing error, Higgins' complaint was not entered on the docket until the following day, May 12, 2021.  *See* Dkt. No. 13.

briefing on those motions, the Court granted the Condominium Defendants' motion.  *See Higgins v. 120 Riverside Blvd. at Trump Place Condominium*, 2021 WL 5450205 (S.D.N.Y. Nov. 19, 2021).  In so doing, the Court held that only those acts that occurred after May 11, 2019 could be considered in connection with a timely FHA claim because there was no allegation of a continuing violation and that none of those acts supported a claim under the FHA.  *Id.* at *3–7. The Court specifically held that Higgins had not alleged that she ever told the Condominium Defendants that notice of construction anywhere in the building was necessary to accommodate her disability or that the mold to which she was allegedly exposed had any greater effect on her as a result of her disability as compared to individuals generally faced with mold exposure.  *Id.* at *6.  After dismissing Higgins' FHA claims, the Court declined to exercise supplemental jurisdiction over the remaining state-law claims, including the claims against the Gallianis.  *Id.* at *8.  Because the Court declined to exercise jurisdiction over the claim brought against the Gallianis, the Court denied their motion to dismiss as moot.  *Id.*

Higgins thereafter filed another amended complaint—the Second Amended Complaint. Dkt. No. 89.  In it, she asserts twelve causes of action: (1) discrimination based on disability, in violation of the FHA, 42 U.S.C. § 3601 *et seq.*, against the Condominium Defendants for their failure to make reasonable accommodations for Higgins' disability and for their retaliation and discrimination against Higgins, *see* Dkt. No 89 ¶¶ 164–177; (2) violation of the New York City Administrative Code by the Condominium Defendants by their refusal to make reasonable accommodations, including by failing to construct and maintain and accessible entrance to the building, and otherwise discriminating against Higgins, *see id.* ¶¶ 178–200; (3) violation of the New York State Executive Law by the Condominium Defendants by failing to make reasonable accommodations for Higgins' disability and otherwise discriminating against her, *see id.* ¶¶ 201–

221; (4) violation of the New York State Civil Rights Laws by the Condominium Defendants for discrimination, *see id.* ¶¶ 222–225; (5) retaliation, coercion, and intimidation by the Condominium Defendants, *see id.* ¶¶ 226–236; (6) breach of the Bylaws and Declaration by the Condominium Defendants, *see id.* ¶¶ 237–243; (7) negligence by the Condominium Defendants for failure to take affirmative steps to control the ongoing moisture in the Unit, *see id.* ¶¶ 244–262; (8) for injunctive relief against the Condominium Defendants, *id.* ¶¶ 263–269; (9) for a declaratory judgment concerning each of the violations of the Condominium Defendants, *id.* ¶¶ 270–271; (10) negligent infliction of emotional distress by the Condominium Defendants, *id.* ¶¶ 272–276; (11) fraudulent inducement by the Gallianis with respect to the condition of the Unit as being without leaks, *id.* ¶¶ 277–293; and (12) slander per se by Starcic for calling Higgins "crazy" and commenting on her inconsistent use of a walker, *id.* ¶¶ 294–301.  Higgins seeks attorneys' fees, expenses, and costs pursuant to the FHA, New York City Administrative Code, and New York State Executive law, *id.* ¶ 302; monetary damages in the millions of dollars; injunctive relief; and declaratory relief.  *Id.* at 57–61.

After Higgins filed her Second Amended Complaint, counsel for the Gallianis submitted a letter stating that they were electing to renew and reply on their previously filed motion to dismiss.  Dkt. No. 93.  On January 24, 2022, the Condominium Defendants moved to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 95.  Higgins submitted oppositions to both motions, *see* Dkt. Nos. 98, 100, and Defendants submitted replies, *see* Dkt. Nos. 99, 101.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 554, 557 (2006)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This "does not impose a probability requirement at the pleading stage" but rather "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556.  That is, a complaint need not allege "detailed factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555.

In reviewing a motion to dismiss under Rule 12(b)(6), a court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor."  *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is in inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.*, and a complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive dismissal, *Twombly*, 550 U.S. at 555.

## DISCUSSION

Defendants seek dismissal of all claims against them.  The Condominium Defendants argue that, if the Court dismisses the sole federal claim—alleging a violation of the FHA—the Court should grant dismissal of the rest of the action for lack of subject-matter jurisdiction.  Dkt. No. 97 at 1.  The Court will therefore first consider the FHA claim and will turn to the other, state-law claims only in the event that that claim survives.

I.    **Fair Housing Act Claim**

The FHA makes it unlawful "[t]o discriminate against any person in the terms,

conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities

in connection with such dwelling, because of a handicap of . . . that person."  42 U.S.C.

§ 3604(f)(2)(A).  It further defines "discrimination," for the purposes of that subsection, as

including "a refusal to make reasonable accommodations in rules, policies, practices, or services,

when such accommodations may be necessary to afford such person equal opportunity to use and

enjoy a dwelling."  *Id.* § 3604(f)(3)(B).  This subsection does not "require[] that the denial of . . .

accommodations be the result of a discriminatory animus toward the disabled."  *Austin*, 826 F.3d

at 627.  Rather, it requires "only that the requested . . . accommodation be reasonable and that the

denial(s) result . . . in so diminishing that person's use and enjoyment of the premises as to

constitute a denial of equal opportunity."  *Id.*

To establish discrimination under the FHA, "plaintiffs have three available theories: (1)

intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a

reasonable accommodation."  *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir.

2003), *superseded by regulation on other grounds*; *see also Wilson v. Wilder Balter Partners,

Inc.*, 2015 WL 681594, at *7 (S.D.N.Y. Feb. 17, 2015) (same).  As Higgins states in her brief in

opposition to the Condominium Defendants' motion to dismiss, her claim "falls under the failure

to make a reasonable accommodation theory."  Dkt. No. 98 at 7; *see also* Dkt. No. 89 ¶ 169

(alleging that the Condominium Defendants "violated the FHA by not responding to Higgins'

requests for reasonable accommodations and by failing to make reasonable accommodations

available for Higgins' disability despite notice that such accommodations are necessary for

Higgins to derive the same use and enjoyment from [the Unit] as the[] other residents").  "In

order to prove a failure-to-accommodate claim, a plaintiff must show (1) that the plaintiff or a

person who would live with the plaintiff had a handicap within the meaning of § 3602(h); (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that the accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation." *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014).

The FHA provides that an "aggrieved person" may file suit "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . to obtain appropriate relief with respect to such discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). "The statute of limitations for certain discrimination claims, including the FHA, can be effectively extended under the 'continuing violation' theory, whereby the plaintiff claims not just an isolated violation, but an ongoing policy of discrimination which extends into the limitations period." *273 Lee Ave. Tenants Ass'n by Sanchez v. Steinmetz*, 330 F. Supp. 3d 778, 791–92 (E.D.N.Y. 2018) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 (1982) and *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004)). Where the continuing-violation doctrine applies, it "delays 'the commencement of the statute of limitations period . . . until the last discriminatory act in furtherance of' the alleged discriminatory policy." *Grimes v. Fremont General Corp.*, 785 F. Supp. 2d 269, 292 (S.D.N.Y. 2011) (quoting *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009)). "Under the continuing violation doctrine, when an unlawful practice 'continues into the limitations period, the complaint is timely' if the last alleged practice is within the two-year statutory period." *Dames v. de Blasio*, 2020 WL 3869724, at *4 n.5 (S.D.N.Y. July 8, 2020) (quoting *Havens*, 455 U.S. at 380).

"[S]uch tolling is . . . 'disfavored in this Circuit, and will be applied only upon a showing of compelling circumstances.'" *Stone v. 23rd Chelsea Assocs.*, 2020 WL 1503671, at *6 (S.D.N.Y. Mar. 30, 2020) (quoting *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 279 (S.D.N.Y. 2019)); *cf.* Dkt. No. 98 at 20 (Higgins arguing that the Condominium Defendants' actions constitute "[c]ompelling circumstances which warrant the use of the continuing violations doctrine" because they "fall under a pattern of covert conduct."). Moreover, some courts in this District have adopted the principle that the continuing-violation doctrine "does not apply where a plaintiff was on notice of what she believed was discrimination but 'failed to act in preservation of her rights in spite of her knowledge.'" *273 Lee*, 330 F. Supp. 3d at 792 (quoting *Petrosky v. N.Y. Dep't of Motor Vehicles*, 72 F. Supp. 2d 39, 48 (N.D.N.Y. 1999)); *see also Petrosky*, 72 F. Supp. 2d at 52 (stating, in the employment-discrimination context, that "[o]ther courts have . . . emphasized that longstanding notice of a claim may preclude resort to the continuing violation doctrine" and observing that "[t]he Second Circuit appears to agree"); *cf. Melton v. Malcolm Shabazz, L.P.*, 2021 WL 535661, at *4 (S.D.N.Y. Feb. 12, 2021) (declining to dismiss FHA claims on statute-of-limitations grounds where plaintiff asserted she was not aware of alleged discrimination before the limitations period). Not all have applied this principle, however; in *Eastern Paralyzed Veterans Association v. Lazarus-Burman Associates*, 133 F. Supp. 2d 203 (E.D.N.Y. 2001), discussed in the Court's prior Opinion and Order, the "fact that the plaintiffs first became aware of the condition [that violated the FHA] did not bar their claim when the violation related to 'an ongoing policy as opposed to a discrete incident' and that ongoing policy continued into the limitations period." *Higgins*, 2021 WL 5450205, at *7 (quoting *Eastern Paralyzed Veterans*, 113 F. Supp. 2d at 212).

27

The relevant question with respect to whether the continuing-violation doctrine applies to make an otherwise time-barred act timely is whether the act is discrete.  "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  Following *Morgan*, the Second Circuit held, in considering a claim brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), that "an employer's rejection of an employee's proposed accommodation for religious practices does not give rise to a continuing violation," because "the rejection is the sort of 'discrete act' that must be the subject of a [timely] complaint."  *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134–35 (2d Cir. 2003).  In *Elmenayer*, the Circuit explained:

> The rejection of a proposed accommodation is a single completed action when taken, quite unlike the "series of separate acts" that constitute a hostile work environment and "collectively constitute" an unlawful employment practice. Although the *effect* of the employer's rejection continues to be felt by the employee for as long as he remains employed, that continued effect is similar to the continued effect of being denied a promotion or denied a transfer.

*Id.* at 135 (quoting *Morgan*, 536 U.S. at 117).  This is so even if the request for an accommodation is repeated; the violation of the statute—the refusal to honor a request for accommodation—must occur within the limitations period for it to form the basis of a timely claim.  *See Zacharowicz v. Nassau Health Care Corp.*, 117 F. App'x 152, 153 (2d Cir. 2006) (summary order) (concluding that any claim plaintiff had for defendant's failure to accommodate plaintiff's religious practice prior to the limitations period was time barred where plaintiff "complained repeatedly about being scheduled to work or to be on-call . . . during Jewish Sabbaths and religious holidays" but where he did not allege "any unheeded requests for religious accommodation that occurred [during the limitations period]," citing *Elmaneyer* in support); *Bd. of Educ. v. C.M. on behalf of P.G.*, 744 F. App'x 7, 9 (2d Cir. 2018) (summary

order) ("In analyzing the timing of [when a claim accrues] in the context of discrimination claims, the Supreme Court has instructed that 'the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful.'" (quoting *Morse v. Univ. of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992))).

The Circuit and courts within this District have applied this principle in the context of claims for failure to accommodate a disability as well.  In *Troeger v. Ellenville Central School District*, 523 F. App'x 848, 851 (2d Cir. 2013) (summary order), the Circuit rejected an attempt to deem as timely under the continuing-violation doctrine a defendant's time-barred refusal to accommodate an employee's alleged disability, allegedly in violation of the Americans with Disabilities Act ("ADA").  There, an employee of defendant school district alleged that defendant refused to reasonably accommodate his alleged disability during the 2006–2007 school year, outside the relevant limitations period, as well as during the limitations period.  *Id.* at 849–51. The Circuit held that the continuing-violation doctrine could not make timely the defendant's refusal to accommodate before the limitations period began, explaining that "any alleged failure to accommodate Troeger's disability during the 2006–07 school year would have been actionable at the time of the relevant decisions refusing to accommodate Troeger's disability." *Id.* at 851.  It continued: "Troeger cannot file an untimely claim simply by alleging that the [defendant's] noncompliance continued, or that the [defendant] engaged in similar unlawful actions during subsequent years." *Id.* at 852 (internal quotation marks omitted).  As in the Title VII context, the continuing-violation doctrine does not apply in the ADA context even to repeated requests and denials for an accommodation.  *See, e.g.*, *Gomez v. N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 302 (S.D.N.Y. 2016) (Nathan, J.) (rejecting argument that failure-to-accommodate claim is timely because multiple "requests for accommodation remained unmet for

the duration of [the plaintiff's] employment" and relying on *Elmenayer* to reject the applicability

of the continuing-violation doctrine); *Fol v. City of New York*, 2003 WL 21556938, at *5

(S.D.N.Y. July 9, 2003) ("Although the repetition of [p]laintiff's requests [for an accommodation

under the ADA], and [defendant's] failure to act on them is distinguishable from the single

request and denial in *Elmenayer*, each request and denial is analogous to the discrete acts which

*Morgan* expressly held are no longer subject to the continuing violation doctrine."); *see also*

*Gomez*, 191 F. Supp. 3d at 302 ("Courts in this district have regularly applied *Elmenayer* to

failure to accommodate claims under the ADA.").

While not as firmly established with respect to failure-to-accommodate claims in the

FHA context, the Court sees no reason why the *Elmenayer* logic should not apply to claims

brought under that statute.  Both the FHA and the ADA compel covered entities to make

"reasonable accommodations" to persons with a disability (in the case of the ADA) or a handicap

(in the case of the FHA).  *See* 42 U.S.C. § 12112(b)(5)(A); 42 U.S.C. § 3604(f)(3)(B).

Generally, "analysis of a reasonable accommodation claim . . . is treated the same" under the

FHA and the ADA, and while there may be "subtle differences" between the statutes, no such

difference would counsel in favor of permitting the continuing-violation doctrine to apply to one

statute and not the other.  *Logan*, 57 F. Supp. 3d at 253–54 (first quoting *Sinisgallo v. Town of

Islip Hous. Auth.*, 865 F. Supp. 2d 307, 337 (E.D.N.Y. 2012); and then quoting *Henrietta D. v.

Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)); *see also Tsombanidis*, 352 F.3d at 373 n.4 ("Due

to the similarities between [the FHA Amendments and the ADA], we interpret them in

tandem.").  In both circumstances, the refusal to accommodate an individual seeking an

accommodation for a disability or handicap is a discrete act taken by the defendant.  At least one

court in this District has implicitly recognized as much in declining to apply the continuing-

violation doctrine to prevent consideration of a request for a reasonable accommodation under the FHA made years prior. *See, e.g.*, *Logan*, 57 F. Supp. 3d at 267 n.11 (concluding that the continuing-violation doctrine does not allow for consideration of an alleged request for reasonable accommodation under the FHA and citing to *Elmenayer*).

The Condominium Defendants—the only defendants against whom an FHA claim is brought—argue that only acts that occurred after May 12, 2019 are timely and may be considered in evaluating the viability of an FHA claim and that, considering these acts, Higgins has failed to make out a claim. Higgins disagrees on both counts. The Court will first consider the statute of limitations arguments to define what acts should be considered for the purposes of evaluating an FHA claim and then will consider whether the well-pleaded factual allegations of the Second Amended Complaint could support such a claim.

### A.    Statute of Limitations and Relevant Acts

The Condominium Defendants argue that, because the statute of limitations under the FHA is two years from the occurrence or termination of an alleged discriminatory practice, "the discriminatory practice complained of in the pleading must have occurred *after* May 12, 2019 for Plaintiff's FHA claim to be timely." Dkt. No. 97 at 5 (citing 42 U.S.C. § 3613(a)(1)(A)). They contend that none of the allegations before this date are independently actionable and that each is sufficiently discrete that the continuing-violation doctrine cannot link the time-barred acts to the non-time-barred acts such that the acts occurring before May 12, 2019 can be considered. *Id.* at 5–8.

The Court adopted a position similar to the Condominium Defendants' position in its prior Opinion and Order deciding the motion to dismiss the first amended complaint. The Court explained that the allegations of the actions proceeding May 12, 2019 were not "independently actionable under the FHA" and that "[e]ach alleged action is at most a discrete incident of

31

discrimination as opposed to a specific ongoing discriminatory policy or practice, or a specific and related instance of discrimination that was permitted to continue unremedied for so long as to amount to a discriminatory policy or practice." *Higgins*, 2021 WL 5450205, at *7 (alterations adopted and internal quotation marks omitted) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)).  Because "[e]ach of the alleged acts that preceded May 12, 2019 was complete and concluded more than two years before Higgins filed this action," Higgins could not take advantage of the continuing-violation doctrine to make claims related to those acts timely.  *Id.*

Higgins responds that the Second Amended Complaint cured the deficiencies on which the Court rested its conclusion that the continuing-violation doctrine did not apply.  She argues that her allegations do not speak to discrete incidents but rather were "evidence of a policy and practice adopted by the Condominium Defendants to retaliate against Higgins by ignoring her requests for reasonable accommodations" because these were "all denials relating to the same types of requests."  Dkt. No. 98 at 19–20.

The principle set forth in *Morgan*, *Elmenayer*, and their progeny directly undercut Higgins' position.  Describing the Condominium Defendants' acts as part of a "policy and practice" to ignore her requests for reasonable accommodations does not strip those acts of their discrete nature—each time the Condominium Defendants denied Higgins' request for a reasonable accommodation, they were committing a discrete act that could potentially serve as the basis for an FHA claim.  Just because the alleged violations were serial does not mean they were continuing.

Higgins argues that "it was not always clear and obvious to Higgins that her requests were being completely denied at the time they were made" because her requests were "being ignored and thus denied" and she would not found out about this until she would hear loud

construction noise without having received notice.  Dkt. No. 98 at 20.  But the fact that the denial

of an accommodation request may not have appeared until "weeks later," *id.*, does not make each

denial into anything other than a discrete act.  The Court will therefore consider the denial of

reasonable accommodations—the theory Higgins asserts she is pursuing, Dkt. No. 98 at 7—to

the extent those denials occurred after May 12, 2019.[7]

### B.  Requests for Reasonable Accommodations

The Condominium Defendants contend that the "arguably timely allegations" do not

speak to their conduct, concern matters within their control, provide details as to the substance of

requested accommodations, or provide allegations that would support a theory of disparate

treatment.  Dkt. No. 97 at 9–15.  They also argue that the allegations regarding the FHA

violations are conclusory because they "do not allege sufficient facts to prove that the motive for

the conduct was one circumscribed by the FHA, or that a specific reasonable accommodation

was requested within the statute of limitations and not responded to."  *Id.* at 16.

Higgins disagrees, pointing to what she describes as "detailed allegations concerning the

Condominium Defendant's [sic] knowledge of Higgins [sic] disability and describing the

numerous requests Higgins made for reasonable accommodations accompanied with notice that

such accommodation was necessary *because* of her disability."  Dkt. No. 98 at 7.

As explained above, to sustain her failure-to-accommodate claim, Higgins will need to

show "(1) that the plaintiff . . . had a handicap within the meaning of § 3602(h); (2) that the

defendant knew or reasonably should have been expected to know of the handicap; (3) that the

accommodation was likely necessary to afford the handicapped person an equal opportunity to

---

[7] The parties both appear to assume that the action should be deemed filed on May 12, 2021, even though counsel initially attempted to file the complaint on May 11, 2021.  *See* Dkt. No. 97 at 5; Dkt. No. 98 at 18.  There is no material difference between using May 11, 2019 or May 12, 2019 as the start date for statute-of-limitations purposes; the Court will use the latter.

use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation." *Olsen*, 759 F.3d at 156. "[A]t the outset of a lawsuit," a plaintiff ordinarily must plead "what the plaintiff must prove in the trial at its end." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303 (2d Cir. 2021) (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020)).

The parties appear to agree that the first two requirements have been adequately pleaded: that Higgins suffers from a handicap as defined by the FHA and that defendants knew or reasonably should have known of this handicap. Rather, the Condominium Defendants argue that Higgins does "not allege requests to the Condominium Defendants for a reasonable accommodation that was 'likely necessary to afford' Plaintiff an equal opportunity to use and enjoy the dwelling." Dkt. No. 97 at 16.[8]

Although many of the allegations in the Second Amended Complaint are conclusory and consist of little more than statements that Higgins "requested an accommodation" and that the Condominium Defendants "ignored" such requests, *see, e.g.*, Dkt. No. 89 ¶¶ 12, 13, 89, there are sufficient well-pleaded allegations to sustain Higgins' FHA claim. That is, Higgins has adequately alleged that she asked at least some of the Condominium Defendants for advanced notice of construction work and that this was an accommodation for her disability that was "likely necessary" to afford her an equal opportunity to use and enjoy her dwelling. *Olsen*, 759

---

[8] While the Condominium Defendants challenge that Higgins made requests "for a reasonable accommodation," they do not argue that any accommodations that were within their control— such as providing advanced notice of construction—would not have been reasonable. In light of this, and because "[w]hether a requested accommodation is required is 'highly fact-specific, requiring case-by-case determination,'" *Temple v. Hudson View Owners Corp.*, 222 F. Supp. 3d 318, 323 (S.D.N.Y. 2016) (quoting *Hubbard v. Samson Mgmt. Corp.*, 994 F. Supp. 187, 190 (S.D.N.Y. 1998)), the Court will not consider the reasonableness of the accommodation requests at this juncture.

F.3d at 156.  She alleges that, upon first occupying her Unit, she informed Crotty—the then property manager—"that because of her disability she would need a reasonable accommodation of advanced notice of construction work to be performed . . . so that Higgins could make appropriate arrangements including assessing whether she needed to live outside of [the Unit] during construction in the Building."  Dkt. No. 89 ¶ 34.  She alleges that "the Board of Managers" and "AKAM" had "knowledge of Higgins' request and need for a reasonable accommodation to receive notice of construction so she may assess whether to leave [the Unit]." *Id.* ¶ 35.  She further alleges that, at the annual board meeting in November of 2016, "in the presence of the then Board of Managers, including upon information and belief defendant Ritchken, Higgins expressed the need for a reasonable accommodation of advanced notice, due to her disability, and expressed to the [Condominium Defendants] her concern that the construction would not allow her, as a disabled person, the same opportunity to use and enjoy [the Unit] in the same way other residents could as the noise would trigger symptoms of her disability." *Id.* ¶ 38.  She alleges that she "repeatedly inform[ed] the [Condominium Defendants] that she is unable to live in [the Unit] during construction, and . . . that this is a result of her disability and that she required a reasonable accommodation notice of any construction [sic]." *Id.* ¶ 49.  In the Second Amended Complaint, Higgins also referenced letters authored in 2021 by one of her doctors that states that the "chronic construction in her building [has resulted] in a severe exacerbation in all of her symptoms from [her traumatic brain injury]." *Id.* ¶¶ 149–150.  These allegations are sufficient to plead that Higgins requested an accommodation that was likely necessary to afford her an equal opportunity to use and enjoy her home, particularly given the allegation that she required advance notice of construction so that she could assess how to proceed to minimize the effect noises would have on her disability.

There are allegations that, if proven, could support a finding that this request for an accommodation—couched in ongoing terms of future notice whenever there was construction generally—was denied after May 12, 2019. Higgins alleges that "[o]n or about August 19, 2019, [she] awoke to banging on her window as a result of more construction work being conducted in the Building," that she "sent an email to Ritchken, Starcic and AKAM informing them, once again, of her need for notice on this type of work to accommodate her disability and complaining of their consistent failure to do so." Dkt. No. 89 ¶ 121. She alleges that "[o]n or about March 9, 2020, [she] experienced huge amounts of noise [and shaking in the Unit] due to renovation work being performed in an apartment one floor above [the Unit] and also on the 14th floor" and that she had not received advanced notice of the work, despite her request to the Condominium Defendants "that she be provided with notice of renovation work that would create loud noises." *Id.* ¶ 126. These allegations support Higgins' claim that the Condominium Defendants failed to make the requested accommodation of providing Higgins advanced notice of construction, and that they did so within the application limitations period.

In her opposition to the motion to dismiss, Higgins also suggests that she made other requests for accommodations that were not honored. She states that she "requested accommodations with respect to notice of construction, mitigation of noises and fumes, mitigation of water and mold in her Home and access to the Building." Dkt. No. 98 at 13 (citing Dkt. No. 89 ¶¶ 13, 16, 34, 35, 38, 40, 43, 45, 49, 65, 67, 88, 89, 100, 102, 104, 106, 119, 130, 142, 145, 146, 147, 149, 157, 158, 159, 167, 169, 191, 192). And she alleges that she provided notice that "reasonable accommodations are necessary for Higgins to derive the same use and enjoyment from [the Unit] as other residents" through ongoing requests by Higgins to, among other things, "provide assistance in mitigating construction noise and noxious odors that invaded

[the Unit]; and . . . accommodating her requests for access to the Building including handicap parking access at the front of the Building and assistance in entering the Building since entry to the Building is not accessible." *Id.* ¶ 169.  But these vague and conclusory allegations are insufficient to plead that she actually *made requests* regarding these topics for reasonable accommodations with the requisite specificity that the Condominium Defendants would have known that an accommodation was being requested and why; rather, they simply state that Higgins made general requests and suggest that therefore the Condominium Defendants should have been on notice that some "reasonable accommodations are necessary."  *Id.*  An entity "must know what a plaintiff seeks prior to incurring liability for failing to affirmatively grant a reasonable accommodation." *Tsombanidis*, 352 F.3d at 579.  As the Court previously explained:

> The duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an accommodation made. Defendants must instead have been given an opportunity to make a final decision with respect to Plaintiffs' request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law.

*Higgins*, 2021 WL 5450205, at *6 (quoting *Prindable v. Ass'n of Apt. Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003)).  Thus, "[a] request for an accommodation must be reasonably specific." *Kromenhoek v. Cowpet Bay W. Condo. Ass'n*, 77 F. Supp. 3d 462, 471 (D.V.I. 2014); *see also Summers v. City of Fitchburg*, 940 F.3d 133, 139 (1st Cir. 2019) ("To prevail on . . . a reasonable accommodation claim, a plaintiff must show . . . a request for a specific accommodation that is both reasonable and necessary to allow the handicapped individual an equal opportunity to use and enjoy the particular housing, and the defendant's refusal to make the requested accommodation."); *Taylor v. Hous. Auth. of New Haven*, 267 F.R.D. 36, 65 (D. Conn. 2010), *aff'd sub nom. Taylor ex rel. Wazyluk v. Hous. Auth. of City of New Haven*, 645 F.3d 152 (2d Cir. 2011) (explaining that "*Tsombanidis* teaches that a plaintiff

does not have an actionable reasonable accommodation claim until she has requested, but failed to obtain, a specific accommodation" and decertifying a subclass where plaintiffs did not show "any basis on which an entity may be liable for denying a specific reasonable accommodation to individuals who have not requested that specific accommodation because the entity has not offered that specific accommodation to its beneficiaries").

Non-conclusory allegations cited by Higgins that could speak to a request for an accommodation (other than for advanced notice of construction) appear at paragraphs 65, 100, 106 in the Second Amended Complaint and relate to addressing "noxious" odors and fumes. However, these requests appear to be related to discrete occurrences of noxious odors and fumes—all of which were either addressed or resolved by May 12, 2019—and not a request for ongoing amelioration of any odor she found offensive. Specifically, Higgins alleges that, in September of 2017, an ENT specialist wrote a letter documenting Higgins' "severe allergies to fumes in the setting of construction in the building" and that Higgins "requested an accommodation be made because of her disability, that the noxious fumes be addressed by the Building." *Id.* ¶ 65. But Higgins also alleges that Crotty was aware of the problem of smells from the lobby construction lingering in the Unit and had installed an ozone machine and an air purifier in an attempt to remedy the issue. *Id.* ¶ 68. There is no allegation that "the noxious fumes" associated with this request or with the lobby construction more generally existed after May of 2019.

Higgins also alleges that in December of 2018, there were fumes coming into Higgins' apartment and that she "provided notice of the need for a reasonable accommodation in the form of addressing the fumes by the Building because of her disability," but she does not allege that the problem persisted past January 2019. *Id.* ¶ 100. She alleges that "[i]n April of 2019,

marijuana odor emanated into Higgins' apartment," that she had "expressed the need to rectify these noxious odors . . . and requested reasonable accommodation from the Building in doing so," and that, while "the Building acknowledged this issue, it was never corrected." *Id.* ¶ 106. She does not specify from who in "the Building"—defined in the Second Amended Complaint as a structure—she requested an accommodation, but in any event, she does not allege that this marijuana odor continued after April of 2019.

Higgins does allege that some fumes came into the Unit after May 12, 2019, but she does not allege that she requested an accommodation with respect to these fumes or on these occasions (and in one instance, she alleges that "management" *did* attempt to remedy the situation). She alleges: (1) "[o]n May 22, 2019, fumes were all over Higgins' apartment as well as the hallways. After Higgins called management, they put air blowers but that did not help," *id.* ¶ 111; (2) "[o]n May 31, 2019, fumes of marijuana came into Higgins' apartment again and the manager refused to come up to Higgins' apartment once again," *id.* ¶ 112; (3) "[o]n June 1, 2019, fumes once again came into Higgins' apartment coming from the mechanical room," *id.* ¶ 113; (4) "[o]n June 7, 2019, marijuana and some funky smelling fumes entered Higgins' Home. Once again, the manager refused to do anything about it," *id.* ¶ 115; (5) "[o]n June 9, 2019, Higgins' whole apartment smelled like marijuana to the point that Higgins couldn't breathe and felt shaky. Security came up to Higgins' floor but refused to come into Higgins' apartment and stated that management doesn't want him to report the marijuana any further and that he could not enter Higgins' apartment," *id.* ¶ 116; and (6) "[o]n June 10, 2019, to June 15, 2019, the fume reader in Higgins' Home alerted Higgins to the presence of marijuana fumes for the entire week, however, management refused to take any action. In various letters from Higgins' doctors cited below, one of the issues cited for her aggravated condition was the existence of noxious fumes

and marijuana smell in the Building," *id.* ¶ 117.  Unlike her request for a reasonable accommodation with respect to notice of ongoing construction—which was both specific in the accommodation requested (notice) and general in the scope of the circumstances to which it applied (future construction generally)—there are no allegations that could be plausibly read to support a claim that Higgins requested and was denied a reasonable accommodation with respect to these odors.  Unlike advanced notice of construction noise, for which there can plausibly be an ongoing accommodation request, an accommodation for these odors were not alleged to have been requested in advance (nor does such an issue seem susceptible of such an advanced request where it is not alleged that the odors were foreseen by the Condominium Defendants).  In the absence of such "ongoing" requests tied to her disability at the time it was made, the statements that a manager refused to address odors, without more, cannot be read to mean that each time those odors were smelled, an accommodation request was made.

Nor do any of the allegations cited by Higgins support that Higgins requested that the Condominium Defendants use precautions to minimize noise to Higgins during construction as an accommodation.  Rather, Higgins alleges that, when she expressed concern about the effect of the lobby construction on her ability to live in the Unit, she was "assured" that the Condominium Defendants "would be using sound reducing methods," Dkt. No. 89 ¶ 39; she did not allege that she requested this mitigation as an accommodation.  Indeed, Higgins alleges that the construction of the lobby took place "without any precautions to minimize disruption to Higgins" but that "[t]he requested reasonable accommodation *of notice of the construction* was completely ignored."  *Id.* ¶ 40 (emphasis added).  She alleges that she informed the Condominium Defendants "of her need for a reasonable accommodation because of her disability, and requested that steps be taken to reduce the noise," but she does not allege that the

accommodation was the reduction in noise rather than (or in addition to) the notice of the construction. *Id.* ¶ 43.

With respect to Higgins' allegations that she was not reasonably accommodated when she faced issues in accessing her building, those allegations cannot support an FHA claim.  Higgins alleges that the doorman was not present when she arrived on several occasions, causing her to have to try to open the front door while moving her belongings, which is difficult on account of her disability.  *Id.* ¶¶ 157–158.  She alleges that "she had explained her need for access to the Home and her need due to her disability of assistance opening the door" but does not allege to whom she explained this need.[9]  *Id.* ¶ 159.  However, Higgins does not allege that she requested an accommodation in connection with these accessibility issues or even that any such request would constitute an "accommodation"; rather, the Second Amended Complaint suggests that the lack of a doorman was a problem that was faced by all residents equally and experienced by all residents equally, in contravention of the normal policy of the building, which "has a 24 hours [sic] doorman" and which charges "common charges for . . . the amenity of a doorman."  *Id.* ¶ 158.  Higgins alleges that "she attempted on several occasions to make advance plans for doorman assistance," *id.* ¶ 157—she does not allege that she actually requested a doorman to be present at specific times to put her on equal footing with other residents.  And to the extent that Higgins complains that she was denied handicap parking access in the front of the building, *see id.* ¶ 169, there is no allegation that she ever requested this from any of the Condominium Defendants or that such a request was denied.[10]

---

[9] Higgins attaches to her complaint a copy of an emails she sent to Ritchken, Starcic, and AKAM regarding difficulties she had accessing the building on a specific day.  That email suggests that she had to wait a few minutes for assistance and was provided it when asked (albeit not unprompted), not that she was denied assistance.  *See id.* ¶ 158; Dkt. No. 89-8.

[10] Higgins alleges that "there is no handicap doorway in the entrance as required by law."  *Id.*

Finally, Higgins' allegations with respect to the leaking and subsequent mold she experienced in the Unit cannot sustain an FHA claim.  Even assuming that the Condominium Defendants could be held liable for a failure to ameliorate leaks and mold conditions in Higgins' privately owned space, Higgins still has not alleged facts that would suggest that such an action would be an accommodation for her particular handicap.  Higgins alleges that she "suffers from a variety of conditions including vertigo, hearing and vision impairment from traumatic brain injury and thus has a disability within the meaning of the FHA.  As a direct and proximate result of Higgins's disability, Higgins is particularly sensitive to loud noises, noxious fumes, and vibrations resulting from construction work as well as other harmful conditions such as mold." *Id.* ¶ 167.  She points to doctors' letters "substantiat[ing]" her "heightened sensitivity to 'noxious stimuli'" and "explaining the exacerbation of her disability due to the . . . mold infestation," *id.* ¶ 168, and argues in her opposition to the motion to dismiss that the doctors' letters refute the Condominium Defendants' position "that Higgins has not alleged that mold exposure affects her differently than others."  Dkt. No. 98 at 14.

But far from substantiating the allegation that her sensitivity is related to her disability, these doctors' letters, which were appended to and incorporated by reference into the Second Amended Complaint, do not support her allegation that her sensitivity to mold is related to her disability.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("[W]hen the complaint alleges that . . . a document made a particular representation, the court may properly look at the document to see whether that representation was made.").  The letters include a recommendation

---

¶ 158.  She does not, however, appear to bring a federal claim for the Condominium Defendants' alleged noncompliance with the unspecified law, instead alleging in connection with her FHA claim that the Condominium Defendants' actions toward Higgins specifically constituted violative conduct.

by one of her doctors—Dr. Fusco—that Higgins remain in a "mold free living environment,"
Dkt. No. 89 ¶ 147, and an observation by that same doctor that there is "suspected mold" in the
Unit with a recommendation that "she be removed from noxious stimuli," *id.* ¶ 149.  While Dr.
Fusco explains that the "chronic construction" has exacerbated the symptoms of Higgins'
traumatic brain injury, *see* Dkt. No. 108 at 3, 7, 9, she tellingly does not tie the concern about
mold to Higgins' traumatic brain injury or resulting disability and posits only a temporal, rather
than causal, relationship between the "water leak" and exacerbation of Higgins' "brain injury
symptoms," *id.* at 4.  Nor do two other letters Higgins attached to the Second Amended
Complaint by other doctors make this connection—one, from Dr. Martin Pico, simply states that
Higgins, who had "symptoms consistent with chronic radiculopathy vs SI joint pain," "would
greatly benefit from being able to perform physical therapy and exercise in an environment that
is free from mold."  *Id.* at 11.  The other, from Dr. Gregory Tsai, which Higgins points to in her
opposition to the motion to dismiss as support that mold affects her differently than others,
simply says that Higgins "suffers from nasal congestion and chronic sinus infections," which
"can be exacerbated by allergies or exposure to environmental triggers," and thus "Higgins
should not be in a living area that is infested with black mold" as "[e]xposure to these
environmental triggers can worsen Ms. Higgins's health and increase the frequency of her
infections."  *Id.* at 12.

"Ordinarily, the duty to make reasonable accommodations is framed by the nature of the
particular handicap."  *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 301 (2d Cir.
1998).  And "[i]f the proposed accommodation provides no direct amelioration of a disability's
effect, it cannot be said to be 'necessary.'"  *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of
Twp. of Scotch Plains*, 284 F.3d 442, 460 (3d Cir. 2002) (quoting *Bryant Woods Inn, Inc. v.*

*Howard Cnty., Md.*, 124 F.3d 597, 604 (4th Cir. 1997)).  The handicap—the "physical or mental impairment which substantially limits one or more of [a] person's major life activities," 42 U.S.C. § 3602(h)(1)—alleged here is not congestion or sinus infections but the effects and symptoms of a traumatic brain injury.  Although Higgins stated in the Second Amended Complaint in a conclusory fashion that she is more sensitive to mold because of that disability, she alleges no facts that support that conclusion, in contrast to, for example, her allegations as to construction noise, which can trigger symptoms of her disability like vertigo and headaches.  *Cf. Magee v. Bos. Land Co. Mgmt. Servs.*, 90 F. App'x 560, 561 (2d Cir. 2004) (summary order) (affirming grant of summary judgment in favor of defendant where plaintiff "neglected to submit any medical or other trustworthy documentation establishing that his condition requires" the requested accommodation and that it was thus an accommodation "necessary to afford [him] equal opportunity to use and enjoy [the] dwelling" (internal quotation marks and citation omitted)).  Significantly, none of the material that she points to in support and that she chose to put before the Court in connection with the Second Amended Complaint actually support this position.  Rather, the materials suggest that, while construction noise exacerbates the symptoms related to her disability, the danger she faces with respect to mold exposure is due to sinus infections and congestion—neither of which are alleged to be part of her disability.

\*     \*     \*

Because Higgins has adequately alleged that she was denied a reasonable accommodation of advanced notice of construction, dismissal of her FHA claim is not appropriate at this juncture.

## II.    Claims Against Starcic, Ritchken, and AKAM

Higgins brings her first through tenth causes of action (all but the fraudulent inducement and slander per se claims) against the Condominium Defendants, which includes Starcic,

Ritchken, and AKAM.  As a threshold matter, the Condominium Defendants argue, in footnotes throughout their briefs, that the breach of contract claims against the Condominium Defendants other than the Condominium should be dismissed, since the Bylaws—"which arguably form the contract between the Condominium only and the plaintiff"—are only between "the Condominium" and Higgins.  Dkt. No. 97 at 21 n.3.  Higgins appears to agree that the breach of contract claim cannot lie against most defendants; as she states in arguing that she is entitled to plead both negligence and breach of contract claims, "a majority of Condominium Defendants were not signatories to the Offering Plan or by laws."  Dkt. No. 98 at 2; *see also id.* at 25 ("As asserted above, a majority of Condominium Defendants are not parties to the contract and as such their duties are independent of the contract.").

The Condominium Defendants request dismissal of the breach of contract claim against Starcic, Ritchken, and AKAM by name.  *See* Dkt. No. 97 at 19 n.1, 20 n.2.  The parties expressly agree that Starcic, Ritchken in his individual capacity, and AKAM are not signatories to the contract.  Accordingly, the breach of contract claim is dismissed against them.  *See Linden v. Lloyd's Planning Serv., Inc.*, 750 N.Y.S.2d 20, 21 (1st Dep't 2002) ("[P]laintiff's claims [including for breach of the condominium's contractual obligations] would not lie against the board members in their individual capacities.").[11]

---

[11] The Condominium Defendants do not expressly request dismissal as to any other defendants and as used in the Condominium Defendants' brief, "Condominium" appears to refer to more than just 120 Riverside.  *See, e.g.*, *id.* at 13 (explaining that paragraph 142 of the Second Amended Complaint "assert[s] Plaintiff's disagreement with the Condominium's conclusion as to the environmental condition of the building," where paragraph 142 refers to an opinion of "Condo Management Group"—Higgins' term for the Condominium Defendants); *id.* at 20 (noting both that AKAM was acting as an agent "of the defendant Condominium Board" and that AKAM was "serving as the managing agent for the defendant Condominium").  *But see id.* at 15, 17, 18 (referring to the "Condominium Board" as such).  Accordingly, the Court does not address whether other defendants except 120 Riverside are entitled to dismissal of the breach of contract claim on this theory.

The Condominium Defendants argue that the claims against Starcic and Ritchken should be dismissed because the Second Amended Complaint does not allege (1) specific tortious conduct by Ritchken or decisions made by him that were not in good faith, in the exercise of honest judgment, or in furtherance of the "lawful and legitimate" corporate purposes of the Condominium Board, Dkt. No. 97 at 17; or (2) decisions made by Starcic that were "not outside [sic] the scope of authority given to him by his employer, or by his employers principal" or were not made in good faith, in the exercise of honest judgment, or in "furtherance of the lawful and legitimate corporate purposes of the Condominium Board," *id.* at 18; *see also id.* at 17. The Condominium Defendants argue that the business-judgment rule operates to shield Ritchken from individual liability and that Starcic is protected by the rule that agents of a disclosed principal have no liability to third parties absent malfeasance. *See id.* at 18–19. In a footnote, they contend that, because Higgins "has alleged no agreement or contract with either Ritchken or Starcic," Higgins' breach of contract claim against them should be dismissed. *Id.* at 19 n.1.

Higgins responds that the claims against Starcic and Ritchken should stand because "[b]oth Starcic and Ritchken have misused their respective positions in the Building to harass and bad mouth Higgins," "acted in bad faith in discharging their respective duties to Higgins as a unit owner, abused their power in the Building and embarked upon a path to make living in the Building impossible for Higgins." Dkt. No. 98 at 3. She also argues that the "ongoing acts and omissions of Ritchken and Starcic were not undertaken in good faith, and neither is protected by the business judgment rule." *Id.* at 29. As to Ritchken, Higgins points to "documentary evidence" appended to the Second Amended Complaint that she attempted to work with Ritchken towards a resolution to various issues in the Building and argues that her requests went unanswered, and she contends that "upon information and belief, Ritchken disclosed to a unit

owner Higgins' disability and aversion to construction noise," which caused a unit owner to "menacingly" come to Higgins' door. *Id.* at 30.  She also cites an allegation from the Second Amended Complaint that "[t]he acts of Ritchken were undertaken in bad faith and willfully." *Id.* (quoting Dkt. No. 89 ¶ 219).  As to Starcic, Higgins argues that he "controls the staff of the Building day to day and has embarked upon a path to make Higgins Home [sic] unlivable by consistently ignoring her requests for accommodation and upon information and belief creating an environment in the Building where everything she says is discredited and deemed to be because she is crazy" and that his conduct therefore "falls outside of the protection of the business judgment rule." *Id.*  She also argues that Starcic is liable for negligently performing his duties under the theory that negligence is misfeasance rather than nonfeasance and that he could be liable for nonfeasance anyway because AKAM, through Starcic, has complete and exclusive control of the Building.  *Id.* at 27–29.

The Condominium Defendants also move for dismissal of the claims against AKAM— also named in the first through tenth causes of action of the Second Amended Complaint.  They argue that, because managing agents like AKAM have no liability to third parties for non-feasance under New York law, and because AKAM is not alleged to have engaged in affirmative wrongful acts rather than simply acting as the agent of the condominium, all claims against AKAM should be dismissed.  *See* Dkt. No. 97 at 19–20.  Higgins contends that AKAM owes a duty of care to Higgins and that its negligence—which, Higgins argues, constitutes misfeasance—in performing its duties renders it liable to Higgins.  Dkt. No. 98 at 27.  As with Starcic, Higgins argues that AKAM may be liable for nonfeasance because, she claims, it has complete and exclusive control of the Building.  *Id.* at 28.

The Court first addresses the claims against Ritchken.  It then addresses the claims against AKAM and Starcic.

## A.      Claims Against Ritchken

Under New York law, "[w]here a challenge is made by an individual owner to an action of a condominium board of managers, whether incorporated or not, absent claims of fraud, self-dealing, unconscionability, or other misconduct, the court should apply the business judgment rule and should limit its inquiry to whether the action was authorized and whether it was taken in good faith and in furtherance of the legitimate interests of the condominium.  So long as the board acts for the purposes of the condominium, within the scope of its authority and in good faith, courts will not substitute their judgment for the board's."  19A N.Y. Jur. 2d Condominiums § 103; *see also Schoninger v. Yardarms Beach Homeowners Ass'n, Inc.*, 523 N.Y.S.2d 523, 527 (2d Dep't 1987) (noting that the business judgment rule applicable to repair decisions of board of managers); *see also Hersh v. One Fifth Ave. Apartment Corp.*, 83 N.Y.S.3d 4, 5 (1st Dep't 2018) (dismissing claims against individual board members regarding water infiltration); *Orange Orchestra Props. LLC v. Gentry Unlimited, Inc.*, 139 N.Y.S.3d 528 (1st Dep't 2021) (holding that claims against individual defendants challenging action by cooperative regarding renovation were correctly dismissed).  Where the board's duty arises solely as a result of contract, the individual directors are not liable.  *Bd. of Managers of Alfred Condominium v. Miller*, 162 N.Y.S.3d 353, 355 (1st Dep't 2022).  In addition, directors of a condominium or cooperative board of directors, no different than directors of any other incorporated or unincorporated association, owe a duty to the shareholders collectively and not to any particular shareholder individually.  It is inherent in the job of a board of directors that it will occasionally need to make decisions on issues that affect shareholders or unit owners differently; the fact that one owner might be disappointed while the other is pleased is not alone sufficient to give rise to a personal

action against the director.  *Bd. of Managers of Honto Condominium v. Red Apple Child Development Center*, 160 A.D.3d 580 (1st Dep't 2018) (dismissing claim against condominium board managers individually for failure to keep common elements of building in good repair); *Hersh*, 83 N.Y.S.3d at 5 (dismissing claim for breach of fiduciary duty, noting there was no "corporate tort in which the individual board members could have participated" since "there is no viable corporate tort alleging breach of fiduciary duty, because a corporation owes no fiduciary duty to its shareholders"); *cf. Carper v. Nussbaum*, 825 N.Y.S.2d 55, 67–69 (2d Dep't 2006) (holding that, while "the members of a board of managers of a condominium owe a fiduciary duty to the individual unit owners *in their management of the common property*," individual unit owners cannot bring an individual action to protect his or her interest in the common elements of a condominium, and that managing agents are fiduciaries "as to the condominium, but not as to the individual unit owners" (emphasis added)).  At the same time, "'the participation of an individual director in a corporation's tort is sufficient to give rise to individual liability'—even absent any 'tort independent of the tort committed by the corporation itself.'" *Bd. of Managers of Alfred Condominium v. Miller*, 162 N.Y.S.3d 353, 355 (1st Dep't 2022) (quoting *Fletcher v. Dakota, Inc.*, 948 N.Y.S.2d 263, 268 (1st Dep't 2012)).  That is, where the claim arises from tort—and not from contract—and where the individual board member has participated in the tort, his membership on the board and his participation in the tort through membership on the board does not immunize him from liability.[12]  *See Fletcher* 948 N.Y.S.2d at 266 (declining to dismiss

---

[12] In this sense, the circumstances in which a board member may be held liable for misconduct (by participating in a tort) overlaps in large part with the obligations imposed on the board members by the Bylaws and Offering Plan.  *See* Dkt. No. 89 ¶ 218 ("The offering plan and the Condominium By-Laws for the Building both state: 'The members and officers of the Board of Managers shall not be liable to the Unit Owners except for their own individual willful misconduct or bad faith actions or bad faith failures to act.'").  Because the Court is not presented with a circumstance where this language would alter the liability of Ritchken, the

claims against cooperative board director alleged to have participated in the cooperative's
violation of the State and City Human Rights Laws).

As for the first cause of action—for a violation of the FHA—the Supreme Court "has
noted that an action brought for compensation by a victim of housing discrimination is, in effect,
a tort action." *Meyer v. Holley*, 537 U.S. 280, 285 (2003).  Thus, "[i]ndividual board members
or agents such as property managers can be held liable when they have personally committed or
contributed to a Fair Housing Act violation." *Conn. Fair Housing Center v. Corelogic Rental
Prop. Solutions, LLC*, 369 F. Supp. 3d 362, 375 (D. Conn. 2019) (quoting *Sabal Palm
Condominiums of Pine Island Ridge Ass'n, Inc. v. Fischer*, 6 F. Supp. 3d 1272, 1293 (S.D. Fla.
2014)).  The first through fourth causes of action state a claim for relief against Ritchken
personally at least with respect to the failure to accommodate.  Although most of Higgins'
allegations are leveled against what she calls the "Condo Management Group" generally and
allege no participation by Ritchken personally, paragraph 121 of the Second Amended
Complaint alleges that "[o]n or about August 19, 2019," Plaintiff "awoke to banging on her
window as a result of more construction work being conducted in the Building [and] sent an
email to Ritchken, Starcic and AKAM informing them, once again, of her need for notice on this
type of work to accommodate her disability and complaining of their consistent failure to do so."
Dkt. No. 89 ¶ 121.  Thereafter, the Board of Managers, which includes Ritchken, failed to
provide the requested accommodation.  *Id.* ¶ 126.  Accepting these allegations as true, then,
Plaintiff had informed Ritchken personally of her disability and had requested of him an

---

Court need not consider the effect this language has on Ritchken's liability under traditional
principles of tort liability.

accommodation based on that disability, and he personally failed to provide that accommodation. That is enough for personal liability.  *See Fletcher* 948 N.Y.S.2d at 270.

However, the fifth cause of action cannot lie against Ritchken.  In connection with her "retaliation coercion intimidation" claim.  Higgins alleges that the "Condo Management Group, in whole or in part, engaged in unlawful conduct to coerce, intimidate, and threaten Higgins" and "retaliated by refusing to repair the leak on the façade of the Building," Dkt. No. 89 ¶¶ 15, 228, 232, she does not allege facts that would show that Ritchken specifically participated in these acts.  As to Higgins' conclusory allegation that, "[a]t all times relevant hereto, defendants Trump Place Condominium, Board of Managers, AKAM, Ritchken, and Starcic, actively chose to retaliate against Higgins by harassing her and adopting a pattern of ignoring her requests for a reasonable accommodation due to her disability under the FHA, as opposed to providing the requested accommodations," *id.* ¶ 15, she does not allege what actions Ritchken supposedly took in pursuit of this retaliation.  And she also points to statements made by unnamed individuals that stated that Higgins was "crazy" or had sued a building in which she had previously lived, but there is no allegation anywhere in the Second Amended Complaint that Ritchken was one of these individuals.  Absent factual allegations that Ritchken personally participated in retaliation against Higgins, the fifth cause of action against him cannot stand.

The sixth cause of action plainly does not state a claim against Ritchken personally.  That cause of action alleges a breach of the Bylaws and Declaration of 120 Riverside.  But those Bylaws constitute a contract and the duties of the Board of Managers arise contractually and not as a result of the law of torts.  Even to the extent Ritchken was bound by the Bylaws, he would not be liable as an individual director.  *See Bd. of Managers of Alfred Condominium*, 162

N.Y.S.3d at 355 (explaining that where the board's duty arises solely as a result of contract, individual directors are not liable). Thus, that claim against Ritchken is dismissed.

The seventh cause of action for negligence also cannot lie against Ritchken. The duty alleged to be owed by Ritchken individually appears to derive from the Bylaws and Offering Plan. *See, e.g.*, Dkt. No. 89 ¶¶ 259–60. However, there are no allegations that Ritchken personally engaged in any action that would breached the duty to repair the leaks in the common elements of the Building (such as in the façade) that could have led to the mold of which Higgins complained. Rather, the allegations with respect to Ritchken's role in the leak and mold are that Ritchken was told Higgins should not be living in an area with black mold, *id.* ¶ 146. There are no other allegations specific to Ritchken that relate to the leaks or mold that form the basis of Higgins' negligence claim. Absent these allegations, there is no plausible inference that Ritchken participated in a tort of the condominium that could make him personally liable. The negligence claim against him must be dismissed.

## B.     Starcic and AKAM

As to Starcic and AKAM, as disclosed agents for the condominium, they "cannot be held personally liable for the acts of their principal, unless they have participated or personally profited in the wrong." *Lax v. 29 Woodmere Blvd. Owners, Inc.*, 812 F. Supp. 2d 228, 239–40 (E.D.N.Y. Sept. 23, 2011) (Bianco, J.) (alterations adopted) (quoting *Bd. of Mngrs. of the Fairways at N. Hills Condominium v. Fairways at N. Hills*, 545 N.Y.S.2d 343, 347 (2d Dep't 1989)). Higgins argues that AKAM and Starcic are liable to Higgins for negligently performing their duties, thus committing "misfeasance," Dkt. No. 98 at 17–28; because they committed affirmative acts of negligence, Higgins contends, they are liable to her notwithstanding their position as disclosed agents, *see Newman v. Upton, Cohen & Slamowitz*, 781 N.Y.S.2d 508, 509 (1st Dep't 2004) ("As a disclosed agent . . . , defendant is liable to third persons only for

*affirmative* acts of negligence." (emphasis added) (citing, *inter alia*, *Greco v. Levy*, 12 N.Y.S.2d 470, 472 (1st Dep't 1939)); *see also Greco*, 12 N.Y.S.2d at 472 (concluding that agent was not "liable in tort to third persons for failure to keep the premises in repair" in the face of the argument that the agent "in failing to make repairs the agent was derelict in the performance of his duty" because "the duty which the agent failed to execute was a duty to his principal and not a duty to the plaintiff [third party]," and explaining that "[t]his view accords with the established rule of law that the agent is not liable to third parties for nonfeasance but only for affirmative acts of negligence or other wrong.").  "[A]ffirmative acts of negligence or other wrong" is not required for liability where a managing agent "has complete and exclusive control of the management of the building;" in that case, "a managing agent of a building may nevertheless be subject to liability for nonfeasance." *Lennon v. Oakhurst Gardens Corp.*, 645 N.Y.S.2d 652, 653 (3d Dep't 1996); *see also Mollino v. Ogden & Clarkson Corp.*, 154 N.E. 307, 308 (N.Y. 1926) (explaining that, where corporate agent "had possession of [a] building and had stipulated, under the agreement, to make the necessary repairs," it committed "misfeasance on its part in not making the necessary repairs"); *Greco*, 12 N.Y.S.2d at 471 (explaining that *Mollino* did not require a finding that an agent was liable to a third party for failure to repair a bathroom floor because, in *Mollino*, "the contract under which the agent was retained constituted him, in effect, a trustee of the property for the several parties for whose benefit it was to be operated. Moreover, it gave him possession of the premises as distinguished from a mere duty to the owner to rent apartments, make repairs and collect the rents").

The Second Amended Complaint has pleaded facts sufficient to show that AKAM or Starcic committed affirmative acts of negligence or other wrongdoing, but only as to her failure-to-accommodate claims.  Higgins repeatedly alleges that AKAM and Starcic, along with the

other Condominium Defendants, "ignore[d] . . . explicit legal requirements to accommodate Higgins," Dkt. No. 89 ¶ 14, "actively chose to retaliate against Higgins by harassing her and adopting a pattern of ignoring her requests for a reasonable accommodation due to her disability under the FHA," *id.* ¶ 15, and "decided to violate the law and harm Higgins" by making "a calculated, but unlawful decision that Higgins does not deserve rights equivalent to those afforded to other non-disabled persons," *id.* ¶ 16.  Putting aside these conclusory allegations, the factual basis for Higgins' assertion that AKAM and Starcic committed affirmative acts of negligence or other wrongdoing is, with respect to her FHA claim, her allegation that, on or about August 19, 2019, she notified AKAM and Starcic of the need for advance notice of construction work and complained of their consistent failure to do so.  *Id.* ¶ 121.  As explained in Part I.B, *supra*, the refusal to provide such notice can form the basis for a failure-to-accommodate claim under the FHA.  And in this way, by allegedly denying Higgins' request for an accommodation—a request that the Second Amended Complaint can be fairly read to show that AKAM and Starcic had some power to grant, *see* Dkt. No. 89 ¶¶ 26 (alleging that AKAM "is charged with operating and maintaining" 120 Riverside); 27 (alleging that Starcic "is responsible for the day to day maintenance issues at" 120 Riverside)—they participated in the alleged wrongdoing against her.  Thus, even as agents for a disclosed principal, AKAM and Starcic may be liable for their participation in denying Higgins a reasonable accommodation, and neither the FHA claims nor the parallel state and local claims for the failure to accommodate—counts one through four—will be dismissed against them.

The allegations cannot be read, however, to suggest that AKAM or Starcic participated in wrongdoing or affirmative acts of negligence with respect to any of the other claims that otherwise survive this motion.  In connection with her fifth cause of action, for retaliation,

coercion, and intimidation, Higgins does not allege affirmative acts taken by Starcic or AKAM that could support a finding that they specifically retaliated against, coerced, or intimidated her.[13] She alleges that she was retaliated against by "the Condo Management Group . . . pointing to the irrelevant fact that she had sued a building in which she had previously lived." Dkt. No. 89 ¶ 230. The Second Amended Complaint elsewhere makes clear that this comment was made not by AKAM or Starcic but by an unidentified "ex-member of the Board of Managers." *Id.* ¶ 95. Higgins also alleges that, when she lost consciousness, the "Condo Management Group . . . retaliated by telling EMTs that Higgins was 'crazy' so that the EMTs would treat Higgins as an emotionally distressed patient." *Id.* ¶ 231. Again, the Second Amended Complaint identifies this speaker not as Starcic or AKAM, but as a "Building employee[]." *Id.* ¶ 75. And Higgins alleges that the "Condo Management Group . . . retaliated by refusing to repair the leak on the façade of the Building which is causing water damage in Higgins' Unit." *Id.* ¶ 232. She does not allege that AKAM or Starcic specifically and affirmatively refused to repair the leak, instead alleging that it was simply never repaired. *Cf. id.* ¶ 10. In the absence of allegations that AKAM and Starcic specifically engaged in affirmative acts of negligence or wrongdoing, the fifth cause of action against them cannot stand.

There are also no facts pleaded in connection with the seventh cause of action, for negligence, that could support a finding that AKAM or Starcic engaged in affirmative acts of negligence. Even assuming that Higgins pleaded facts sufficient to conclude that AKAM has a

---

[13] Higgins alleges that the "Condo Management Group refused to take any steps to accommodate any of Higgins' reasonable requests that the Condo Management Group implement measures to reduce noise, vibrations, and noxious fumes in carrying out their renovation of the lobby of the Building," but this appears just to be background for the "retaliation coercion intimidation" cause of action and to not allege any affirmative acts of negligence on the part of AKAM or Starcic that could constitute coercion, intimidation, or retaliation. Dkt. No. 89 ¶ 229.

duty of care to maintain the common elements to avoid dangerous conditions, she has not pleaded any facts that could suggest they engaged in affirmative acts of negligence or wrongdoing rather than simply failing to repair the leak in the façade.  Such a failure to repair is not an affirmative act that can form the basis for agent liability to a non-principal such as Higgins.  *See Greco*, 12 N.Y.S.2d at 472.

Higgins cannot avoid dismissal of the fifth and seventh causes of action against AKAM and Starcic by taking advantage of the exception to the general rule that an agent must have committed an affirmative act of negligence or wrongdoing.  Higgins argues that AKAM, and through its managing agent Starcic, "has exclusive control of the Building" and that "therefore the defense of nonfeasance does not relieve AKAM or Starcic from liability."  Dkt. No. 98 at 28; *see also Lennon*, 645 N.Y.S.2d at 653; *Ioannidou v. Kingswood Mgmnt. Corp.*, 610 N.Y.S.2d 277, 278 (2d Dep't 1994) ("As managing agent of the building in which the plaintiff was injured, Kingswood could be subject to liability for nonfeasance only if it were in complete and exclusive control of the management and operation of the building.").  Higgins alleges that AKAM "is charged with operating and maintaining Trump Place Condominium," Dkt. No. 89 ¶ 26, and Starcic is "an agent of AKAM[] and  . . . is responsible for the day to day maintenance issues at Trump Place Condominium," *id.* ¶ 27.  But she does not allege that AKAM or Starcic had "exclusive control" of the Building; to the contrary, she alleges that "Trump Place Condominium, the Board of Managers, *and* AKAM own, lease, operate, manage and/or control an apartment building."  *Id.* ¶ 11 (emphasis added).  Absent an allegation of exclusive control, and in light of the allegations suggesting that 120 Riverside and the Board of Managers retained some control over the Building, neither AKAM nor Starcic may be liable for nonfeasance.  *See Ioannidou*, 610 N.Y.S.2d at 278 (affirming finding that managing agent "did not have exclusive

control over the building and could not be liable for nonfeasance" where relevant agreement was nearly identical to one where "the court found that the managing agent was not in complete and exclusive control of the premises because the owner had reserved to itself a certain amount of control in the agreement").

## III.    Negligence Claim

The Condominium Defendants move for dismissal of Higgins' seventh cause of action, which is for negligence.  The Second Amended Complaint alleges that the Condominium Defendants were negligent because they allowed mold to develop in the Unit and did not promptly remediate it.  It alleges that "[o]n or about February 2021, it was uncovered that significant mold was present behind the walls" and that, while Higgins is the owner of the Unit, "[t]he mold may be originating from behind the wall," Dkt. No. 89 ¶¶ 247, 250.  It also alleges that the Condominium Defendants: were "aware of the existence of a water leak" in the Unit but "did not take any affirmative steps to control the ongoing moisture issue in the [Unit], causing mold to develop," *id.* ¶¶ 245–246; were "negligent in allowing the mold to occur in the [Unit]" in that they "knew or should have known that mold was growing in the [Unit]" and was notified of the mold but that they "failed to act promptly upon receiving notice of the mold," *id.* ¶¶ 249, 252; and have a "duty to remove mold, correct the underlying water leaks that may be leading to mold problems and fix any ventilation problems that contribute to mold," *id.* ¶ 253.

In connection with the negligence claim, the Second Amended Complaint cites provisions of the offering plan for 120 Riverside (the "Offering Plan") and the Bylaws that speak to the responsibilities of the Board of Managers.  *Id.* ¶¶ 258–260.  The Second Amended Complaint alleges that the Offering Plan states, in relevant part:

> Damage to or destruction of any portion of the Building as a result of fire or other casualty shall be promptly repaired and reconstructed by the Board of Managers as nearly as practicable to the condition it was in before the casualty using the

> proceeds of casualty insurance and/or other funds for that purpose, subject to
> various conditions as described in the By-laws.

*Id.* ¶ 258.  The complaint also alleges that the Bylaws[14] define "General Common Elements" as

including the "exterior walls of the Building excluding windows but including all façade and

structural elements of exterior walls," *id.* ¶ 259, and "Residential Common Elements" as

including "exterior windows, including without limitation, panes, casements, and frames in

Residential Unit," *id.* ¶ 260.  According to the Second Amended Complaint, the Bylaws states

that the duties of the Board of Managers include: (1) "making ordinary repairs, restorations,

additions and improvements to or alterations of the General Common Elements and making

repairs to and restoration of the Property . . . after damage or destruction by fire or other casualty,

as a result of condemnation or eminent domain proceedings," *id.* ¶ 259; and (2) "maintenance,

repairs and replacements whether structural or non structural ordinary or extraordinary to . . . the

General Common Elements, Residential Common Elements or Non Residential Common

Elements whether located inside or outside of the Units . . . if concerning a General Common

Element," *id.* ¶ 260; *see also id.* (stating that such "maintenance, repairs and replacements" shall

be made by the "residential Committee if concerning a Residential Common Element").

The Condominium Defendants argue that Higgins' negligence claim must be dismissed

because she does not allege a violation of a legal duty independent from the contractual duties

that form the basis of her breach of contract claim.  Dkt. No. 97 at 20–21.  Higgins responds that

she is entitled to plead claims in the alternative and that she can therefore maintain her

negligence claim—particularly since most of the Condominium Defendants are not signatories to

the contract that forms the basis of the breach of contract claim—and that the duty owed to her

---

[14] The Second Amended Complaint cites the Offering Plan for the language it attributes to the Bylaws. *See id.* ¶¶ 259–260.

arose from her residence in the Building rather than dependent on the contract itself.  Dkt. No. 98 at 24–26.  Higgins frames this duty as follows:

> The moment Higgins became a resident of the Building, this created a duty on the part of all Condominium Defendants to act on her behalf, to the best of their ability to assist with and prevent leaks, manage the Building to avoid discrimination, and manage the Building to avoid the growth of toxic mold in the Home.  Condominium Defendants breached their duty to properly manage the Building . . . .

Dkt. No. 98 at 25.  Higgins also argues that, though AKAM is not a signatory to a contract with Higgins, it "has a duty to repair Higgins' Home as they [sic] control the premises."  Dkt. No. 98 at 28.

Under New York law, where a duty to make repairs arises only as a result of the bylaws of a condominium or the proprietary lease of a cooperative, the plaintiff's sole cause of action is in contract and a claim in tort will not lie.  *See Baker v. 16 Sutton Place Apt. Corp.*, 768 N.Y.S.2d 198, 200 (1st Dep't 2003).  "[A]bsent the allegation of a duty owed by defendant independent of the contract . . . , a valid cause of action for negligence is not stated."  *Wapnick v. Seven Park Ave. Corp.*, 658 N.Y.S.2d 604, 606 (1st Dep't 1997).  Where a duty exists independent of the agreement, the negligence claim is not duplicative and a tort action can be maintained.  *See Gendell v. 42 W.17th St. Housing Corp.*, 148 N.Y.S.3d 76, 77 (1st Dep't 2021).  "Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party."  *Espinal v. Melville Snow Contractors, Inc.,* 773 N.E.2d 485, 487 (N.Y. 2002).

It is well-settled under New York law that "a landowner has a duty to exercise reasonable care under the circumstances in maintaining its property in a safe condition."  *Kush v. City of Buffalo*, 449 N.E.2d 725, 727 (N.Y. 1983) (citing *Basso v Miller*, 532 N.E.2d 868, 872 (N.Y. 1976)).  "A condominium complex owner has a duty to repair and maintain the 'common elements' of the condominium building and owes a non-delegable duty to maintain the premises

in good repair."  Dkt. No. 98 at 25 (quoting *Onetti v. Gatsby Condominium*, 975 N.Y.S.2d 27, 29

(1st Dep't 2013)); *cf.* N.Y. Multiple Dwelling L. § 78 ("Every multiple dwelling, including its

roof or roofs, and every part thereof and the lot upon which it is situated, shall be kept in good

repair.  The owner shall be responsible for compliance with the provisions of this section.").

        As Higgins recognizes, this duty extends as far as the ownership extends—that is, to the

common areas of the building and those parts owned by 120 Riverside itself.  Higgins has

provided no support for the proposition that the duty that could give rise to the negligence itself

also extends to making repairs to her Unit, rather than that she is entitled to damages that she

suffered in her apartment for breach of the duty to maintain the premises owned by 120

Riverside in good working condition.  For example, in *Onetti*, on which Higgins relies, residents

of a condominium apartment who suffered a fire in their unit sued the owner of the condominium

for negligence.  The Appellate Division concluded that the owner had not demonstrated its

entitlement to judgment as a matter of law because the owner "had a duty to exercise reasonable

care in maintaining the property in a reasonably safe condition," and the owner had not

established that "the origin of the fire was not within the 'common elements' of the

condominium."  *Onetti*, 975 N.Y.S.2d at 29.  Because issues of fact existed with respect to

whether the conditions that caused the destructive event in the plaintiffs' apartment was part of

the "common elements" of the apartment or not, the owner was not entitled to dismissal of the

plaintiffs' negligence claim.  *Id.*  Here, Higgins has alleged that the water leak was caused, at

least in part, by water penetration in the façade of the Building.  Dkt. No. 89 ¶ 19.

        There is also a duty of care owed for a "dangerous condition on property," and this duty

may be triggered by not only ownership but "control" over the premises.  *Weierheiser v.

McCann's Inc.*, 6 N.Y.S.3d 882, 883 (4th Dep't 2015); *cf. Cotton v. Robert K. Lesser Trust*, 2017

WL 811886, at *5 (Sup. Ct. Chautauqua Cnty. Feb. 23, 2017) (citing *Onetti* for the proposition

that those who "manage a building have a duty to exercise reasonable care in maintaining the

building . . . in a reasonably safe condition").  To the extent that Higgins alleges that water

leaking from the common elements of the Building, which 120 Riverside and the "Board of

Managers" are alleged to "own, lease, operate, manage and/or control," Dkt. No. 89 ¶ 11, is a

dangerous condition, she has adequately alleged the existence of a duty of care.

 The owners of the condominium had a duty to maintain the common elements of the

Building and those in control had a duty of care to address dangerous conditions in the premises

they controlled.  To the extent that the damage to the Unit was caused by a breach of those

duties—for example, by water penetration in the façade of the Building—120 Riverside and the

Board of Managers may be held liable in negligence.  The negligence claim against 120

Riverside[15] and the Board of Managers derives from common law duties owed and is thus not

duplicative of the breach of contract claim.  *See Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897,

899 (2d Cir. 1980) ("Where the conduct alleged breaches a legal duty which exists independent

of the contractual relations between the parties a plaintiff may sue in tort." (internal quotation

marks and citation omitted)); *cf. Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 516

N.E.2d 190, 193 (N.Y. 1987) ("It is a well-established principle that a simple breach of contract

is not to be considered a tort unless a legal duty independent of the contract itself has been

violated.").  However, because members of the Board of Managers may only be held liable for

tort claims like this one upon a showing that they participated in the condominium's tort, and

---

[15] The Second Amended Complaint and the documents incorporated by reference therein—
including the Bylaws—gives rise to the plausible inference that 120 Riverside, as the
condominium association, is the owner of the Building.  The Condominium Defendants do not
appear to dispute this.

because Higgins does not allege acts by individual members of the Board of Managers in connection with her negligence claim, the cause of action cannot lie against individual members of the Board of Managers.

Higgins has not, however, alleged a broader duty that was owed to her, either by the other Condominium Defendants or by any Condominium Defendants to address leakage occurring solely in the Unit. She argues that, by her residency alone, there was "a duty on the part of all Condominium Defendants to act on her behalf, to the best of their ability to assist with and prevent leaks," Dkt. No. 98 at 25, but she provides no support for the existence of such a duty in the Unit that she, and she alone, owned. The negligence claim may therefore be maintained, but only insofar as it relates to negligence in maintaining or repairing the common elements of the Building.

## IV.    Claim for Declaratory Judgment

The Condominium Defendants argue—in two sentences—that the ninth cause of action for declaratory judgment should be dismissed as duplicative of Higgins' breach of contract cause of action. Dkt. No. 97 at 21. Higgins responds that it is separate and apart from the breach of contract cause of action in that it is warranted by "[t]he prejudicial and discriminatory behavior on the part of [the] Condominium Defendants," Dkt. No. 98 at 22, and that the breach of contract action does not provide adequate relief for the Condominium Defendants' breach of their legal duties, *id.* at 22–23.

"A cause of action for a declaratory judgment is unnecessary and inappropriate when the plaintiff has an adequate, alternative remedy in another form of action, such as breach of contract." *Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S.2d 279, 281 (1st Dep't 1988) At this juncture, the Court cannot say that the claim for declaratory relief "parallel[s] the breach of contract claim[] and merely seek[s] a declaration of the same rights and obligations." *Id.*

Rather, it is broader in that it seeks relief against all Condominium Defendants and for "each of the violations" committed by them, including those against whom a breach of contract claim cannot lie.  The Court will not dismiss the claim for declaratory judgment as duplicative at this stage.

## V.      Claim for Negligent Infliction of Emotional Distress

The Condominium Defendants move for dismissal of the tenth cause of action—for negligent infliction of emotional distress—because the Second Amended Complaint does not allege conduct "so outrageous as to go beyond all possible bounds of decency," as required to state a claim.  Dkt. No. 97 at 22.  Higgins responds that "extreme and outrageous conduct is not an essential element" of a cause of action for negligent infliction of emotional distress.  Dkt. No. 98 at 23 (internal quotation marks and citation omitted).  Viewed under the correct standard, Higgins argues, her claim survives because she alleges adequately that she suffered emotional and physical harm as a direct result of the Condominium Defendants' breach of the duty of care. *Id.*

"To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021) (en banc).  Departments of the Appellate Division appear to be split on whether "extreme and outrageous conduct" is an essential element of a cause of action for negligent infliction of emotional distress.  The Second Department has analyzed the issue and stated unequivocally that, "notwithstanding case law to the contrary, extreme and outrageous conduct is not an essential element of a cause of action to recover damages for negligent infliction of emotional distress." *Taggart v. Costabile*, 14 N.Y.S.3d 388, 398 (2d Dep't 2015); *see also*

63

*Tigano v. United States*, 527 F. Supp. 3d 232, 249 (E.D.N.Y. Mar. 22, 2021) (declining to dismiss plaintiff's claim based on a failure to plead extreme and outrageous conduct).  The First Department, on the other hand, recently explained that "[e]xtreme and outrageous conduct continues to be an essential element of a cause of action alleging negligent infliction of emotional distress," and acknowledged *Taggart* in so explaining.  *Xenias v. Roosevelt Hosp.*, 120 N.Y.S.3d 298, 299–300 (1st Dep't 2020); *see also Lazar v. City of New York*, 2022 WL 2953934, at *5 (S.D.N.Y. July 26, 2022); *Holmes v. City of New York*, 111 N.Y.S.3d 856, 857 (1st Dep't 2019) ("Contrary to plaintiff's argument, extreme and outrageous conduct is an essential element of a cause of action alleging the negligent infliction of emotional distress.").

The Court need not decide whether Higgins was required to plead extreme and outrageous conduct as part of her negligent infliction of emotional distress claim because she has not alleged a breach of a duty that could support a "direct causal connection between the breach and the emotional harm alleged," *Francis*, 992 F.3d at 81.  The negligence Higgins alleges in connection with her negligent infliction of emotional distress claim "consists of the [Condominium Defendants'] negligent acts and failure to act which exposed her to repeated, sudden, and protracted periods of noise, vibrations and reverberations that shook the walls, ceiling, furniture and fixtures in [the Unit], as well as mold, dust and chemical odors."  Dkt. No. 89 ¶ 275.  As discussed in Part III, *supra*, the extent of the duty owed to Higgins by any of the Condominium Defendants were to maintain the common elements of the Building and keep those elements in good repair.  The negligent infliction of emotional distress claim could thus only be premised on the breach of the duty to resolve the water leak in the façade of the Building, particularly since the Second Amended Complaint cannot be read to assert that the construction that aggrieved Higgins was in violation of the duty to maintain or repair the

building.  The relevant conduct for the negligent infliction of emotional distress claim—a breach

of the duty to maintain leading to mold formation and damage in the Unit—is the same as for the

negligence claim, and the relief sought in connection with the negligent infliction of emotional

distress claim and the negligence claim are identical: Higgins seeks monetary damages of at least

$10,000,000 "plus costs, attorneys' fees, interest, punitive damages, and medical bills incurred

by Higgins."  *Id.* ¶¶ 262, 274.  In this regard, the claims are duplicative of one another; "[u]nder

New York law, claims are duplicative when both arise from the same facts and seek the identical

damages for each alleged breach."  *Deutsche Bank Nat. Trust Co. v. Quicken Loans Inc.*, 810

F.3d 861, 869 (2d Cir. 2015) (internal quotation marks and citation omitted); *see also Deer Park*

*Enters., LLC v. Ail Sys., Inc.*, 870 N.Y.S.2d 89, 90. (2d Dep't 2008) ("Here, the conduct and

resulting injury alleged in the fourth cause of action are identical to those alleged in the first two

causes of action . . . . Therefore, the fourth cause of action should have been dismissed as

duplicative of the [first two] causes of action.").

> As this Court has previous explained:
>
> A [negligent infliction of emotional distress] claim cannot be asserted if it is "essentially duplicative of tort or contract causes of action." . . . "The rationale for this rule is grounded in the underlying purpose of the common law tort of negligent infliction of emotional distress which has its roots in the acknowledgement by the courts of the need to provide relief in those circumstances where traditional theories of recovery do not."

*Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 364 (S.D.N.Y. July 28, 2021) (first quoting

*Djangmah v. Falcione*, 2013 WL 208914, at *9 (S.D.N.Y. Jan. 18, 2013); then quoting *Virgil v.*

*Darlak*, 2013 WL 4015368, at *10 (W.D.N.Y. Aug. 6, 2013) (internal quotation marks omitted)).

Because the only allegations that could support a negligent infliction of emotional distress claim

in light of the connection between the limited duty owed and the allegations made are duplicative

of the conduct underlying the negligence claim, the negligent infliction of emotional distress claim will be dismissed as duplicative of the negligence claim.[16]

Even if the claims were not duplicative, the Court would not sustain the negligent infliction of emotional distress claim. Higgins does not allege that the noise, vibrations, or chemical odors—the result of renovations—occurred in breach of duty to maintain the premises. Nor does she allege that the water leak in the façade of the Building was itself a manifestation of this negligent infliction of emotional distress, instead alleging that the negligence exposed her to "mold." *See* Dkt. No. 89 ¶ 275. That the water penetration in the façade of the Building led, upon information and belief, the window to leak, that mold formed as a result of the window leak, and that Higgins thereafter was distressed and suffered harm by the fact that there was mold does not create a "direct causal connection" between any action the Condominium Defendants took (or did not take) with respect to the water penetration of the façade and Higgins' eventual distress upon discovering that there was mold in the wall of the Unit. Without such a "direct causal connection" to an alleged breach of the duty that was actually owed, Higgins cannot sustain a claim for negligent infliction of emotional distress.

## VI.    Slander Per Se Claim

Higgins alleges that Starcic made and published to third parties "oral defamatory false statements" with respect to Higgins' mental state and her disability. Dkt. No. 89 ¶ 295. Starcic allegedly called Higgins "crazy" to individuals present at the inspection. *Id.* ¶ 297. He also, upon observing her leave the Unit to go to her car with a walker and return without one, stated to Higgins' lawyer "one minute she needs a walker and another minute she does not." *Id.* ¶ 298.

---

[16] The Court would not reach a different conclusion even if the obligation under the FHA to grant a reasonable accommodation could be read to create a duty on which a negligent infliction of emotional distress claim could rest, because that too would be duplicative of a cause of action already asserted by Higgins.

The Condominium Defendants argue that the "slander per se" claim must be dismissed because: (1) the statements are non-actionable as a matter of law; (2) the second statement is conceded to be true in the Second Amended Complaint; (3) the statements are the subject of a privilege; and (4) Higgins does not allege special damages. Dkt. No. 97 at 23. Higgins responds that she need not prove special damages because the defamatory statements were "slander per se" because she derives her income from a settlement reached due to her disabilities, Dkt. No. 98 at 31, and because the "atmosphere created by Starcic" made his statement that she was "crazy" actionable, even if the statement would have not been actionable on its own, *id.* at 32.

The elements of a cause of action for defamation are a "false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se." *Salvatore v. Kumar*, 845 N.Y.S.2d 384, 388 (2d Dep't 2007) (quoting *Dillon v. City of New York,* 704 N.Y.S.2d 1, 5 (1st Dep't 1999)). "Since falsity is a necessary element of a defamation cause of action and only facts are capable of being proven false, . . . only statements alleging facts can properly be the subject of a defamation action." *Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014) (quoting *Gross v. New York Times Co.,* 623 N.E.2d 1163, 1167 (N.Y. 1993) (internal quotation marks omitted)). "Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Mann v. Abel,* 885 N.E.2d 884, 886 (N.Y. 2008). "In evaluating whether a cause of action for defamation is successfully pleaded, [t]he words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not

actionable and cannot be made so by a strained or artificial construction." *Dillon*, 704 N.Y.S.2d at 5.

Courts "apply three factors in determining whether a reasonable reader would consider the statement connotes fact or nonactionable opinion: '(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.'" *Davis*, 22 N.E.3d at 1005 (quoting *Mann*, 885 N.E. at 33). Higgins pleads no facts that indicate that Starcic's statement that Higgins is "crazy" could be reasonably understood to have been "an assertion of fact" capable of being proven false rather than a "pure opinion" that is not actionable under the laws of New York. *Davis*, 22 N.E.3d at 1004. "Loose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable." *Dillon*, 704 N.Y.S.2d at 5. Thus, the Appellate Division has observed that a statement that someone is "crazy" "appear[s] to be a hyperbolic expression of opinion, and thus, nonactionable." *Epifani v. Johnson*, 882 N.Y.S.2d 234, 243 (2d Dep't 2009). The Court agrees. The term "crazy", at least as used in the context alleged, is not susceptible of a precise, provable meaning and is frequently used informally; even if it were not, there is nothing about the context in which Starcic used the term that would suggest he was stating a fact that could be proved true or false.

The second statement, that one minute Higgins was using a walker and the next she was not, cannot form the basis of a defamation claim with the facts alleged in the Second Amended Complaint. "Truth provides a complete defense to defamation claims." *Dillon*, 704 N.Y.S.2d at 6. The Second Amended Complaint alleges that Higgins was using a walker when she went to

her car and returned without it.  It thus appears to be technically true, at least according to the allegations that must be assumed to be true at this juncture, that "one minute she needs a walker and another minute she does not."  Dkt. No. 89 ¶ 298.

## VII.   Fraudulent Inducement Claim

Higgins pleads a single claim against the Gallianis for fraudulent inducement.  She alleges that the Gallianis made deliberate misstatements as to the Unit being without leaks "for the purpose of inducing Higgins to purchase" the Unit.  Dkt. No. 89 ¶ 278.  In particular, she alleges that she relied to her detriment on a representation in a rider to the contract of sale that, to the best of the Gallianis' "actual knowledge" "there have not been any leaks into the Unit and Seller has not received written notice of any leaks from the Unit, during the past twelve months" and that the Unit "shall be delivered free from any active leaks," *id.* ¶ 279.  Higgins also claims to have relied on a signed sworn statement from the Gallianis' attorney signed on June 8, 2016— the date Higgins purchased the Unit, *see id.* ¶ 30—that states: "On June 8, 2016 [I] had a telephone conversation with Nancy Galliani who confirmed to me that the last leak into Unit 3N at 120 Riverside Boulevard was more than 3 years ago."  *Id.* ¶¶ 228, 280; *see also* Dkt. No. 89-11.  The letter was delivered after Higgins, during a walkthrough inspection prior to closing, allegedly observed "water staining by the bedroom window.  *Id.* ¶ 4.  Higgins alleges that the representation and the letter constituted "deliberate misstatements" that fraudulently induced her to purchase the Unit.  *Id.* ¶ 289. Within a month after closing but before Plaintiff moved into the Unit, her contractors allegedly discovered water penetration near the bedroom window while they were renovating other aspects of the Unit.  *Id.* ¶ 96.  She alleges that "soon after" her purchase the window began to leak.  *Id.* ¶¶ 9, 94.

The Gallianis move to dismiss the claim against them.  They argue that Plaintiff cannot establish reliance because—based on her own allegations—she was aware of a condition (the

water staining on the window) that at a minimum "should have alerted her to the presence of a possible leak, triggering a duty to further investigate the condition before consummating the transaction," and she nonetheless failed to exercise her right to conduct further investigation or to ask the Gallianis' permission to conduct any testing to determine whether there was water penetration.  Dkt. No. 78 at 9.  The Gallianis also argue that the merger provision and a provision by which Higgins agrees to accept the property "as-is" in the contract of sale, as well as a rider to the contract that states the contract had "been entered into after full investigation by the parties and neither is relying upon any statement, representation, or warranty that is not embodied in the contract," precludes any reliance on the statement of the seller's attorney.  *Id.* at 13–16.  They further argue that Higgins has pleaded neither transaction causation nor loss causation.  *Id.* at 16–19.  The Gallianis argue that Plaintiff has not alleged either scienter or that the misrepresentations were false at the time they were made—that the Gallianis had actual knowledge that there was a leak within the year before the contract was signed.  *Id.* at 21–22.  Finally, the Gallianis argue that Higgins' claim should be barred by the equitable doctrine of laches.  *Id.* at 22–23.  Higgins responds that she was not placed on notice of an active leak when she saw water staining in her home, Dkt. No. 100 at 8,11, that the merger clause does not preclude fraudulent inducement claims, *id.* at 11–15, and that the Second Amended Complaint sufficiently pleads that the misrepresentations were the case of the damages sustained by Higgins, *id.* at 15–19.  She also argues that she has pleaded sufficient detail with respect to the scienter of a fraud claim, *id.* at 20, and that the defense of laches is reserved for the trier of fact and thus is not proper at this stage of the proceedings, *id.* at 21–26.

The contract of sale ("Contract") between Higgins and the Gallianis is dated May 2, 2016.  Dkt. No. 111 at 1.  It provides for Higgins' purchase of the Unit "as is," with an exception

of a representation in paragraph 5(f) that "[a]ll refrigerators, freezers, ranges, dishwashers, washing machines, clothes dryers and air conditioning equipment included in the sale will be in working order at the time of Closing." *Id.* ¶¶ 10, 5(f).  In particular, the Contract provides that:

> Purchaser has inspected the Unit, its fixtures, appliances and equipment and the personal property, if any, included in th[e] sale, as well as the Common Elements of the Condominium, and knows the condition thereof and, subject to subpara. 5(f), agrees to accept the same 'as is,' i.e., in the condition they are in on the date hereof, subject to normal use, wear and tear between the date hereof and the Closing.

*Id.* ¶ 10.  Paragraph 10 goes on to state that Higgins, as purchaser:

> has considered or waived consideration of all other matters pertaining to this Contract and to the purchase to be made hereunder, and does not rely on any representations made by any broker or by Seller or anyone acting or purporting to act on behalf of Seller as to any matters which might influence or affect the decision to execute this Contract or to buy the Unit, or said personal property, except those representations and warranties which are specifically set forth in this Contract.

*Id.*  The Contract has a merger or integration clause:  "All prior understandings and agreements between Seller and Purchaser are merged in this Contract and this Contract supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter hereof."  *Id.* ¶ 24.  A rider to the Contract, which supersedes any inconsistent provisions in the Contract itself, includes other representations of the sellers, including that to the best of their "actual knowledge," "there have not been any leaks into the Unit and Seller has not received written notice of any leaks from the Unit, during the past twelve months.  The Unit shall be delivered free from any active leaks."  *Id.* at 17; *see also* Dkt. No. 89 ¶ 279.  A different rider to the Contract contains the following language:

> It is understood that this Contract has been entered into after a full investigation by the parties and neither party is relying upon any statement, representation or warranty that is not embodied in the Contract made by the other.  Purchaser acknowledges that Seller has afforded Purchaser the opportunity for full and complete investigation, examination, and inspection of the Unit.

Dkt. No. 111 at 14–15.

The Gallianis are entitled to dismissal of the claim against them.  "To recover damages for fraud, a plaintiff must prove (1) a misrepresentation or an omission of material fact which was false and known to be false by the defendant, (2) the misrepresentation was made for the purpose of inducing the plaintiff to rely upon it, (3) justifiable reliance of the plaintiff on the misrepresentation or material omission, and (4) injury." *Jablonski v. Rapalje*, 788 N.Y.S.2d 158, 162 (2d Dep't 2005).  Establishing that a plaintiff actually relied on a misrepresentation is not enough, she must also show "that this reliance was reasonable or justified."  *Daly v. Kochanowicz*, 884 N.Y.S.2d 144, 152 (2d Dep't 2009); *see also Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599–600 (reciting the "fundamental precept that the asserted reliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud").  Here, Plaintiff cannot plead either reliance, falsity, or scienter.

As an initial matter, Plaintiff cannot plead reliance on the extracontractual representation by the Gallianis' attorney.  That representation, made on the date of the closing, is to the effect that he had a conversation with one of the sellers and that she had told him that the last leak into the Unit was more than three years earlier.  Dkt. No. 89  ¶¶ 228, 280; *see also* Dkt. No. 89-11. Tellingly, the representation was not made by the Gallianis themselves and spoke only to what the attorney said he was told; it was not a representation of fact.  The Contract, however, contains a specific disclaimer precluding reliance on the attorney's extra-contractual statement. Those disclaimers are not limited to the general statement in Paragraph 24 that "[a]ll prior understandings and agreements between Seller and Purchaser are merged in this Contract and this Contract supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter thereof."  Dkt. No. 111  ¶ 24.  It also includes the specific disclaimer in Paragraph 10 that Plaintiff is agreeing to

take the Unit "as is"; she agreed that she "has inspected the Unit . . . and knows the condition

thereof and . . . agrees to accept the same 'as is,' i.e., in the condition they are in on the date

hereof" and that she "does not rely on any representations by . . . anyone acting or purporting to

act on behalf of Seller as to any matters which might influence or affect the decision to . . . buy

the Unit . . . except those representations and warranties which are specifically set forth in this

Contract." *Id.* ¶ 10.  Moreover, in a rider to the Contract, Higgins agreed that the Contract "has

been entered into *after a full investigation* by the parties and neither party is relying upon any

statement, representation or warranty that is not embodied in the Contract made by the other"

and acknowledged "that Seller has afforded [Higgins] the opportunity for full and complete

investigation, examination, and inspection of the Unit."  *Id.* at 14–15.

    "A general merger clause is ineffective to exclude parol evidence of fraud in the

inducement," *DiFilippo*, 537 N.Y.S.2d at 223.  However, under New York law, "a specific

disclaimer denying reliance on certain . . . representations can render parol evidence inadmissible

even to substantiate a claim of fraud," *O'Hearn v. Bodyonics, Ltd.*, 22 F. Supp. 2d 7, 13

(E.D.N.Y. 1998).  The relevant clauses in this case are not the sort of "omnibus statement that

the written instrument embodies the whole agreement, or that no representations have been

made," but are rather the sort of "specific disclaimer[s] [that] destroy the allegations in plaintiff's

complaint that the agreement was executed in reliance upon these contrary . . . representations."

*Danann Realty Corp.*, 157 N.E.2d at 598–99.  These clauses plainly contemplate that Higgins

cannot rely on representations as to things that could have been uncovered by investigation and

inspection of the Unit, or representations contained outside of the Contract as to the condition of

the Unit, which Higgins agreed to purchase "as is."  When faced with similar clauses, the

Appellate Division has construed the language as "a specific disclaimer as distinguished from a

general merger clause." *Mahn Real Estate v. Shapolsky*, 577 N.Y.S.2d 824, 826 (1st Dep't 1991) (considering language of contractual rider where sale was stated to include "personal property *if any*," purchaser agreed to take the same "as is," and purchaser represented that he "inspected the premises or caused an inspection thereof" and concluded that the language "negate[d] the plaintiff's claim that it relied on the existence of personalty when it signed the contract"); *see also 85–87 Pitt St., LLC*, 921 N.Y.S.2d at 41 (holding that merger clause that set forth that the plaintiff "accepted the building 'as is' after having had an opportunity to inspect the premises" and "specifically disclaimed reliance on any representations as to the physical condition of the building . . . extinguished any claims arising from defendants' alleged misrepresentations that the building did not have a bedbug problem").  As a result, Plaintiff cannot rely on the extracontractual statement of the attorney to support a fraudulent inducement claim.

Plaintiff also cannot base a fraudulent inducement claim on the actual representation in the Contract—that to the Gallianis' "actual knowledge," there have been no leaks into the Unit and the sellers had receive no notice of leaks within the prior twelve months.  In *Daly v. Kochanowicz*, 884 N.Y.S.2d 144 (2d Dept. 2009), the Appellate Division, Second Department, confronted similar factual claims.  During a pre-closing inspection, the purchaser's inspector discovered evidence of water intrusion in the basement, and the purchaser then made inquiries of the sellers, who denied ever having water problems in the house.  *Id.* at 152.  The court assumed that the statements were false and were not barred by the merger clause, but held that even under those assumptions, the plaintiff had failed to plead reliance; it explained: "In light of the plaintiff's private inspector's discovery of evidence of water intrusion in the basement of the subject property, made known to the plaintiff prior to closing, any reliance on alleged statements

by one of the sellers that they had never had 'water problems in the house' was unreasonable and unjustifiable." *Id.* at 153.

Here too, Higgins herself found evidence of a leak in the Unit but chose to rely on representations that there had been no recent or active leaks.  Higgins alleges that "[d]uring the final walkthrough prior to her purchase of the [Unit], Higgins observed water staining at the window in the bedroom," but "[a]t no point did Higgins observe the existence of an active or present leak."  Dkt. No. 89 ¶¶ 4, 5.  She alleges that, in order to induce her to close, the attorney for the sellers signed a statement confirming that he had been told that there was no leak, as a leak that had previously been there had been repaired "several years earlier."  *Id.* ¶ 6.  She also alleges that she "relied on the direct representation in the rider to the contract of sale made by Sellers stating that the unit would be delivered free from leaks and had not had any leaks in the twelve months prior to closing."  *Id.*  She does not allege that after observing the water staining, she sought an inspection or otherwise investigated the cause of the staining; faced with a visible water stain, she decided simply to close and to do nothing more.  "Reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where 'plaintiff was placed on guard or practically faced with the facts.'"  *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006) (quoting *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 81 (2d Cir. 1980), *abrogated in part on other grounds by Peltz v. SHB Commodities*, 115 F.3d 1082, 1090 (2d Cir. 1997)).  That is, in some situations, "[c]ircumstances may be so suspicious as to suggest to a reasonably prudent plaintiff that the defendants' representations may be false, and that the plaintiff cannot reasonably rely on those representations, but rather must make additional inquiry to determine their accuracy."  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) (internal quotation marks and alterations omitted).  "[T]he greater the sophistication

of the investor, the more inquiry that is required." *Crigger*, 443 F.3d at 235.  While the question whether a plaintiffs' reliance was reasonable is often "a question of fact for the jury rather than a question of law for the court," *STMicroelectronics, N.A. v. Credit Suisse Securities (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011), it is not always so, *see Allison v. Round Table Inv. Mngmt. Co., LP*, 447 F. App'x 274, 275–76 (2d Cir. 2012) (summary order) (concluding that there were "no facts" in the plaintiffs' complaint "from which a district court could draw an inference of reasonable reliance").

The circumstances as alleged in the Second Amended Complaint do not permit an inference that Higgins' reliance on the representations made by the Gallianis and their counsel that there were no active or recent leaks were reasonable.  After being directly confronted with circumstances that would suggest the Gallianis' representations were false, Higgins made no investigation to determine the accuracy of the representations, instead asking the sellers to reconfirm the substance of their representations through their agent.  There are no allegations that the presence of a leak was "peculiarly within the [Gallianis'] knowledge," and "[i]f the facts represented are not peculiarly within the representor's knowledge and the other party has the means available to him of knowing by the exercise of ordinary intelligence the truth or real quality of the subject of the representation he must make use of those means or he will not be heard to complain that he was induced to enter the transaction by misrepresentation." *DiFilippo v. Hidden Ponds Assoc.*, 537 N.Y.S.2d 222, 224 (2d Dep't 1989); *see also 85–87 Pitt St., LLC v. 85–87 Pitt St. Realty Corp.*, 921 N.Y.S.2d 40, 41 (1st Dep't 2011) (affirming dismissal of fraudulent inducement where basis of alleged fraud was a bug infestation because this "is not a matter peculiarly within a seller's knowledge that requires disclosure by the seller" because "[a]n infestation could be discovered with reasonable diligence and an inspection of the premises").

The facts that Higgins had a right to investigate and that she exercised that right precludes any such claim.  *See McPherson v. Husbands*, 864 N.Y.S.2d 444, 445–46 (2d Dep't 2008) (holding that where premises were made fully available for inspection by plaintiffs and their agents the facts represented were not matters peculiarly within the knowledge of the seller, and "the plaintiffs had the means available to them of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the representation, and as it was their responsibility to make use of those means, they will not be heard to complain that they were induced to enter into the transaction by misrepresentations").  The obligation to make an independent inquiry into the truth of the matter would be meaningless if a purchaser could discharge this obligation simply by asking for another representation from the same party (or that party's agent) that he claims has defrauded him.

Indeed, "reliance on a warranty is not *per se* reasonable": "A warranty will not save a plaintiff's fraud claim if it relied on representations known to be false or relied in a matter 'so utterly unreasonable, foolish or knowingly blind as to compel the conclusion that whatever injury it suffered was its own responsibility.'"  *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, 2022 WL 426199, at *11 (E.D.N.Y. Feb. 11, 2022) (quoting *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 182 (2d Cir. 2007)); *see also Banque Franco-Hellenique de Commerce Intern. Et Maritime, S.A. v. Chirstophides*, 106 F.3d 22, 27 (2d Cir. 1997) (explaining that a party "could not have justifiably relied on statements that he had reason to know were false").  Reliance on the representations here is unreasonable where the representations by the Gallianis themselves were narrowly circumscribed—the representation was "to the best of Seller's *actual knowledge*" that there had not been prior leaks, Dkt. No. 111 at 17—and are not alleged to have been made before the final walkthrough.  The statement that

appears to have been made after the walkthrough was by the Gallianis' attorney, but reliance on this is statement is not reasonable in light of the various merger and disclaimer clauses in the Contract.

In light of the above, the Court cannot read the Second Amended Complaint to give rise to a plausible inference that Higgins' reliance on the statements made with respect to the state of the leaks in the Unit was reasonable. *See Crigger*, 443 F.3d at 234 ("A plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth about an investment."). But even if it were reasonable—or Higgins had pleaded enough to make a reasonableness determination inappropriate at the motion to dismiss stage—the Court would still dismiss this claim for Higgins' failure to plead adequately that the Gallianis' alleged misrepresentations were made with knowledge and the intent to defraud.

While "[a] fraud claim is subject to the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure," "the Second Circuit has recognized in interpreting Rule 9(b) that 'great specificity is not required with respect to allegations of scienter' as 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'" *Winklevoss Cap. Fund, LLC v. Shrem*, 351 F. Supp. 3d 710, 717 (S.D.N.Y. 2019) (applying New York law) (quoting *Conn. Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir. 1987)). "A plaintiff satisfies its burden of pleading with particularity with respect to scienter when it 'specifically plead[s] those events which give rise to a strong inference that the defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'" *Id.* at 718 (quoting *Conn. Nat'l Bank*, 808 F.2d at 962).

Higgins does not plead any facts that could give rise to an inference, much less a strong inference, that the Gallianis had an intent to defraud, knowledge of the falsity of the state of the leaks (assuming for the purposes of this motion only that there was an active leak at the time of the sale), or a reckless disregard for the truth.  In the Second Amended Complaint, she refers to the representations of the leaks in the Unit as "fraudulent," Dkt. No. 89 ¶ 8; alleges that the Gallianis "made deliberate misstatements as to the condition of the [Unit] being without leaks," *id.* ¶ 278, and then recites those statements, *id.* ¶¶ 279–280; states that "Sellers as prior owners of the unit had exclusive knowledge of the defects in the Home," *id.* ¶ 281; and alleges that "[t]he fraudulent statements of the Sellers were intended to and did obstruct Higgins from discovering the truth regarding the Home," *id.* ¶ 290.  But these are all conclusory statements, alleging that the Gallianis had an intent to defraud or suggesting indirectly that they knew the status of the leaks in the Unit at the time they made their representations.  None of these allegations (or others in the Second Amended Complaint) plead *facts* from which the Court could infer that the Gallianis had the requisite mental state to commit fraud.  Absent such allegations, the claim for fraudulent inducement cannot stand.

## CONCLUSION

The motion to dismiss by the Condominium Defendants is GRANTED IN PART and DENIED IN PART as set forth in this Opinion and Order.  The motion to dismiss by the Gallianis is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 93 and 95.

SO ORDERED.

Dated: August 31, 2022
      New York, New York
                                    _____
                                    LEWIS J. LIMAN
                                    United States District Judge

79